UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

GOODRICH QUALITY THEATERS, INC.,

Debtor.

_____/

Case No. DG 20-00759
Hon. Scott W. Dales
Chapter 11

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
Chief United States Bankruptcy Judge

Chapter 11 debtor-in-possession Goodrich Quality Theaters, Inc. (the "Debtor") seeks authority to pay prepetition claims of so-called "critical vendors" – vendors with economic leverage sufficient to halt the case if they refused to continue dealing with the Debtor post-petition. To this end, the Debtor filed the Debtor's Motion for an Order (A) Authorizing Debtor to Pay Prepetition Claims of Critical Vendors and (B) Granting Related Relief (ECF No. 52, the "Critical Vendor Motion"). The Debtor also seeks permission to use cash collateral to make the payments to critical vendors (on account of prepetition claims) as well as payments on specified post-petition claims.

Crediting the urgency expressed in the Critical Vendor Motion, the court set March 4, 2020 as the date for the hearing on shortened notice, as is customary for "first day" motions in larger chapter 11 cases. On the eve of the March 4, 2020 hearing, the Debtor and its primary lenders, CIBC Bank USA for itself and as agent for Macatawa Bank and Independent Bank (collectively the "Lenders") reached agreement on the use of cash collateral, and filed their Emergency Stipulated Motion to Authorize the Debtor to Use Certain Cash Collateral (ECF No. 67, the "Cash Collateral Motion"). In view of their agreement, and the need to use cash to fund operations, the

Debtor and Lenders orally moved during the hearing on the Critical Vendor Motion to further expedite the court's consideration of the Cash Collateral Motion by conducting an interim hearing in conjunction with the hearing regarding critical vendors. Over the objection of the United States Trustee (the "UST"), the court agreed to conduct an interim hearing on the Cash Collateral Motion as Rule 4001(b)(2)[1] allows, making clear that granting any relief at the interim hearing would require, at a minimum, proof by a preponderance of the evidence that the Lenders are the only entities with an interest in cash collateral. This is not to say that the Lenders are the only creditors with an interest in the hearing on the Cash Collateral Motion, rather that they represent the universe of stakeholders with a property interest in the collateral at issue.[2]

At today's hearing, the Debtor, the Lenders, the Debtor's principal (Robert E. Goodrich), and the UST all appeared through counsel. The court took testimony from a single witness and admitted three exhibits. In addition, the parties agreed that the court could consider the two declarations of Mr. Goodrich submitted in connection with the first day motions. The UST opposes both the Cash Collateral Motion and the Critical Vendor Motion, on procedural and substantive grounds.

The following constitutes the court's findings of fact and conclusions of law in accordance with Rule 52, made applicable here by Rules 7052 and 9014. Given the urgency of the situation – Mr. Pettinga testified that the Debtor had to fund payroll and weekly film-licensing payments by

---

[1] The court will refer to any Federal Rule of Bankruptcy Procedure or Federal Rule of Civil Procedure simply as "Rule ___," relying on the numbering convention for each set of rules to identify the intended reference. Also, unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

[2] Based on the credible testimony of the Debtor's Chief Financial Officer, Ross C. Pettinga, the court finds for purposes of today's hearing that the Lenders are the only entities with an interest in the Debtor's cash collateral within the meaning of § 363(a).

tomorrow -- this opinion is necessarily abbreviated.  The court will first address the Critical Vendor Motion before turning to the Cash Collateral Motion.

The Debtor operates a chain of 30 multiplex movie theaters, mostly directly but at least one in conjunction with another investor, with 267 screens in 5 states, conducted with the help of approximately 1,150 employees.  The company, based in Kentwood, Michigan, is wholly owned by Robert E. Goodrich, the son of its founder.  In one form or another, the Debtor has been in business in Grand Rapids since 1930.  The Declaration of Robert E. Goodrich, admitted with the consent of the parties, explains that the Debtor recently expended substantial sums of money -- $20 million in the last five years – improving and upgrading theaters.  At the same time, the onset of "on-line streaming" of entertainment content has taken its toll. The Debtor's annual sales have dropped precipitously in the last two years, decreasing from over $91 million in fiscal year 2018 to $84 million in fiscal year 2019.  The resulting illiquidity caused the Debtor to default in meeting its obligations to the Lenders under the prepetition loan agreements.  Mr. Pettinga estimated that the Debtor owes the Lenders approximately $30 million, secured by an "all asset" security agreement and related financing statement.

Just prior to filing, the Debtor and the Lender entered into a forbearance agreement, but when the Lenders sent a default notice to the Debtor under that agreement, the Debtor filed a voluntary petition for relief under chapter 11, hastily and without adequate planning in the court's view.  This precipitated the problems this case has had to overcome thus far.

This weekend, the Debtor retained experienced bankruptcy counsel and the retention prompted the Lenders to withdraw, without prejudice, their motion for appointment of a trustee under § 1104 or dismissal under § 1112.

In the first week of the case, the Lenders, with the court's permission, advanced substantial sums to fund the Debtor's prepetition payroll obligations.

The UST has not yet appointed an official committee, which the court suspects is due largely to the Debtor's erroneous election to proceed as a small business debtor under the newly minted Small Business Reorganization Act of 2019, which precludes the appointment of committees.

1.   Critical Vendor Motion

One searches the Bankruptcy Code in vain for express statutory authority for payment of prepetition claims in chapter 11, except pursuant to a confirmed plan, yet bankruptcy courts generally, though begrudgingly, authorize such payments under § 105(a) and the "Doctrine of Necessity" or "Necessity of Payment Doctrine" first acknowledged in early railroad reorganizations. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999); *In re CoServ*, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991); *see also In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988) (Cole, J.) (stating, in *dicta*, that the court can conceive of rare instances in which the payment of a pre-petition debt may be absolutely vital to the reorganization of a Chapter 11 debtor, based on factual findings).

The decision from the bankruptcy court in the Northern District of Texas in *CoServ*, which the Debtor cites as authority for paying prepetition claims, provides a useful framework for approaching the problem of critical vendors, by which the court means creditors whose continued participation in the financial affairs of a debtor will make the difference between the life or death of the enterprise.  With less drama, the bankruptcy court of the Southern District of Ohio described

a payment to a critical vendor as one that is "necessary to avert a serious threat to the chapter 11 process." *In re Eagle–Picher Indus., Inc.*, 124 B.R. at 1023.  The court finds persuasive and helpful the *CoServ* court's articulation of the three conditions for authorizing payment of a prepetition claim of a so-called "critical vendor":

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*CoServ,* 273 B.R. at 498. After listening to the credible testimony of Mr. Pettinga, the court finds that only the following eight film companies meet this stringent test: Walt Disney, Universal, LionsGate, SONY, STX Financing, Warner Bros., Paramount, and United Artists (the "Critical Vendors").  There was absolutely no testimony to support treating any other creditors as "critical" within the meaning of *CoServ* and similar authorities.  The court does not doubt that popcorn, popcorn oil, soft drinks and Goobers are critical to the success of a modern movie chain, but this means only that the products are critical, not the vendors who supply them.  There was no vendor-specific testimony to persuade the court to permit the Debtor to depart from the usual practice in bankruptcy proceedings that creditors must await payment until confirmation of a plan. Unlike testimony about Walt Disney, for example, who literally holds a monopoly on the electronic key to its licensed films, the Debtor offered no similar testimony regarding the concessions or vendors listed on Exhibit 2.[3]

---

[3] The record supports the conclusion, however, that the Payroll Total and Film Total on Exhibit 2 represent post-petition claims.

Although Mr. Pettinga was more specific about the Debtor's dealings with Walt Disney and Universal than the others, the court infers that the relationships with the Critical Vendors work in roughly the same fashion and that, as between the Debtor and the suppliers of its films, the suppliers hold all the cards.   For example, Mr. Pettinga explained that the Debtor obtains the right to show films pursuant to various master licensing agreements pursuant to which the Critical Vendors deliver the films to the Debtor electronically by sharing each week a "KDM" or key that functions as a password to unlock access to the film content.  Mr. Pettinga stated that the Debtor generally pays the Critical Vendors each week for a "cycle" that runs from Friday to Thursday. Although some of the Critical Vendors have until recently given the Debtor "thirty-day terms," the Debtor makes payments weekly and in arrears.  According to Mr. Pettinga's credible testimony, if the Critical Vendors do not receive their weekly payment, they have the capacity to electronically prohibit the Debtor's access to the company's films, essentially by changing the KDM password or key.  As he stated, gone are the days when the Debtor uses actual celluloid film reels that it could, conceivably, continue showing through the mere power of possession.  Digital delivery puts greater power in the vendor's hands.  Mr. Pettinga stated that he understands the Critical Vendors, as a matter of industry practice, have broad discretion to decide whether to permit access to their licensed films, or not.

The court finds that without the films to be supplied by the Critical Vendors the Debtor's business would cease, making the loss of going concern value incalculable and irreparable.

By way of example, Mr. Pettinga testified that Walt Disney has advised that it will not grant the Debtor access to this week's new release of "Onward" unless the Debtor pays its account current.  Universal made a similar announcement.  Although Mr. Pettinga did not give specific examples of similar "conditions" to release of the KDM from other Critical Vendors, the court

infers that others in the industry would follow suit and deprive the Debtor of access to their films. It should go without saying, although Mr. Pettinga said it, that a movie theater cannot operate without movies that the public wants to see. The Critical Vendors control access to these films. The *CoServ* test is met as to the Critical Vendors.

Based on Mr. Pettinga's testimony, Exhibit 3, and reasonable inferences to be drawn from both, the following table summarizes the prepetition claims of each Critical Vendor that the court will authorize the Debtor to pay (subject to the court's ruling on the Cash Collateral Motion):

| VENDOR | AMOUNT |
|---|---|
| Walt Disney | $283,613.45 |
| Universal | $388,666.10 |
| LionsGate | $ 12,636.46 |
| SONY | $179,779.92 |
| STX Financing | $ 40,938.58 |
| Warner Bros. | $ 24,362.77 |
| Paramount | $ 14,021.98 |
| United Artists | $ 17,689.25 |
| **Total** | **$961,708.51** |

This finding means, for example, that the Debtor may pay Walt Disney on account of its prepetition claim not more than $283,613.45, even if it achieves savings by negotiating a lower payment to, say, Warner Bros. If the Debtor negotiates a lower payment to a Critical Vendor, today's opinion does not stand in the way of that discount but neither does it authorize paying other vendors or paying more than the amounts listed to other Critical Vendors.

In opposing the Critical Vendor Motion, the UST expresses a concern, which the court shares, that allowing payment of prepetition claims to some but not all unsecured creditors violates the bankruptcy principle of *pro rata* distribution – similarly situated creditors should be paid similarly. The court's finding of the extraordinary power of the Critical Vendors, however,

suggests that they are not situated similarly to other vendors with less market power -- vendors whose products the Debtor might obtain elsewhere.

In raising the principle of *pro rata* distribution as the sole touchstone of bankruptcy, the UST cites § 1122 and the cram-down requirement of § 1129(b) (that a plan must be fair and equitable) as the legal rationale for denying the Critical Vendor Motion.  *See* UST Response at p. 14 (ECF No. 65).  At this stage of the proceedings, these references seem more hypothetical than helpful.  Who is to say that creditors relying on the Debtor as a going concern would not consent to favorable treatment for vendor-creditors whose participation is, in a word, "critical" to the reorganization?  If so, the cram down provisions and the "fair and equitable" test may not come into play.  And, as for § 1122, it is not at all clear that the Debtor must lump the Critical Vendors in the same class as others. "Section 1122(a) does not demand that all similar claims be in the same class." *In re Dow Corning Corp*., 280 F.3d 648, 661 (6th Cir. 2002) (citations omitted). Indeed, it has long been held that the bankruptcy court has substantial discretion to place similar claims in different classes according to the "factual circumstances" of a particular case. *Id.* The question is one of good faith and the court has no reason to doubt the Debtor's good faith at this time.

Indeed, even the United States Supreme Court suggested, albeit in *dicta*, that "interim distributions that violate ordinary priority rules" may be justified by reference to "significant Code-related objectives that the priority violating distributions serve," including, as specific examples, first-day orders authorizing payment of prepetition wages or critical vendors. *See Czyzewski v. Jevic Holding Corp*., 137 S. Ct. 973,  985-86 (2017).  The Supreme Court in *Jevic Holding* rejected the structured dismissal at issue in that case not because it violated the general priority scheme of chapter 11, but because it did so in an order that brought the reorganization to an end.  Tellingly, the Supreme Court observed:

> By way of contrast [to first day wage and other critical vendor orders], in a structured dismissal like the one ordered below, the priority-violating distribution is attached to a final disposition; it does not preserve the debtor as a going concern; it does not make the disfavored creditors better off; it does not promote the possibility of a confirmable plan; it does not help to restore the status quo ante; and it does not protect reliance interests.

*Id.*    The Supreme Court cited *Toibb v. Radloff*, 501 U.S. 157, 163–64 (1991) for the proposition that "permitting business debtors to reorganize and restructure their debts in order to revive the debtors' businesses" and "maximizing the value of the bankruptcy estate" are also purposes of the Bankruptcy Code. The principle of *pro rata* distribution upon with the UST relies does not stand alone or above these other motivating policies.  The Supreme Court's decision in *Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999), is to similar effect.[4] In short, in order to have a *pro rata* distribution, courts sometimes have to take steps to preserve the possibility of any distribution at all.

Finally, the court notes that Rule 6003(b) itself contemplates the payment of prepetition claims but only upon a showing of irreparable harm.  Although the advisory committee notes may be read to suggest that the payment of prepetition claims relates to cure payments associated with assumption of executory contracts under § 365, the text of the rule is not so limited.

The statutory predict for authorizing the payment of the Critical Vendors in the amounts specified above is § 363 because such payment obviously involves the use of estate property, and § 1107, because the Debtor has a trustee's fiduciary duty to protect estate assets.  As its rationale

---

[4] Although these cited passages from *Jevic Holding* are probably *dicta*, the Sixth Circuit teaches that lower courts "are obligated to follow Supreme Court *dicta*, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." *Ellmann v. Baker (In re Baker)*, 791 F.3d 677, 682 (6th Cir. 2015).  The court perceives no reason for ignoring the Supreme Court's reminder that preserving asset value and the chance to reorganize are also worthy goals – goals that, on a proper showing might justify non-plan or interim distributions seemingly inconsistent with the principle of *pro rata* distribution.

for departing from the principle of *pro rata* distribution, the court relies on the competing bankruptcy principles identified in *Jevic Holding*, *Radloff,* and *203 N. LaSalle St. P'Ship.* – the preservation of going concern value and prospects for reorganization.

The court will grant the Critical Vendor Motion only to the extent set forth above, and subject to the authority to use cash collateral.

2.  Cash Collateral Motion

The court routinely authorizes the use of cash collateral when all entities with an interest in the cash collateral consent, and sometimes even when they do not.  Here, all entities consent which means, as a statutory matter, the court's order is unnecessary.  It is only because the Debtor and the Lenders are asking the court to approve their agreement, including the adequate protection to the Lenders for the use of their cash collateral, that the court must hold a hearing.  *See* 11 U.S.C. § 363(c)(2).

The UST opposes the Cash Collateral Motion, and again largely on grounds that the terms of use give the Debtor too much discretion, and that notice of the request is insufficient, generally because the Debtor's 20 largest creditors have not been served.  The objection is certainly not frivolous, and the UST's ardent defense of the rules is compelling.  Nevertheless, being satisfied that the only entities who will be harmed by authorizing the use of Cash Collateral are the Debtor and the Lenders, the court overrules the UST's objections.

First, again relying on Mr. Pettinga and Exhibit 2, the record supports the Debtor's need to fund post-petition payroll obligations -- tomorrow -- in the amount of approximately $385,000.00. Mr. Pettinga, as "CFO," is familiar with the Debtor's cash management systems and regular cash

needs including payroll.  A chain of movie theaters and probably any other corporate debtor cannot act without agents and most agents will not work without pay.  The need to make payroll in order to avoid irreparable harm is practically self-evident.  Although the $10,000.00 proposed payment to Mr. Goodrich strikes the court as high under the circumstances, the court has no basis to reduce the payment other than its impression that the rate is too high.  Nothing in today's order should be construed as blessing the arrangement going forward, after the UST or creditor representatives have an opportunity to inquire.

Second, with respect to the post-petition weekly payments for film licensing on Exhibit 2, Mr. Pettinga's testimony in connection with the Critical Vendor Motion applies equally to post-petition licensing fees and the court has no reason to doubt the figures on Exhibit 2 or Mr. Pettinga's testimony in this respect.  As noted above, the payment of post-petition weekly licensing fees is crucial to the preservation of the Debtor's business.  The court credits Mr. Pettinga's testimony, which fortifies Exhibit 2, that the Debtor must pay $375,000.00 in licensing fees by tomorrow to ensure a stream of films for the coming week.   Without the payment, irreparable harm would almost certainly follow, as movie fans go elsewhere.

Third, as noted above with respect to the Critical Vendor Motion, the Debtor will have to pay as much as $961,708.51 to the likes of Walt Disney and Universal to preserve going concern value and avoid irreparable harm.

With respect to the additional amounts on Exhibit 2, including concessions, the Debtor has not provided a budget and not offered any specific and persuasive testimony about the need to pay concession and general vendors before the hearing on March 6, 2020 that the court initially set to consider cash collateral issues.  Payment on this score is not yet allowed.

Accordingly, the court will authorize the Debtor to use the sum of $1,721,708.00 for payroll and film licensing fees (pre and post-petition) as outlined in this opinion. The court will consider additional authority to use cash collateral at the hearing on March 6, 2020.

As for adequate protection, the Lenders' request is surprisingly modest, in effect limited to replacement liens on post-petition cash collateral, and administrative claims with ordinary and super priority to address the possible failure of adequate protection (for example, if the reduction in the Debtor's bank balances is not replenished through post-petition sales).

The only provisions in the Debtor's agreement with the Lenders that excited any meaningful controversy were the adequate protection payment (in an unspecified amount to commence on April 1, 2020) and the provisions [i] regarding the "validity or perfection of [the Lenders'] prepetition liens or [ii] that release claims against [the Lenders]." *See* Amended Coversheet for Motion to Use Cash Collateral or to Obtain Credit (ECF No. 70).

Given the court's and the UST's concerns about notice, the court is willing to approve adequate protection for the diminution of cash collateral that the Debtor uses between the entry of this opinion and the March 6, 2020 hearing in the form of replacement liens on all after-acquired, created, or arising estate property, and allowed super-priority claims under § 507(b) for failure of adequate protection during the same period. The court, however, is not yet willing to approve the adequate protection payment because the parties have established no urgency (with the first payment to be made on April 1, 2020), and in any event the amount of the payment is nowhere specified. The court does not authorize blank checks.

Finally with respect to adequate protection in the form of the Debtor's statement approving the Lenders' perfected status, the court will not disturb that statement as it applies to adequate

protection for diminution between the entry of this opinion and the March 6, 2020 hearing, and will, in addition, preserve for 45 days after the formation of an official committee, the right of the committee to challenge the Lenders' security interests, validity, perfection, and otherwise. The court notes that the Debtor's statement regarding the validity and perfection of the Lenders' security interest most likely reiterates statements included within a typical forbearance agreement for $30 million secured debt, likely minimizing the import of this aspect of adequate protection in any event.

     3.  <u>Conclusion and Order</u>

The court recognizes the importance of this longtime local company to the people it employs and the generally smaller communities it serves. The court also acknowledges that the only persons who will likely suffer as a result of today's decision are the Debtor and the Lenders, all of whom support the relief provided herein and are betting heavily on the Debtor with the Lenders' collateral. Similarly, any upside from today's decision in terms of estate preservation or possible reorganization will likely be shared with the creditors, including the 20 largest, who could not participate in today's hearing given the court's decision to expedite its consideration of the motions. The UST's objections premised on the notice to unsecured creditors, though weighty, must yield to the Bankruptcy Code's other goals and the interest of creditors, especially given the court's conclusion that today's decision will not meaningfully prejudice them.

For the foregoing reasons, the Cash Collateral Motion and the Critical Vendor Motion are granted to the extent provided herein. Any need for clarification of the court's rulings, for example in the form of a separate order, can be addressed at the March 6, 2020 hearing. For now, the parties may rely on this Memorandum of Decision and Order as authority for the use of cash collateral,

adequate protection, and the payment of the Critical Vendors only to the extent provided (and subject to the conditions outlined) herein, pending the second interim hearing to take place this Friday.

The Clerk shall serve a copy of this Memorandum of Decision and Order pursuant to Rule 9022 and LBR 5005-4 upon (a) the Debtor; (b) the United States Trustee; (c) the Lenders' counsel; (d) entities appearing on the Debtor's mailing matrix; and (e) any party who has filed a notice of appearance or request for notice.

**IT IS SO ORDERED.**

**IT IS SO ORDERED.**



**Dated March 4, 2020**

Scott W. Dales
United States Bankruptcy Judge