***Personal and Confidential***

Second Amended and Restated Engagement Agreement

As of March 5, 2020

Goodrich Quality Theaters, Inc.
4417 Broadmoor Ave SE
Grand Rapids, MI 49512
Attn: Robert Goodrich, President

Dear Bob:

This letter agreement (this "Agreement") confirms the terms under which Goodrich Quality Theaters, Inc. (collectively with its direct and indirect subsidiaries, the "Company") has engaged Stout Risius Ross Advisors, LLC ("Stout"), effective as of the engagement letter executed by the parties (the "Initial Agreement") on or about November 8, 2019 (the "Effective Date"), thereafter amended on February 13, 2020 (the "First Amended and Restated Agreement"), and amended once again as of the date indicated above (the "Second Amended and Restated Agreement", collectively referenced herein with the First Amended and Restated Agreement as the "Amendments"), as its exclusive financial advisor to provide financial advisory and investment banking services in connection with one or more financing transactions and/or one or more merger and/or acquisition transactions involving the Company and with respect to such other financial matters as to which the Company and Stout may agree in writing during the term of this Agreement. Stout hereby acknowledges and agrees that the Company's engagement of a chief restructuring officer, turnaround consultant and/or other similar professionals to provide advisory services to the Company shall not violate or be a breach of the terms of this Agreement, including Section 2 of this Agreement.

1.  **Services.** In connection with each potential Transaction (as defined below), Stout will assist and advise the Company with the analysis, evaluation, pursuit and effectuation of any such Transaction. Stout's services will consist of, if appropriate and if requested by the Company, (i) assisting the Company in the development and distribution of selected information, documents and other materials, including, if appropriate, advising the Company in the preparation of an offering memorandum; (ii) assisting the Company in evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers and/or strategic partners; (iii) assisting the Company with the negotiation of any Transaction(s), including participating in negotiations with creditors and other parties involved in any Transaction(s); (iv) providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary; (v) attending meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company and Stout mutually agree; and (vi) providing such other financial advisory and investment banking services as may be required by additional issues and developments not anticipated on the Effective Date, as described in Section 17 of this Agreement.

2.  **Exclusive Agency.** The Company agrees that neither it nor its management will initiate any discussions regarding a Transaction during the term of this Agreement, except with prior consultation with Stout. In the event the Company or its management receives any inquiry regarding a Transaction from any party, the Company shall promptly inform Stout of such inquiry so that Stout can assist the Company in evaluating such party and its interest in a Transaction and in any resulting negotiations.

3. **Fees.** In consideration of Stout's acceptance of this engagement, the Company shall pay the following:

(i) *Monthly Fees:* In addition to the other fees provided for herein, upon the execution of this Second Amended and Restated Agreement, and on every monthly anniversary of the execution of the Second Amended and Restated Agreement thereafter, the Company shall pay Stout a nonrefundable cash fee of $35,000 ("Monthly Fee"). Each Monthly Fee shall be earned upon Stout's receipt thereof in consideration of Stout accepting this engagement and performing services as described herein. With respect to any Monthly Fees previously paid on a timely basis to Stout, $10,000 of each such Monthly Fee payment shall be credited against any Transaction Fee (as defined below) to which Stout becomes entitled hereunder (it being understood and agreed that no Monthly Fee shall be credited more than once). Further, with respect to any sale transaction consummated with Classic Cinemas, a division of Tivoli Enterprises, Inc. or the Marcus Group, an additional $12,500 of any Monthly Fees previously paid on a timely basis to Stout shall be credited against any Transaction Fee (as defined below) to which Stout becomes entitled hereunder ; and

(ii) *Transaction Fee(s)*: In addition to the other fees provided for herein, the Company shall pay Stout the following transaction fee(s):

   a. *Sale-Leaseback Fee.* Upon the closing of each Sale-Leaseback Transaction (as defined below), Stout shall earn, and the Company shall thereupon pay directly from the gross proceeds of such Sale-Leaseback Transaction, a cash fee ("Sale-Leaseback Fee") equal to 3.0% of the gross proceeds of any Sale-Leaseback Transaction

   b. *Partial Sale Transaction Fee.* Upon the closing of each Partial Sale Transaction (as defined below), Stout shall earn, and the Company shall thereupon pay directly from the gross proceeds of each such Partial Sale Transaction, as a cost of such Partial Sale Transaction, a cash fee ("Partial Sale Transaction Fee") equal to the greater of (i) $200,000 or (ii) 3.0% of the Aggregate Gross Consideration ("AGC") for each transaction, including the sale of individual theaters or a subset of theaters.

   c. *Complete Sale Transaction Fee.* Upon the closing of a Complete Sale Transaction (as defined below), Stout shall earn, and the Company shall thereupon pay directly from the gross proceeds of such Complete Sale Transaction, as a cost of such Complete Sale Transaction, a cash fee ("Complete Sale Transaction Fee") equal to 3.0% of the Aggregate Gross Consideration ("AGC") for the transaction.

   d. *Financing Transaction Fee.* Upon the closing of each Financing Transaction (as defined below), Stout shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, as a cost of such Financing Transaction, a cash fee ("Financing Transaction Fee") equal to the sum of: (i) 2.0% of the gross proceeds of any indebtedness raised or committed that is senior to other indebtedness of the Company, secured by a first priority lien and unsubordinated, with respect to both lien priority and payment, to any other obligations of the Company (other than with respect to debtor-in-possession financing); (ii) 4.0% of the gross proceeds of any indebtedness raised or committed that is secured by a lien (other than a first lien), is unsecured and/or is subordinated; and (iii) 6.0% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or committed. It is understood and agreed that if the proceeds of any such Financing Transaction are to be funded in more than one stage, Stout shall be entitled to its applicable compensation hereunder upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities whether such sale has been arranged by Stout, by another agent (or other issuer of the Securities (as defined below) in such Financing Transaction) or directly by the Company.

Any non-cash consideration provided to or received in connection with the Financing Transaction (including but not limited to intellectual or intangible property) shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of Securities issued in exchange for such consideration multiplied by (in the case of debt securities) the face value of each such Security or (in the case of equity securities) the price per Security paid in the then current round of financing. The fees set forth herein shall be in addition to any other fees that the Company may be required to pay to any investor or other purchaser of Securities to secure its financing commitment.

Any Sale-Leaseback Fee, Financing Transaction Fee, Partial Sale Transaction Fee and Complete Sale Transaction Fee is each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees." All payments received by Stout pursuant to this Agreement at any time shall become the property of Stout without restriction. No payments received by Stout pursuant to this Agreement will be put into a trust or other segregated account. Notwithstanding anything contained herein to the contrary, Stout shall not be entitled to any Transaction Fee or any other fees due under this Agreement, except for the Monthly Fee, if a Transaction or any other transaction, including, without limitation, any debtor-in-possession financing or credit bid, is consummated with CIBC Bank USA and/or any "Lender" as defined in or under the senior credit facilities and/or any of their successors, assigns or affiliates (individually and collectively, the "Excluded Party").

4.   **Term and Termination.** This Agreement may be terminated at any time by either party upon thirty days' prior written notice of termination to the other party. The expiration or termination of this Agreement shall not affect (i) any provision of this Agreement other than Sections 1 through 3 and (ii) Stout's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due, whether or not any Transaction shall be consummated prior to or subsequent to the effective date of expiration or termination, as more fully set forth in this Agreement.

In addition, notwithstanding the expiration or termination of this Agreement, Stout shall be entitled to full payment by the Company of the Transaction Fees described in this Agreement: (i) so long as a Transaction is consummated during the term of this Agreement, or within 9 months after the date of expiration or termination of this Agreement ("Tail Period"), and/or (ii) if an agreement in principle to consummate a Transaction is executed by any entity comprising the Company during the term of this Agreement, or within the Tail Period, and such Transaction is consummated at any time following such execution with the counterparty named in such agreement, or with any affiliate or employee of, or investor in, such counterparty, or any affiliate of any of the foregoing.

5.   **Transaction.** As used in this Agreement, the term "Transaction" shall mean any of the following:

   (i) *Sale-Leaseback Transaction.* Any transaction or series of related transactions that constitutes the sale of real property and the subsequent leasing of the divested property back to the Company; or

   (ii) *Partial Sale Transaction.* Any transaction or series of related transactions that constitute the disposition of one or more theaters to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity (except for any Excluded Party), and also including, among others, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company and/or the affiliates of each, except for any Excluded Party) in one or a series of related transactions (each a "Partial Sale Transaction"; or

   (iii) *Complete Sale Transaction.* Any transaction or series of related transactions that constitute the disposition of (a) all or a material portion of the equity securities of any entity comprising the Company or any interest held by any entity comprising the Company and/or (b) any

significant portion of the assets (including the assignment of any executory contracts) or operations of any entity comprising the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction, including, without limitation, any sale transaction under Sections 363, 1129 or any other provision of Title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") (each a "Sale Transaction"); or

(iv) *Financing Transaction.* (a) Any transaction or series of related transactions that constitutes any refinancing of all or any portion of the existing obligations of any entity comprising the Company and/or (b) the placement, raising or issuance of any form of equity, equity-linked or debt securities (including, without limitation, any convertible securities, preferred stock, unsecured, non-senior or subordinated debt securities, and/or senior notes or bank debt) or any loan or other financing, including any "debtor in possession financing" (other than a debtor in possession financing provided by the existing lenders to the Company) or "exit financing" in connection with a case under the Bankruptcy Code by any entity comprising the Company (any or all of which being "Securities"), from any source (except for any Excluded Party) including, without limitation, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company (whether or not such transaction is effectuated in-court, out-of-court, through the confirmation of a plan of reorganization or otherwise under the Bankruptcy Code, or whether the requisite consents to such transaction(s) are obtained in-court or out-of-court) (each a "Financing Transaction").

6.  **Aggregate Gross Consideration ("AGC").** For the purpose of calculating the Sale Transaction Fee, the AGC shall be the gross proceeds and other consideration paid to, or received by, or to be paid to or received by, any entity comprising the Company, or any of its equity or debt holders, or other parties in interest, including, without limitation, holders of warrants and convertible securities, and holders of options or stock appreciation rights, whether or not vested (collectively "Constituents"), in connection with the relevant Sale Transaction. Such proceeds and consideration shall be deemed to include, without limitation: amounts in escrow and any deposits or other amounts forfeited by any investor; cash, notes, securities, and other property; payments made in installments; Contingent Payments (as defined below) and/or insurance proceeds upon the occurrence of an insurable event that diminishes the value of the Company. Upon the closing of a Sale Transaction in which less than 100% of the ownership of the equity interests are sold, the AGC shall be calculated as if 100% of the ownership of the equity interests of the Company on a fully diluted basis had been sold by dividing (i) the total consideration, whether in cash, securities, notes or other forms of consideration, received or receivable by the Company and/or its Constituents by (ii) the percentage of ownership which is sold. If, in the Sale Transaction, no consideration is being paid in respect of the existing equity, AGC of the retained equity shall be determined by the good faith agreement of the parties as to the value of such retained equity implied by the Sale Transaction. In addition, if any of the liabilities of any entity comprising the Company are assumed, decreased, reinstated, satisfied or otherwise paid off in conjunction with a Sale Transaction (by any entity comprising the Company or any investor, in the form of "cure" payments or otherwise), or any of the assets of any entity comprising the Company are sold or otherwise transferred outside of the Company's ordinary course of business to another party prior to the closing of a Sale Transaction (including, without limitation, any dividends or distributions paid to security holders or amounts paid to repurchase any securities) or are retained by any entity comprising the Company after the closing of the Sale Transaction, the AGC will be increased to reflect the face value of any such liabilities and the fair market value of any such assets. Contingent Payments shall be defined as the consideration received or receivable by the Company, or any of its Constituents and/or any other parties in the form of deferred performance-based payments, "earn-outs", or other contingent payments based upon the future performance of any entity comprising the Company, or any of its businesses or assets.

7.  **Value of Consideration.** For the purpose of calculating the AGC received in a Sale Transaction, any securities, other than a promissory note, will be valued at the time of the announcement of the Sale Transaction, without regard to any restrictions on transferability, as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading day period ending two days prior to the announcement of the Sale Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period ending two days prior to the announcement of the Sale Transaction; and (iii) if such securities have not been traded prior to the announcement of the Sale Transaction, Stout and the Company shall negotiate in good faith to agree on a fair valuation thereof, without regard to any restrictions on transferability, for the purposes of calculating the AGC. For any lease payments and other consideration that is not freely tradable or has no established public market, if the consideration utilized consists of property other than securities, then the value of such property shall be the fair market value thereof as determined in good faith by Stout and the Company. If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable. The value of any purchase money or other promissory notes shall be deemed to be the face amount thereof. In the event the AGC includes any Contingent Payments, Stout's Transaction Fee shall be calculated based on the mutually agreed value of such Contingent Payments as of closing. If the parties cannot reach such an agreement, an additional Sale Transaction Fee shall be paid to Stout from, and on account of, such Contingent Payments at the same time that each of such Contingent Payments are received regardless of any prior termination or expiration of this Agreement. Each such additional Sale Transaction Fee shall be calculated pursuant to the provisions of this Agreement based upon the amount of each such Contingent Payment.

8.  **Characterization of Multiple and/or Complex Transactions.** For the avoidance of doubt, if two or more single Transactions occur simultaneously or at different times, whether or not they are connected with or related to one another, the Company shall pay Stout the Transaction Fee for each such Transaction in addition to, and not in lieu of, each other.

9.  **Reasonableness of Fees.** The parties acknowledge that this engagement will require a substantial professional commitment of time and effort by Stout. Moreover, the amount of time and effort may vary substantially during different periods of the engagement. As a result, in order to ensure the availability of all necessary professional resources, whenever required, Stout may be foreclosed from pursuing other alternative engagement opportunities. In light of the foregoing, and given: (i) the numerous issues which can currently be anticipated in engagements such as this, (ii) Stout's commitment to the variable level of time and effort necessary to address such issues, (iii) the expertise and capabilities of Stout that will be required in this engagement, and (iv) the market rate for Stout's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Stout, and provides the requisite certainty to the Company. The parties further agree and acknowledge that: (a) additional issues and developments, not currently anticipated, may arise and have an impact upon the services to be rendered by Stout hereunder, and may result in substantially more work and/or services being performed by Stout than is anticipated at this time; and (b) as a result of such unanticipated issues and/or developments, the results of Stout's services under this Agreement may also be substantially more beneficial than anticipated at this time. Accordingly, in the event of the occurrence of (a) and/or (b), in the prior sentence, each of the parties to this Agreement may, at the conclusion of the services rendered by Stout pursuant hereto, agree to a modification of the Transaction Fees described herein to more appropriately reflect the actual work performed, services rendered and/or any extraordinary results achieved by Stout pursuant to its engagement hereunder.

10. **Expenses.** In addition to all of the other fees and expenses described in this Agreement, and regardless of whether any Transaction is consummated, the Company shall, upon Stout's request, reimburse Stout for its reasonable out-of-pocket expenses incurred from time to time in connection with its services hereunder. Stout bills its clients for its reasonable out-of-pocket expenses including, but not limited to (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Stout may receive from, or fixed-fee arrangements made with, travel agents, airlines or other

vendors, and (ii) research, database and similar information charges paid to third party vendors, and postage, telecommunication and duplicating expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment or percentage of the fees due to Stout. In no event shall Stout exceed $35,000 in total reimbursable expenses during the term of this engagement without the prior written consent of the Company.

11. **Invoicing and Payment.** All amounts payable to Stout shall be made in lawful money of the United States in accordance with the payment instructions set forth on the invoice provided with this Agreement, or to such accounts as Stout shall direct, and the Company shall provide contemporaneous written notice of each such payment to Stout.

12. **Information.** The Company will provide Stout with access to management and other representatives of the Company and other participants in the Transaction, as reasonably requested by Stout. The Company will furnish Stout with such information as Stout may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's best knowledge, accurate and complete at the time furnished. The Company further represents and warrants that any financial projections delivered to Stout have been or will be reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of the future financial results and condition of the Company. The Company will promptly notify Stout in writing of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to, or discussed with, Stout, or any materials provided to any interested party. Stout shall rely, without independent verification, on the accuracy and completeness of all information that is publicly available and of all information furnished by or on behalf of the Company or any other potential party to any Transaction or otherwise reviewed by, or discussed with, Stout. The Company understands and agrees that Stout will not be responsible for the accuracy or completeness of such information, and shall not be liable for any inaccuracies or omissions therein. The Company acknowledges that Stout has no obligation to conduct any appraisal of any assets or liabilities of the Company or any other party or to evaluate the solvency of any party under any applicable laws relating to bankruptcy, insolvency or similar matters. Stout's role in reviewing any information is limited solely to performing such a review as it shall deem necessary to support its own advice and analysis and shall not be on behalf of any other party. Any advice (whether written or oral) rendered by Stout pursuant to this Agreement is intended solely for the use of the Board of Directors of the Company (solely in its capacity as such) in evaluating a Transaction, and such advice may not be relied upon by any other person or entity or used for any other purpose. Any advice rendered by, or other materials prepared by, or any communication from, Stout may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of Stout. In addition, neither Stout nor the terms of this Agreement may otherwise be referred to without our prior written consent.

13. **Additional Provisions Regarding Financing Transaction.** The Company authorizes Stout to provide an information memorandum (or similar document) (as such document may be amended or supplemented and including any information incorporated therein by reference, the "Information Memorandum") and other pertinent information to prospective investors and other purchasers which are approved by the Company and subject to execution by each such prospective investor or other purchaser of a confidentiality agreement and agrees not to transmit the Information Memorandum to prospective investors or other purchasers without Stout's prior approval. The Company will be solely responsible for the contents of the Information Memorandum and any and all other written or oral communications provided by or on behalf of the Company to any actual or prospective investor or other purchaser. The Company represents and warrants that the Information Memorandum and such other communications will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. If an event occurs as a result of which the Information Memorandum (as then supplemented or amended) would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, the Company will promptly notify Stout of such event and Stout will

suspend solicitations of prospective investors and other purchasers until such time as the Company prepares (and the Company agrees that, if the solicitation of prospective investors and other purchasers has been so suspended after the Company has accepted orders from prospective investors or other purchasers, the Company will promptly prepare) a supplement or amendment to the Information Memorandum which corrects such statement(s) or omission(s). The Company will (i) make available to each bona fide offeree of the Securities such information (in addition to that contained in the Information Memorandum) concerning the offering of the Securities, the Company and any other relevant matters, and (ii) provide each bona fide offeree the opportunity to ask questions of, and receive answers from, the officers and employees of the Company concerning the terms and conditions of the offering of the Securities.

The Company acknowledges that closing of a Financing Transaction is subject, among other factors, to acceptable documentation, market conditions, and satisfaction of the conditions set forth in one or more agreements to be entered into with any financier, lender, investor or other purchaser of Securities. It is expressly understood that this engagement does not constitute any commitment, express or implied, on the part of Stout to acquire, and does not ensure the successful placement of, any portion of the Securities. The Company further acknowledges and agrees that Stout is not acting as an underwriter of the Securities and shall have no responsibility or obligation to underwrite the Securities.

In connection with all offers and sales of the Securities, the Company will cause to be addressed and delivered to Stout a written opinion of Company counsel acceptable to Stout containing (i) an opinion to the effect that the placement of Securities was exempt from registration under the Securities Act of 1933, as amended (the "Act"), and (ii) any other opinions of counsel that have been provided to investors or other purchasers of the Securities or which Stout may reasonably request. The Company also will cause to be furnished to Stout at or after each closing of a sale of Securities copies (addressed to Stout, if requested and as appropriate) of such agreements, opinions, certificates and other documents (including, without limitation, accountant's letters) as Stout may reasonably request. The Company hereby acknowledges and agrees that Stout shall be entitled to rely upon the representations and warranties made (whether pursuant to a subscription agreement or in any other format) to investors or other purchasers of Securities and the Company shall be deemed to have made such representations and warranties to and for the benefit of Stout.

It is understood that the offer and sale of the Securities in a Financing Transaction will be exempt from the registration requirements of the Act, pursuant to Section 4(2) thereof. The Company has not taken, and will not take, any action, directly or indirectly, so as to cause the transactions contemplated by this Agreement to fail to be entitled to exemption under Section 4(2) of the Act. The Company will promptly from time to time take such reasonable action as necessary to qualify the Securities as a private placement under the securities laws of such States and foreign jurisdictions as any prospective investor or other purchaser may reasonably request and will comply with applicable laws. The Company shall cause the issuer of the Securities to offer and sell the Securities only to investors and other purchasers of the Securities that they reasonably believe to be "accredited investors", as defined in Rule 501 of Regulation D under the Act. The Company will cause the issuer of the Securities to file in a timely manner with the Securities and Exchange Commission (the "SEC") and/or each other regulatory authority any notices or other filings with respect to the Securities required by Rule 503 of Regulation D under the Act and/or other applicable law or regulation and will upon request furnish to Stout a signed copy of each such notice or filing promptly after its submission.

14.     **Limitations on Services as Advisor.**  Stout's services are limited to those specifically provided in this Agreement, or subsequently agreed upon in writing, by the parties hereto. Stout shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational, administrative, cash management, or similar activities. The parties understand that Stout is being engaged hereunder as an independent contractor to provide the services hereunder solely to the Company, and that Stout is not acting as an agent or fiduciary of the Company, its security holders or creditors or any other person or entity in connection with this engagement, and the Company agrees that it

shall not make, and hereby waives, any claim based on an assertion of such an agency or fiduciary relationship. In performing its services pursuant to this Agreement, Stout is not assuming any responsibility for the Company's decision on whether to pursue, endorse or support any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by the Company in its sole discretion. Any duties of Stout arising by reason of this Agreement or as a result of the services to be rendered by Stout hereunder will be owed solely to the Company.

15. **Bankruptcy Court Approval.** In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall seek an order authorizing the employment of Stout pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Section 328(a) of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code. In so agreeing to seek Stout's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Stout's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Transaction, that the value to the Company of Stout's services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Transaction Fee(s) is reasonable regardless of the number of hours to be expended by Stout's professionals in the performance of the services to be provided hereunder. The Company shall submit Stout's employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its best efforts to cause such application to be considered on the most expedited basis. The employment application and the proposed order authorizing employment of Stout shall be provided to Stout as much in advance of any Chapter 11 filing as is practicable, and must be acceptable to Stout in its sole discretion. Following entry of the order authorizing the employment of Stout, the Company shall pay all fees and expenses due pursuant to this Agreement, as approved by the court having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Court"), as promptly as possible in accordance with the terms of this Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with Stout to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. Stout shall have no obligation to provide services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Stout's retention under this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Stout in all respects. If the order authorizing the employment of Stout is not obtained, or is later reversed or set aside for any reason, Stout may terminate this Agreement, and the Company shall reimburse Stout for all fees and expenses reasonably incurred prior to the date of expiration or termination, subject to the requirements of the Bankruptcy Code, Bankruptcy Rules and applicable local rules and orders. Prior to commencing a Chapter 11 case, the Company shall pay all amounts due and payable to Stout in cash. The terms of this Section are solely for the benefit of Stout, and may be waived, in whole or in part, only by Stout.

16. **Additional Services.** To the extent Stout is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this engagement, the Company shall pay Stout such fees as shall be mutually agreed upon by the parties hereto in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove.

17. **Required Services.** If Stout is required to render services not described herein, but which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to, producing documents, answering interrogatories, attending depositions, giving expert or other testimony, whether by subpoena, court process or order, or otherwise), the Company shall pay Stout additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs and expenses, including, among other things, the reasonable legal fees and expenses of Stout's counsel in connection therewith.

18. **Credit.** After the announcement or closing of any Transaction, Stout may, at its own expense, place announcements on its corporate website and in financial and other newspapers and periodicals (such as a customary "tombstone" advertisement, including the Company's logo or other identifying marks) describing its services in connection therewith. Furthermore, if requested by Stout, the Company agrees that in any press release announcing any Transaction, the Company will include in such press release a mutually acceptable reference to Stout's role as financial advisor to the Company with respect to such Transaction.

19. **Choice of Law; Jury Trial Waiver; Exclusive Jurisdiction.** THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN MICHIGAN. THIS AGREEMENT AND ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MICHIGAN WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. EACH OF STOUT AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF STOUT PURSUANT TO, OR THE PERFORMANCE BY STOUT OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT. THE COMPANY AND STOUT HEREBY CONSENT TO SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF MICHIGAN AND OF THE UNITED STATES DISTRICT COURTS LOCATED IN THE WESTERN DISTRICT OF MICHIGAN FOR ANY LAWSUITS, ACTIONS OR OTHER PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT AND AGREE NOT TO COMMENCE ANY SUCH LAWSUIT, ACTION OR OTHER PROCEEDING EXCEPT IN SUCH COURTS. ALTERNATIVELY, IF ALL PARTIES AGREE IN WRITING, ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY BE SETTLED IN ACCORDANCE WITH THE DISPUTE RESOLUTION AND ARBITRATION PROVISIONS, INCLUDING THOSE DEALING WITH VENUE AND JURISDICTION, OF FINRA REGULATIONS; PROVIDED THAT SUCH CONSENT AND AGREEMENT SHALL NOT BE DEEMED TO REQUIRE ANY BANKRUPTCY CASE INVOLVING THE COMPANY TO BE FILED IN SUCH COURTS, AND IF THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DURING ANY SUCH CASE, ANY CLAIMS MAY ALSO BE HEARD AND DETERMINED BEFORE THE BANKRUPTCY COURT. EACH PARTY FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE EXCLUSIVELY TO SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURTS, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR CLAIM BROUGHT IN ANY OF THE COURTS REFERRED TO ABOVE SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURTS HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. THE COMPANY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY AT 4417 BROADMOOR AVE SE, GRAND RAPIDS, MICHIGAN 49512

20. **Indemnification and Standard of Care.** As a material part of the consideration for the agreement of Stout to furnish its services under this Agreement, the Company agrees (i) to indemnify and hold harmless Stout and its affiliates, and their respective past, present and future directors, officers, partners, members, employees, agents, representatives, advisors, subcontractors and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to Stout's engagement under, or any matter referred to in, this Agreement, and (ii) to reimburse each Indemnified Party for all expenses (including, without limitation, the fees and expenses of counsel) as

they are incurred in connection with investigating, preparing, pursuing, defending, settling, compromising or otherwise becoming involved in any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person or entity (including, without limitation, any shareholder or derivative action), arising out of or related to such engagement or matter. However, the Company shall not be liable under the foregoing indemnification provision for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Party.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any Indemnified Party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and Stout, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by such Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company (and its affiliates, and their respective directors, employees, agents or other advisors), on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Stout from the Company pursuant to this Agreement. Relative benefits received by the Company, on the one hand, and Stout, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders and creditors, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Stout under this Agreement. The Company shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding arising out of or related to Stout's engagement under, or any matter referred to in, this Agreement (whether or not an Indemnified Party is an actual or potential party thereto), or participate in or otherwise facilitate any such settlement, compromise, consent or termination, unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Stout.

The Company further agrees that neither Stout nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company arising out of or related to Stout's engagement under, or any matter referred to in, this Agreement, except for losses, claims, damages or liabilities incurred by the Company which are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Party.

The Company shall cause any new company that may be formed by the Company, for any purpose, to agree to all of the obligations in this Section to Stout in accordance with the foregoing provisions. Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Stout in writing thereof (if not previously so notified) and, if requested by Stout, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions satisfactory to Stout. The Company agrees that Stout would be irreparably injured by any breach of this Agreement

(including, without limitation, the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, Stout shall be entitled, in addition to any other remedies, to pursue injunctive relief and specific performance.

The indemnity, reimbursement, and other obligations and agreements of the Company set forth herein (i) shall apply to any services provided by Stout in connection with this engagement prior to the Effective Date and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of the services described in, and any expiration or termination of the relationship established by, this Agreement.

21.  **Miscellaneous.**  This Agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns and any successor, heir or assign of any substantial portion of such parties' respective businesses and/or assets, including any Chapter 11 or Chapter 7 trustee appointed on behalf of the Company.

Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Parties and each of their respective successors, heirs and assigns, any rights or remedies (directly or indirectly as a third party beneficiary or otherwise) under or by reason of this Agreement or as a result of the services to be rendered by Stout hereunder.

This Agreement is the complete and exclusive statement of the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous agreements, Amendments or understandings regarding the same, whether written or oral. This Agreement may not be amended, and no portion hereof may be waived, except in a writing duly executed by the parties hereto.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing business with that person. Accordingly, the Company will provide Stout upon request certain identifying information necessary to verify the Company's identity, such as a government-issued identification number (e.g., a U.S. taxpayer identification number), certified articles of incorporation, a government-issued business license, partnership agreement or trust instrument.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

The Company has all requisite power and authority to enter into this Agreement. This Agreement has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms. This Agreement has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against Stout because this Agreement was drafted by Stout, and the parties waive any statute or rule of law to such effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law. The Company understands that Stout is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice.

To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction, approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

If the foregoing correctly sets forth our agreement, please sign and return to us a copy of this Agreement.

All of us at Stout thank you for choosing us to advise the Company, and look forward to working with you on this engagement.

Very truly yours,

STOUT RISIUS ROSS ADVISORS, LLC

By: *[signature]*
Michael Krakovsky
Managing Director

Accepted and agreed to as of the March 5, 2020:

**GOODRICH QUALITY THEATERS, INC.**, on its own behalf, and on behalf of its direct and indirect subsidiaries

By: *[signature: Robert Goodrich as DIP]*
Robert Goodrich
President

16077581_3.docx