UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

GOODRICH QUALITY THEATERS, INC.,

                Debtor.

_____/

Case No. DG 20-00759
Hon. Scott W. Dales
Chapter 11

SUPPLEMENTAL OPINION AFTER MARCH 6, 2020 HEARING

PRESENT:    HONORABLE SCOTT W. DALES
                      Chief United States Bankruptcy Judge

The court issued a Memorandum of Decision and Order on March 4, 2020 (ECF No. 80, the "MDO") authorizing chapter 11 debtor-in-possession Goodrich Quality Theaters, Inc. (the "Debtor") to pay specified prepetition claims of so-called "Critical Vendors" -- eight suppliers of the films the Debtor exhibits throughout its chain of movie theaters. In the early hours of March 6, 2020, the Debtor filed an emergency motion (ECF No. 100, the "Emergency Motion") to amend the MDO. After taking additional testimony, the court entered an interim order (ECF No. 110) granting the Emergency Motion as provided therein. This Supplemental Opinion augments the oral explanation the court offered during the March 6, 2020 hearing regarding the Emergency Motion.

The Emergency Motion seeks reconsideration of the MDO, purporting to rely on Rules 60(b) and 9024,[1] but the relief requested fits more neatly under Rule 59, Rule 9023, and Rule 9019, given the timing of the motion, its reliance on newly discovered evidence involving the calculation of the claims, and the embedded request to approve the terms of a settlement the Debtor reached

---

[1] The court will refer to any Federal Rule of Bankruptcy Procedure or Federal Rule of Civil Procedure simply as "Rule ___," relying on the numbering convention for each set of rules to identify the intended reference. In addition, unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

with some, and may be forced to reach with other, Critical Vendors.  Bankruptcy courts should not hesitate to look past labels to the substance of a matter, as the court did with respect to the Emergency Motion.  *In re Madeline Marie Nursing Homes*, 694 F.2d 433, 436 (6th Cir. 1982) ("As courts of equity, bankruptcy courts 'will look through the form to the substance of any particular transaction and may contrive new remedies where those in law are inadequate.'").

As explained on the record during the hearing, viewing the Emergency Motion through the lens of Rule 9019 allowed the court to address the exigency described in the motion without insisting on the notice that it ordinarily requires, even with respect to so-called "first day" hearings. More specifically, the rule of construction in § 102, which applies equally to the Bankruptcy Code and the Bankruptcy Rules, provides that the phrase "after notice and a hearing" or similar phrase means "after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1); Fed. R. Bankr. P. 9001 (making § 102 applicable to the Bankruptcy Rules).  More significantly, relying on this rule of construction, the court may sometimes authorize an act without an actual hearing when "there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act." 11 U.S.C. § 102(1).  Crediting the testimony of the Debtor's chief financial officer Ross C. Pettinga, the court found that unless it authorized the Debtor to satisfy the Critical Vendors, they would use their digital access keys to prevent the Debtor from showing the films they supplied pursuant to the various master licensing agreements -- the exhibition of which generates the ticket and concession sales constituting the lifeblood of the Debtor, allowing it to keep its doors open from day to day.  There simply was not enough time to give the notice required, as the testimony on March 4 and 6 from the Debtor's chief financial officer established.

Rule 9019, by referring to Rule 2002, similarly grants the court flexibility with respect to advance notice of a hearing to consider a compromise or settlement because the latter expressly authorizes the court "for cause" to dispense with notice of a hearing on a compromise in appropriate circumstances. Fed. R. Bankr. P. 2002(a)(3) (requiring 21 days' notice of hearing on settlement "unless the court for cause shown directs that notice not be sent."). Here, the capacity of the Critical Vendors to cut off the Debtor's access to the films with a few keystrokes establishes cause. Also, any harm that might result from relaxing the notice requirements will be mitigated to some extent by the modest provision the court made for review by an official committee, if one is appointed.

Moreover, the court has relied on Rule 2002(a)(3) in many cases to dispense with notice for settlements where, for example, the amount at issue does not justify the expense and delay that notice sometimes brings. This was precisely the Debtor's point at the March 6 hearing. When Debtor's counsel elicited credible testimony from Mr. Pettinga regarding the regularity with which the Debtor paid the Critical Vendors for many years prepetition, in the ordinary course of business, he persuaded the court that possible chapter 5 claims against the Critical Vendors likely lack merit or value. The testimony, in other words, laid the groundwork for the Critical Vendors' formidable defense to any preference claim under § 547, the most likely casualty of the waiver that the Debtor asked the court to approve. *See* 11 U.S.C. § 547(c)(2) (ordinary course of business defense). With respect to possible fraudulent transfers, Mr. Pettinga confirmed that the Debtor has not made any extraordinary payments to the Critical Vendors, with the possible exception of payments in response to vendor audits. Even with respect to the one or two such audits in the last ten years, Mr. Pettinga described the review process, and resulting payments, as usual or ordinary, and stated that post-audit payments -- none of which occurred during the preference periods -- discharged the

Debtor's debt to the particular Critical Vendor on account of film royalties.  The satisfaction of debt in exchange for payment constitutes reasonably equivalent value, undermining possible claims under the fraudulent transfer avoidance provisions within chapter 5.  *See, e.g.,* 11 U.S.C. §§ 544 and 548(d)(2); M.C.L. § 566.33.  Similarly, § 549 would offer no boon to the Debtor with respect to the proposed payments to the Critical Vendors because the court will have authorized the transfers by the time they occur.  11 U.S.C. § 549.

In short, the Debtor argued, and the court finds, that the waiver of chapter 5 recoveries is quite likely a small price to pay for inducing the Critical Vendors to supply movies to a chain of movie theaters, almost certainly an appropriate exercise of the Debtor's business judgment. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to this process [of reviewing compromises] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.").  The court agreed to approve the settlement -- essentially the waiver of chapter 5 causes of action -- because Mr. Pettinga's testimony established that the benefit of waiving the claims (quite likely the survival of the Debtor as a going concern) clearly outweighed the value of the claims, given the merits of the likely defenses.

The court's decision in this regard is limited by the extraordinary factual circumstances this Debtor faced given (i) its missteps in commencing the case prematurely and without experienced counsel, (ii) the pressure that the Critical Vendors are not too ashamed to apply against the Debtor, (iii) and the draconian impact of terminating the Debtor's access to the most popular films.  For this, and other reasons, it will not be open season on chapter 5 claims in this court, contrary to the dire predictions the United States Trustee made at the conclusion of the hearing.

This decision, like most difficult decisions requiring the exercise of discretion and judgment, is limited by the facts.

Finally, with respect to the Debtor's request to expand the amount of payments to Critical Vendors, Mr. Pettinga's testimony satisfied the court of the need to increase the "cap" on such payments. For example, his testimony about how the Debtor's licensing fee obligations fluctuate depending on its own ticket revenue and the film studios' national receipts for particular films was particularly persuasive. A film's popularity affects the price the Debtor must pay to exhibit it. A blockbuster film is more expensive, but no one knows for sure which film will be a success until after its opening weekend at the earliest, and probably not until a few weeks thereafter. Coupling that uncertainty with the Debtor's far-flung footprint and the hectic environment that evidently accompanied the early days of the case (until Mr. Almassian's firm jumped in), it is easy to see why the Debtor needed to ask the court to amend the MDO with respect to the amounts needed to satisfy the seeming voracity of the Critical Vendors and why it needs the authority to adjust payments, upon the filing of an affidavit, without awaiting court approval. By setting a cap in the cash collateral budget and requiring an officer to justify the adjustment with a written explanation under penalty of perjury, the court sufficiently cabined the Debtor's discretion while respecting its business judgment and obvious need to make "game day" decisions without running to the courthouse every time.

For these reasons, and those set forth on the record, the court signed an order on March 6, 2020 granting most of the relief the Debtor requested in the Emergency Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall serve a copy of this Supplemental Opinion pursuant to Rule 9022 and LBR 5005-4 upon (a) the Debtor and its counsel;

(b) the United States Trustee; (c) Brendan Best, Esq.; (d) the entities appearing on the Debtor's

mailing matrix; and (e) any party who has filed a notice of appearance or request for notice.

**IT IS SO ORDERED.**

**Dated March 9, 2020**



Scott W. Dales
United States Bankruptcy Judge