# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), is entered into as of June 11, 2020, by and among: (a) **GOODRICH QUALITY THEATERS, INC.**, a corporation formed under the laws of the State of Michigan, as a debtor-in-possession (the "Seller"); and (b)(i) solely with respect to the Assets other than the Oswego Real Property (both as defined below), **TIVOLI ENTERPRISES, INC.**, a corporation formed under the laws of the State of Illinois and (ii) solely with respect to the Oswego Real Property, **603-635 ROGERS, LLC - OSWEGO**, a limited liability company formed under the laws of the State of Illinois (collectively, the "Buyer"). The Seller and the Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, the Seller owns and operates that certain retail movie theater known as Kendall 11, located at 95 Fifth Street, Oswego, Illinois (the "Oswego Theater", and the business conducted at the Oswego Theater, the "Business");

WHEREAS, the Seller operates certain other retail movie theaters at locations owned or leased by the Seller other than the Oswego Theater (the "Excluded Business")

WHEREAS, the Seller filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on February 25, 2020 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Michigan (the "Bankruptcy Court"), Case No. 20-00759 (the "Case");

WHEREAS, the Seller filed with the Bankruptcy Court that certain *Motion for: (I) an Order (A) Approving Bidding Procedures for the Proposed Sale of Substantially All of the Debtor's Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (B) Approving the Establishment of Cure Amounts, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Authorizing Procedures for the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases, and (C) Granting Related Relief* (as may be amended and revised from time to time, the "Sale Motion");

WHEREAS, the Seller wishes to sell, transfer, convey, assign, and deliver to the Buyer, and the Buyer wishes to purchase, assume, and acquire, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, the Assets (as defined below), and the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, subject to the Bankruptcy Court's entry of the Sale Order as defined herein, the Seller shall sell, transfer, convey, assign and deliver to the Buyer, and the Buyer shall purchase, assume, and acquire, the Assets and the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement.

1

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF ASSETS

1.1    <u>Defined Terms</u>. All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth for such terms in <u>ARTICLE 13</u>.

1.2    <u>Purchase and Sale</u>. Subject to the terms and conditions set forth in this Agreement and the Sale Order, at the Closing the Seller shall sell, transfer, convey, and assign to the Buyer, free and clear of all Liens (except for Permitted Liens), and the Buyer shall purchase, assume, and acquire from the Seller, all right, title, and interest of the Seller in, to the following assets, rights and properties (collectively, the "<u>Assets</u>"):

(a)    All tangible personal property, leasehold improvements, installations, fixtures, trade fixtures, equipment, fittings, furniture, furnishings, office equipment and supplies other than Inventory (together with the Inventory, the "<u>Tangible Personal Property</u>") located at the Oswego Theater;

(b)    The Real Property described on <u>Schedule 1.2(b)</u> relating to the Oswego Theater (the "<u>Oswego Real Property</u>");

(c)    All Assumed Contracts;

(d)    All Inventory located at, or in shipment to, the Oswego Theater as of the Closing Time (the "<u>Transferred Inventory</u>");

(e)    All Licenses (to the extent such Licenses are transferable) exclusively relating to the Oswego Theater and listed on <u>Schedule 1.2(e)</u>;

(f)    All security and other deposits and advances and all pre-paid expenses exclusively relating to the Oswego Theater and listed on <u>Schedule 1.2(f)</u>; and

(g)    All of the Seller's books, records, files, documents and other written or electronic materials related exclusively to the Business; <u>provided</u> that the Seller shall be permitted to make copies or extracts of such materials prior to transfer in order to comply with any Applicable Law or to satisfy any contractual obligations.

1.3    <u>Excluded Assets</u>. Notwithstanding anything to the contrary contained herein, the Buyer shall not purchase, assume or acquire from the Seller, and the Seller shall not sell, transfer, convey or assign to Buyer, any of the Seller's right, title and interest in and to any of Seller's assets, rights, or properties other than the Assets, and all such assets, rights, and properties shall be retained by the Seller (collectively, the "<u>Excluded Assets</u>"). Without limiting the generality of

the foregoing, the Excluded Assets shall include, without limitation, all of the assets, rights, and properties of the Excluded Business and the following:

(a)     All Avoidance Actions or other claims of the Seller under Chapter 5 of the Bankruptcy Code;

(b)     All refunds, pre-payments, net operating losses and claims relating to federal, state or municipal income Taxes of the Seller for any period, or portion of any period, ending on or prior to the Closing Date, which shall also encompass all Tax records of the Seller;

(c)     All records relating solely to the Seller's corporate organization and existence, including the certificate of incorporation, bylaws and other governing documents of Seller and the equity interests described thereunder;

(d)     All equity securities owned or held by the Seller;

(e)     All claims (including any litigation or arbitration claims and any refunds and deposits), rights, rights of offset or causes of action that the Seller or its Affiliates may have against or from any Person relating to any of the Excluded Assets or the Excluded Liabilities;

(f)     All assets of the Seller Plans;

(g)     This Agreement and the other Ancillary Agreements and all causes of action and claims that may be asserted under this Agreement or any Ancillary Agreement or any other agreements or instruments otherwise delivered in connection with this Agreement or any Ancillary Agreement against the Buyer;

(h)     All Contracts other than the Assumed Contracts (the "Excluded Contracts");

(i)     All Tangible Personal Property, Inventory, Licenses and other assets relating to or otherwise used, or held for use, by any Excluded Theater, the Home Office or the Excluded Business;

(j)     All security and other deposits and advances and all pre-paid expenses to relating to an Excluded Asset (including an Excluded Theater);

(k)     All personnel and medical records of employees who do not become Transferred Employees;

(l)     All assets and other rights sold or otherwise transferred or disposed of during the period from the date of this Agreement through and including the Closing Date, in any event in accordance with the provisions of this Agreement;

(m)     All claims, deposits, prepayments, prepaid assets, refunds, causes of action, credits, choses in action, rights of recovery, rights of set off and rights of recoupment relating to any of the other Excluded Assets;

(n)     All Real Property other than the Oswego Real Property;

(o)     All Seller Intellectual Property, including the name and phrase "Goodrich Quality Theaters, Inc." and derivatives thereof;

(p)     All Accounts Receivable as of the Closing Time owing from customers of the Business;

(q)     All insurance policies, claims and causes of action;

(r)     All cash and cash equivalents and all bank accounts; and

(s)     All of the other assets, rights and properties set forth on Schedule 1.3(s).

1.4     Assumed Liabilities. Subject to the terms and conditions set forth in this Agreement and the Sale Order, at the Closing, the Buyer shall assume and pay or perform and discharge when due the following liabilities and obligations of the Seller existing as of such time (collectively, the "Assumed Liabilities"):

(a)     All liabilities and obligations under the Assumed Contracts, including all related Cure Costs;

(b)     All liabilities and obligations with respect to the Oswego Real Property arising or payable after the Closing;

(c)     All liabilities and obligations with respect to the Transferred Employees described in Section 7.4;

(d)     All liabilities and obligations relating to the Seller's gift card program for gift cards that were sold at the Oswego Theater;

(e)     All liabilities and obligations relating to the Buyer's ownership or use of the Assets;

(f)     All trade accounts payable to third parties set forth on Schedule 1.4(f) or incurred with respect to the Oswego Theater in the ordinary course of business after the Closing;

(g)     All liabilities and obligations relating to the conduct of the Business at or in connection with the Oswego Real Property from and after the Closing; and

(h)     All liabilities and obligations specifically identified on Schedule 1.4(h).

4

1.5     Excluded Liabilities. Except for the Assumed Liabilities, the Buyer shall not be subject to and shall not assume or be liable for any liabilities of any kind or nature, whether absolute, contingent, accrued, known or unknown, of the Seller (the "Excluded Liabilities").

1.6     Assumed and Rejected Leases and Contracts.

(a)     Schedule 1.6(a) (the "Contract Schedule") sets forth a list of all executory Contracts and other Contracts to which, to the Seller's Knowledge, the Seller is a party and which the Seller shall assume and assign to the Buyer at the Closing; provided that such Contract Schedule shall only include such Contracts of Seller that exclusively relate to the Business (an "Eligible Contract") and any Contracts used, or held for use, in the Excluded Business shall not be deemed listed on the Contracts Schedule or assumable by Buyer. The Contract Schedule reflects with respect to each of the Eligible Contracts: (i) the contract information for each non-Seller party to each of the Eligible Contracts; and (ii) the Cure Costs with respect to such Eligible Contracts (the "Cure Amounts").

(b)     From the date of this Agreement until such time as specified in the Bidding Procedures Order, the Buyer shall have the right to designate, under a notice given to the Seller in accordance with Section 12.1 any Contract listed on the Contract Schedule as a Contract that shall be assumed by the Seller and Assigned to the Buyer (each, an "Assumed Contract"). Until such time, the Buyer may modify Schedule 1.6(a) at any time. Any Eligible Contract added to Schedule 1.6(a) by the Buyer shall become an Assumed Contract, shall be deemed an Asset for all purposes of this Agreement and, all Cure Costs and all liabilities arising with respect to such Assumed Contract shall be Assumed Liabilities for all purposes of this Agreement. Any Contract not on Schedule 1.6(a) shall be deemed an Excluded Asset for all purposes of this Agreement and all Cure Costs and all liabilities arising with respect to such Contracts shall be Excluded Liabilities for all purposes of this Agreement. Within three (3) Business Days after the Closing Date, the Seller shall file with the Bankruptcy Court a complete list of the Assumed Contracts assumed by the Seller and assigned to the Buyer pursuant to the procedures set forth herein. The Seller shall take all actions reasonably required to assign to the Buyer each Assumed Contract in accordance with Section 365 of the Bankruptcy Code, including providing that the Sale Order authorizes such assignment.

(c)     On or before the Closing Date, the Seller shall, subject to the Buyer paying all Cure Costs for Assumed Contracts, (i) cure any and all defaults existing under each Assumed Contract and (ii) subject to the Buyer providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assume and assign such Assumed Contracts to the Buyer effective as of the Closing Date pursuant to an order of the Bankruptcy Court (which may be the Sale Order or one or more other orders that are no less favorable to the Buyer than the provisions of the Sale Order). Effective upon and concurrently with such assignment, Buyer shall assume each Assumed Contract assigned to it pursuant to this Section 1.6.

(d)     No designation of any Contract for assumption and assignment or rejection in accordance with this Section 1.6 shall give rise to any adjustment to the Purchase Price.

## ARTICLE 2

## PURCHASE PRICE AND PAYMENT

2.1     Purchase Price. In addition to the assumption of the Assumed Liabilities, the consideration to be paid by the Buyer for the sale of the Assets shall be Four Million Nine Hundred and Fifty Thousand and No/100 Dollars $4,950,000.00 (the "Purchase Price").

2.2     Non-Assignable Assets. If any Asset is by its terms or by Applicable Law non-assignable or non-transferable, to the extent such terms are not superseded by the terms of the Sale Order, the Seller shall use its reasonable best efforts to obtain, or cause to be obtained, on or prior to the Closing, any approvals or consents necessary to convey to the Buyer the benefit thereof. The Buyer shall cooperate with the Seller in such manner as may be reasonably requested in connection therewith. In the event any consent or approval to an assignment contemplated hereby is not obtained on or prior to the Closing Date, the Seller shall continue to use reasonable best efforts to obtain any such approval or consent after the Closing Date and the Seller agrees to enter into any appropriate and commercially reasonable arrangement to provide that the Buyer shall receive the Seller's interest in the benefits under any such Asset; provided that the Buyer shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent the Buyer would have been responsible therefor if such consent or approval had been obtained.

2.3     Transfer Taxes. To the extent the transactions contemplated hereby are not exempt under Section 1146 of the Bankruptcy Code, the Buyer shall be liable for and pay any sales and transfer Taxes, filing fees, documentary fees or other similar Taxes payable in connection with the purchase, sale or transfer of the Assets to, and the assumption of the Assumed Liabilities by, the Buyer pursuant to this Agreement; provided that the Seller shall pay all recording and filing fees related to the Case and obtain any releases, terminations, or consents related to Taxes which are necessary to consummate the transactions contemplated hereby (including release of any liens or other encumbrances on the Assets). The Buyer and the Seller shall use reasonable best efforts to minimize the amount of all the foregoing Taxes and shall cooperate in providing each other with any appropriate resale exemption certifications, Tax clearance certificates and other similar documentation, including Unemployment Insurance Agency Form 1027. The Party that is required by Applicable Law to make the filings, reports, or returns and to handle any audits or controversies with respect to any of the foregoing Taxes shall do so, and the other Party shall cooperate (and make reimbursement) with respect thereto as necessary.

2.4     Deposit. The Buyer shall, within two (2) Business Days after the date hereof, deposit with a mutually acceptable independent escrow agent (the "Escrow Agent") an amount equal to ten percent (10%) of the Purchase Price (the "Deposit"), pursuant to an escrow agreement in customary commercial form (the "Escrow Agreement"). If the Closing takes place as provided herein, then the Deposit shall be credited against the Purchase Price. If this Agreement is terminated in accordance with ARTICLE 10 for any reason other than pursuant to Section 10.1(c), if the failure of the Closing to occur on or prior to the Outside Date results primarily from Buyer's breach or default of its obligations, covenants or representations under this Agreement, or (b) pursuant to Section 10.1(e), then the Escrow Agent shall promptly return the Deposit to the Buyer. If this Agreement is terminated by the Seller: (a) pursuant to Section 10.1(c), if the failure of the Closing to occur on or prior to the Outside Date results primarily from Buyer's breach or default

of its obligations, covenants or representations under this Agreement, or (b) pursuant to <u>Section 10.1(e)</u>, the Escrow Agent shall promptly deliver the Deposit to the Seller. The Deposit shall not be considered property of the Seller's bankruptcy estate unless and until the Deposit is delivered to the Seller in accordance with this <u>Section 2.4</u>.

**ARTICLE 3**

**CLOSING**

3.1    <u>Closing</u>. Consummation of the transactions contemplated hereby (the "<u>Closing</u>") shall occur within five (5) Business Days after satisfaction or waiver of the conditions to closing in <u>ARTICLE 8</u> (other than those conditions that by their nature are to be satisfied at the Closing) or at such other time as the Parties may agree but in any event no later than July 14, 2020 (the "<u>Outside Date</u>"); <u>provided</u>, <u>however</u>, that the Outside Date may be extended upon mutual agreement of the Parties. The Closing shall take place remotely via electronic exchange of documents or at such other place that is mutually agreed by the Parties. The date on which the Closing actually takes place is referred to in this Agreement as the "<u>Closing Date</u>." The Closing shall be effective as of 11:59 p.m. on the Closing Date (the "<u>Closing Time</u>").

3.2    <u>Illinois Bulk Sales Acts; Unemployment Act</u>.

(a)    No later than ten (10) business days prior to the Closing Date, the Seller agrees to: (i) deliver a CBS-1 Notice of Sale or Purchase of Business Assets (a "<u>Bulk Sales Notice</u>") to the Illinois Department of Revenue (the "<u>IDOR</u>") to allow the IDOR to issue a determination as to whether the Seller has any assessed, but unpaid, amount of tax, penalties, or interest pursuant to (A) Section 120/5j of the Retailers' Occupation Tax Act (35 ILCS 120/1, *et seq.*) or (B) Section of the Illinois Income Tax Act 35 ILCS 5/101, *et seq.* (a "<u>Bulk Sales Stop Order</u>"); and (ii) deliver a Request for Letter of Clearance to the Director of the Illinois Department of Employment Security (the "<u>IDES</u>") to allow the IDES issue a determination as to whether the Seller has any assessed, but unpaid, amount of contributions, interest, or penalties pursuant to Section 2600 of the Illinois Unemployment Insurance Act (820 ILCS 405/100, *et seq.* (a "<u>Determination of Liability</u>").

(b)    The Seller shall, prior to Closing: (i) with respect to any Bulk Sales Stop Order either (A) deliver either a notice of release or evidence of a deemed release (as evidenced by a non-response to a delivered Bulk Sales Notice within the time frames allowed under the Bulk Sales Acts) from the IDOR, or (B) pay all amounts show on any such Bulk Sales Stop Order showing outstanding taxes or other sums due and payable to IDOR, and deliver evidence of such payment to the Buyer; and (ii) with respect to any Determination of Liability, pay all amounts show on any such Determination of Liability showing outstanding contributions or other sums due and payable to the IDES, and deliver evidence of such payment to the Buyer.

3.3    <u>Deliveries by the Seller at Closing</u>. At the Closing, the Seller shall execute, acknowledge and/or deliver to the Buyer the following:

(a)    A bill of sale, pursuant to which the Seller will transfer the Tangible Personal Property included in the Assets to the Buyer, duly executed by the Seller;

7

(b)    One or more assignment and assumption agreements, pursuant to which the Seller shall assign to the Buyer the Assumed Contracts and Assumed Liabilities (the "Assignment and Assumption Agreements"), duly executed by the Seller;

(c)    A copy of the resolutions adopted by the Seller's governing board authorizing the transactions contemplated hereby and the consummation thereof, certified by a secretary or assistant secretary of the Seller to be a true and correct copy;

(d)    With respect to the Oswego Real Property, a warranty deed in a form mutually acceptable to the parties conveying title which is free and clear of all Liens and other than Permitted Liens and any documents ancillary thereto required by the jurisdiction in which the Oswego Real Property is located, duly executed by the Seller (collectively, the "Deed Documents");

(e)    A schedule of all outstanding gift cards in the Seller's gift card program as of the Closing Date, including uncashed amounts on such gift cards, and the serial numbers and PINs necessary to confirm the validity of such gift cards (The Seller will use its best efforts to provide this schedule);

(f)    A copy of the Sale Order as entered by the Bankruptcy Court;

(g)    All other documents, certifications, and other instruments as may be reasonably required to consummate the transactions contemplated by this Agreement, to cause the Title Company to issue the Title Insurance Policy and record the Deed Documents; and

(h)    An affidavit of Seller in a form reasonably satisfactory to Buyer certifying that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended.

3.4    Deliveries by the Buyer at Closing. At the Closing, the Buyer shall execute, acknowledge and/or deliver to the Seller the following:

(a)    The Assignment and Assumption Agreement(s), duly executed by the Buyer;

(b)    The Purchase Price minus the Deposit, in cash by wire transfer of immediately available funds to a bank account designated in writing by the Seller at least two (2) Business Days prior to the Closing Date;

(c)    The Deed Documents, duly executed by the Buyer; and

(d)    The Cure Costs, which shall be delivered to the applicable Cure Obligees of any Assumed Contract at, or promptly after, the Closing.

3.5    Deemed Consents and Cures. The Seller shall be deemed to have obtained all required consents in respect of the assignment of any of the Assumed Contracts and all defaults thereunder shall be deemed to have been cured if, and to the extent that, pursuant to the Sale Order

or another Order of the Bankruptcy Court, the Seller is authorized to assume and assign any such Assumed Contracts to the Buyer pursuant to Section 365 of the Bankruptcy Code.

3.6    Allocation of Purchase Price. Within sixty (60) days after the Closing Date, the Buyer will deliver to the Seller an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities to the Assets. The Seller will review the Allocation Statement and, to the extent the Seller disagrees in good faith with the content of the Allocation Statement, the Seller will inform the Buyer of such disagreement within thirty (30) days after receipt of the Allocation Statement. The Seller and the Buyer will attempt to resolve any such disagreement. If the Seller and the Buyer are unable to reach a good faith agreement on the content of the Allocation Statement within ninety (90) days of the Closing Date, the Seller and the Buyer will each use its own allocation statement. If the Buyer and the Seller agree on the Allocation Statement, the Buyer and the Seller will act in accordance with the Allocation Statement in the preparation and filing of all Tax returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

3.7    Apportionments.

(a)    Subject to the other provisions of this Section 3.7, the following items, without duplication, are to be apportioned between the Seller and the Buyer with respect to the Assets as of the Closing Time, the net amount thereof shall be, (i) if in favor of the Seller, added to the Purchase Price and (ii) if in favor of the Buyer, credited by the Seller against the Purchase Price:

(i)    Real property Taxes and assessments;

(ii)    Water rates and charges;

(iii)    Sewer Taxes and rents;

(iv)    All other utilities;

(v)    Annual permits, license, and inspection fees, if any, on the basis of the fiscal year for which levied, if the rights with respect thereto are transferred to the Buyer; and

(vi)    All other items that reasonably require apportionment in accordance with local custom and practice to effectuate the transactions contemplated hereby.

(b)    Apportionment of real property Taxes, water rates and charges, sewer Taxes and rents and other similar items shall be made on the basis of the fiscal year or other period for which they are assessed. Apportionment of real property Taxes shall be based on 105% of the last known fiscal year Taxes. If the Closing Date occurs before the real property Taxes, water rates and charges, sewer Taxes and rents or similar items with respect to the Assets are finally fixed for the fiscal year or other period in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property Taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year or other period applied to the latest assessed valuation.

(c)    If there are any meters measuring water consumption or other utility usage at any of the Assets, then the Seller shall obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time shall be apportioned on the basis of such readings, or if such readings are not obtained, then the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

3.8    Subsequent Documentation; Further Assurances. The Buyer and the Seller shall, at any time and from time to time after the Closing Date, upon the reasonable request of the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such further (a) assignments, transfers, deeds and conveyances as may be required for assigning, transferring, granting, conveying and confirming the transactions contemplated hereby, including aiding and assisting the Buyer in collecting and reducing to possession any or all of the Assets and (b) documents and instruments as may be reasonably necessary for the further completion of any of the transactions contemplated hereby.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents that the following is true and correct as of the date hereof and shall be true and correct at the date of the Closing after giving effect to the Sale Order (taking into account any updates to Seller's Disclosure Schedules contemplated by Section 6.7 hereunder):

4.1    Organization and Power. The Seller is a Michigan corporation duly organized, validly existing and in good standing under the laws of the State of its organization, is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not have a Material Adverse Effect, has all requisite corporate power and authority to carry on its business as currently conducted, and has the requisite corporate power and authority to own, lease, operate or hold the applicable Assets.

4.2    Authority; No Conflicts. Subject to the Bankruptcy Court's approval and entry of the Sale Order, Seller has the authority to enter into and consummate this Agreement and the Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby. Subject to the Bankruptcy Court's approval and entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and of the Ancillary Agreements to which it is a party (a) do not and shall not violate or conflict with any provision of the certificate of incorporation or bylaws of Seller, (b) do not and shall not violate any provision of any Applicable Law or any order, judgment or decree of any Governmental Authority, and (c) do not and shall not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Assumed Contract, except to the extent such violation, breach or default would not have a material and adverse effect on the Business.

4.3    Execution and Delivery. Subject to the Bankruptcy Court's approval and entry of the Sale Order, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by the Seller has been duly authorized by all necessary company

action, and the execution and performance of the Ancillary Agreements by the Seller has been or shall be authorized by all necessary company action prior to the Closing Date. Subject to the Bankruptcy Court's approval and entry of the Sale Order, this Agreement constitutes, and upon execution of each of the Ancillary Agreements such agreements shall constitute, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms.

4.4     Title to Assets. At the Closing, the Buyer, pursuant to the Sale Order, will acquire good and marketable title in, to and under all of the Assets owned by the Seller as of the Closing Time and a good and valid leasehold interest in, to and under all of the Assets leased by the Seller as of the Closing Time, in each case free and clear of all Liens (other than Permitted Liens) to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. Except as set forth on Schedule 4.4, Seller has good and marketable title to the Assets.

4.5     Permits; Compliance with Laws.

(a)     To the Seller's Knowledge, the Seller is in compliance with the material terms of all material Licenses used by the Seller in the Business, and all such Licenses are valid and in full force and effect, and no proceeding is pending or threatened in writing, the object of which is to revoke any such License.

(b)     The operation of the Business by the Seller complies in all material respects with all Applicable Laws and the requirements and conditions of all Licenses, including all applicable operating certificates and authorities, and all other rules, regulations, directives and policies of all Governmental Authorities having jurisdiction over the Business.

4.6     Third Party Approvals. Except for (a) entry of the Sale Order, and (b) approvals or consents set forth on Schedule 4.6, the execution, delivery and performance by the Seller of this Agreement and the consummation of the transactions contemplated hereby do not require any material consent, waiver, authorization or approval of, or filings with, any Person (including any Governmental Authority) that has not been obtained or is not deemed to be superseded by applicable provisions of the Bankruptcy Code (the matters described in this Section 4.6, collectively referred to as the "Consents").

4.7     Real Estate. The Seller owns the Oswego Real Property, free and clear of Liens other than Permitted Liens.

4.8     Employment and Benefit Matters. All Employee Plans sponsored or contributed to by the Seller, covering employees of the Seller, or for which the Seller may have any liability are set forth on Schedule 4.8 (the "Seller Plans").

4.9     No Brokers. Except as set forth on Schedule 4.9, the Seller has not utilized the services of or contracted or dealt with a broker or finder in connection with any of the transactions contemplated by this Agreement, including the Buyer's purchase of the Assets or any portion

thereof, and no commission or other compensation is or shall be due or owed from the Seller to any Person with respect to the purchase and sale of the Assets.[1]

    4.10    <u>Termination of Representations and Warranties Upon Closing</u>. The representations and warranties of the Seller in this <u>ARTICLE 4</u> (other than <u>Section 4.11</u>) shall not survive the Closing and shall be null and void *ab initio* and of no further force or effect immediately after the Closing.

    4.11    <u>Disclaimer of Other Representations and Warranties</u>. The representations and warranties set forth in this <u>ARTICLE 4</u> are the only representations and warranties made by the Seller with respect to the Business, the Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement. Except as specifically set forth in this <u>ARTICLE 4</u>: (a) the Seller is selling the Assets to Buyer "as is" and "where is" and with all faults, and makes no warranty, express or implied, as to any matter whatsoever relating to the Business, the Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by Buyer after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Seller, any of the Seller's Affiliates, or any of their respective officers, directors, employees, agents, representatives, members, or managers will have, or will be subject to, any liability or indemnification obligation to the Buyer or any other Person resulting from the distribution to the Buyer or its Affiliates or representatives of, or the Buyer's use of, any information relating to the Business including any descriptive memoranda, summary business descriptions or any information, documents or material made available to Buyer or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of the Buyer or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

    The Buyer represents and warrants to the Seller that the following is true and correct as of the date hereof and shall be true and correct at the date of the Closing:

    5.1    <u>Organization and Power</u>. The Buyer is a duly organized, validly existing entity under Applicable Laws and in good standing in the State of its organization, has all requisite power and authority to carry on the business in which it is now engaged, and has taken all action required by Applicable Law, and by the Buyer's organizational documents, to authorize the execution and delivery of this Agreement and the purchase of the Assets and assumption of the Assumed Liabilities in accordance with this Agreement.

    5.2    <u>Authority; No Conflicts</u>. The Buyer has the requisite power and authority to execute this Agreement and each Ancillary Agreement to which the Buyer is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the

---

[1] <u>NTD</u>: Schedule to include agreement with Stout Risius Ross Advisors, LLC.

Buyer of this Agreement and each Ancillary Agreement to which the Buyer is a party (a) do not and shall not violate or conflict with any provision of the organizational documents of the Buyer, and (b) do not and shall not violate any provision of any Applicable Law or any order, judgment or decree of any Governmental Authority.

5.3    <u>Execution and Delivery</u>. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Buyer, and the execution and performance of each Ancillary Agreement to which the Buyer is a party has been or shall be authorized by all necessary action on the part of the Buyer prior to the Closing Date. This Agreement constitutes, and upon execution by the Buyer of each of the Ancillary Agreements to which it is a party, such agreements shall constitute, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms.

5.4    <u>Litigation</u>. There is no claim, litigation, action or legal proceeding before a Governmental Authority pending or threatened in writing against the Buyer, adversely affecting the Buyer's ability to perform its obligations hereunder.

5.5    <u>No Brokers</u>. The Buyer has not utilized the services of or contracted or dealt with a broker or finder in connection with any of the transactions contemplated by this Agreement, including the Buyer's purchase of the Assets or any portion thereof, and no commission or other compensation is or shall be due or owed from the Buyer to any Person with respect to the purchase and sale of the Assets.

5.6    <u>Financing</u>. The Buyer has sufficient funds available to consummate the transactions contemplated by this Agreement.

5.7    <u>Termination of Representations and Warranties Upon Closing</u>.  The representations and warranties of the Buyer in this <u>ARTICLE 5</u> shall not survive the Closing and shall be null and void *ab initio* and of no further force or effect immediately after the Closing.

**ARTICLE 6**

**COVENANTS OF THE SELLER**

Seller covenants and agrees with the Buyer that:

6.1    <u>Access</u>. Prior to the Closing or the termination of this Agreement, and on the basis that the Buyer shall have executed a Non-Disclosure Agreement in customary form as referenced in <u>Section 6.6</u> hereof, the Seller shall, upon reasonable advance notice, afford to the Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives ("<u>Representatives</u>"), reasonable access during normal business hours to the Oswego Real Property and the books and records of the Business. The Buyer shall not be entitled to access to any materials containing privileged communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy or to the extent they relate to Excluded Assets or the Excluded Business. The Buyer shall have no right under this Agreement to conduct any environmental or other assessment of the Oswego Real Property other than visual

inspection and document review. The Buyer expressly acknowledges that nothing in this <u>Section 6.1</u> is intended to give rise to any contingency to the Buyer's obligations to proceed with the transactions contemplated by this Agreement.

6.2     <u>Reasonable Best Efforts</u>. The Seller shall use its reasonable best efforts to cause the conditions set forth in <u>ARTICLE 8</u> to be satisfied and to facilitate and cause the consummation of the transactions contemplated hereby.

6.3     <u>Notice to the Buyer</u>. The Seller agrees to promptly notify the Buyer in writing of any information it obtains or becomes aware of that would indicate that a representation and warranty of the Seller made herein, or that any Schedule hereto, is not correct in all material respects or that any of the conditions to Closing are incapable of being satisfied.

6.4     <u>Maintenance of Interests</u>. The Seller shall use its commercially reasonable efforts from the date of execution of this Agreement until the Closing to maintain and operate the Business and Assets (or cause the Business and Assets to be maintained and operated) in the ordinary course of business consistent with past practice, in a reasonable and prudent manner, in compliance with Applicable Law in all material respects. Without limiting the generality of the foregoing and without the prior written consent of the Buyer, Seller shall not, except for the items set forth on <u>Schedule 6.4</u> which are being sought pursuant to motions pending with or approved by the Bankruptcy Court as of the date hereof: (a) introduce any materially new or different method of maintenance, operation, or accounting with respect to the Business and the Assets; or (b) sell, lease, or otherwise dispose of or agree to sell, lease, or otherwise dispose of, any of its assets, properties, rights, or claims, except for sales of Inventory in the ordinary course of business consistent with past practice or in connection with an Acquisition Transaction in connection with which this Agreement is terminated.

6.5     <u>Consents and Approvals</u>. The Seller shall use its reasonable best efforts to obtain all Consents required by the Bankruptcy Code or other Applicable Law to be obtained by the Seller to effect the transactions contemplated hereby. Without limiting the foregoing, as soon as practicable after the date of this Agreement, the Seller shall make or cause to be made all such further filings and submissions and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis.

6.6     <u>Confidentiality</u>. The provisions of the Non-Disclosure Agreement between or among the Parties shall remain in full force and effect and shall be incorporated herein by this reference.

6.7     <u>Update to Disclosure Schedules</u>. From the date hereof until the Closing Date, the Seller shall disclose to the Buyer in writing (in the form of a supplement to the Disclosure Schedules): (a) Disclosure Schedules which are expressly contemplated to be delivered after the date hereof; or (b) any newly arising or occurring fact, condition, event, or occurrence that will, or is reasonably likely to, cause any of the representations and warranties contained in <u>ARTICLE 4</u> hereof to be untrue or inaccurate in any material respect at any time from the date hereof until the Closing Date. Such disclosures pursuant to this <u>Section 6.7</u> shall amend, cure and supplement the appropriate Disclosure Schedules delivered on the date hereof and attached hereto.

## ARTICLE 7

## COVENANTS OF THE BUYER

The Buyer covenants and agrees with the Seller that:

7.1    <u>Reasonable Best Efforts</u>. The Buyer shall use its reasonable best efforts to cause the conditions set forth in <u>ARTICLE 8</u> to be satisfied and to facilitate and cause the consummation of the transactions contemplated hereby.

7.2    <u>Notice to the Seller</u>. The Buyer agrees to promptly notify the Seller in writing of any information the Buyer obtains or becomes aware of that would indicate that a representation and warranty of the Buyer made herein or in any Schedule hereto is not correct in all material respects.

7.3    <u>Bankruptcy Court Approval and Related Matters</u>. The Buyer acknowledges and agrees to the procedures set forth in <u>ARTICLE 11</u> and shall use reasonable best efforts to assist the Seller in obtaining any Orders necessary to consummate the transactions contemplated hereby and any Orders ancillary hereto and agrees to provide the Seller with information reasonably necessary to obtain such Orders.

7.4    <u>Transferred Employees</u>.

(a)    At least ten (10) Business Days prior to the Closing Date, the Seller shall deliver to the Buyer a true and correct list of all employees of the Seller who are employed by the Seller exclusively at the Oswego Theater (each an "<u>Oswego Employee</u>" and, together, the "<u>Oswego Employees</u>"), including with respect to any inactive employee, the reason for such inactive status and, if applicable, the anticipated date of return to active employment.

(b)    At least five (5) Business Days prior to the Closing Date (or such lesser time as may be appropriate for Oswego Employees who are hired within five (5) Business Days of the Closing Date or as the parties may otherwise agree), the Buyer shall deliver, individually or generally, an offer of employment commencing on the day after the Closing Date and contingent upon the Closing, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by the Buyer and such Oswego Employee), to all of the Oswego Employees; <u>provided</u> that, in each case, Buyer shall have the right to not offer employment to any employee of the Seller otherwise referred to in this <u>Section 7.4(b)</u> upon written notice to the Seller at least five (5) days prior to the Closing Date. Buyer covenants in all events to make sufficient offers of employment to the Oswego Employees so as not to trigger any notification obligations under the WARN Act; <u>provided</u> that the Buyer shall bear all liabilities and costs in connection with any violations of the WARN Act that arise solely as a result of the termination of Oswego Employees in connection with the Closing, and any such liabilities and costs shall be Assumed Liabilities. The individuals who accept offers of employment extended by the Buyer pursuant to this <u>Section 7.4</u> are hereinafter referred to as the "<u>Transferred Employees</u>."

(c)    To the extent that service is relevant for purposes of eligibility, vesting or benefit accrual under any employee benefit plan, program or arrangement established or

15

maintained by the Buyer for the benefit of Transferred Employees, the Buyer will use commercially reasonable efforts to cause such plan, program or arrangement will credit such employees or former employees for service on or prior to the Closing with the Seller and its Affiliates.

(d)     The Buyer shall be responsible for all compensation and benefits payable or provided to the Transferred Employees and any other employees of the Buyer or its Affiliates from and after the Closing Date.

# ARTICLE 8

## CONDITIONS TO CLOSING

8.1     <u>Seller's Conditions to Closing</u>. The obligations of the Seller at the Closing are subject, at the option of the Seller, to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)     All representations and warranties of the Buyer contained in this Agreement shall be true in all material respects at and as of the Closing and the Buyer shall have performed and satisfied all material covenants and obligations to be performed by the Buyer at or prior to the Closing pursuant to this this Agreement in all material respects;

(b)     No stay or injunction shall have been obtained by a court of competent jurisdiction restraining, prohibiting or declaring illegal the purchase and sale contemplated by this Agreement;

(c)     The entry by the Bankruptcy Court of the Sale Order; and

(d)     The Buyer shall have executed and delivered the documents required to be executed and delivered pursuant to <u>Section 3.4</u>.

8.2     <u>Buyer's Conditions to Closing</u>. The obligations of the Buyer to consummate the transactions contemplated hereby at the Closing are subject, at the option of the Buyer, to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)     All representations and warranties of the Seller contained in this Agreement shall be true in all material respects at and as of the Closing and the Seller shall have performed and satisfied all material covenants and obligations to be performed by the Seller at or prior to the Closing pursuant to this this Agreement in all material respects and the Seller shall have certificated the foregoing to the Buyer in writing;

(b)     No stay or injunction shall have been obtained by a court of competent jurisdiction restraining, prohibiting or declaring illegal the purchase and sale contemplated by this Agreement;

(c)     The entry by the Bankruptcy Court of the Sale Order; and

(d)    The Seller shall have executed and delivered the documents required to be executed and delivered pursuant to Section 3.2.

For the avoidance of doubt, the obligations of the Buyer hereunder are not subject to (a) the ability of the Buyer to obtain any financing, or (b) the results of any due diligence investigation of the Buyer.

## ARTICLE 9

## ADDITIONAL OBLIGATIONS AFTER CLOSING

The Parties shall have the following additional obligations after the Closing:

9.1    Execution; Delivery of Instruments and Assistance. The Seller and the Buyer shall each execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, such instruments and take such other actions as may be necessary or advisable to carry out their obligations under this Agreement and under any document, certificate, or other instrument delivered pursuant hereto or thereto or required by Applicable Law.

9.2    Access to Records. From and after the Closing Date, the Seller on the one hand and the Buyer on the other hand shall afford each other and their respective Representatives such access to records in respect of the Seller's businesses which, after the Closing, are in the custody or control of the other Party and which such Party reasonably requires, including in order to comply with its obligations under Applicable Law, including, but not limited to, audits by Tax authorities, or which the Buyer reasonably requires to comply with its obligations under the Assumed Liabilities. Each Party may require the other Party or its Representatives to enter into a confidentiality agreement in customary form in connection with providing access to the records of such Party.

## ARTICLE 10

## TERMINATION

10.1    Termination. This Agreement may be terminated as follows:

(a)    At any time by the mutual written agreement of the Seller and the Buyer;

(b)    Automatically, upon the Seller's entry into any agreement seeking to consummate any Acquisition Transaction between the Seller and a party other than the Buyer; provided that the Sale Order shall not have been entered;

(c)    By either Party, at such Party's election, in the event that the Closing shall not have occurred on or before the Outside Date; provided that no Party shall be entitled to terminate this Agreement pursuant to this Section 10.1(c) if the failure of the Closing to occur on or prior to such date results primarily from such Party's breach or default of its obligations, covenants or representations under this Agreement;

(d)    By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Seller or if any representation or warranty of the Seller shall have become untrue

17

in any material respect, in either case if such breach or untruth is not, or is incapable of being, cured by the later of (i) the Outside Date and (ii) thirty (30) days after written notice of such breach or untruth; provided that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 10.1(d) if such termination right results primarily from the Buyer's breach of any representation, warranty or covenant contained in this Agreement;

(e)     By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case if such breach or untruth is not, or is incapable of being, cured by the later of (i) the Outside Date and (ii) thirty (30) days after written notice of such breach or untruth; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 10.1(e) if such termination right was caused by the Seller or results primarily from the Seller's breach of any representation, warranty or covenant contained in this Agreement;

(f)     By the Buyer, at its sole election, upon (i) the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, (ii) the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, (iii) the dismissal of the Case, (iv) the filing of any plan of reorganization by any party in interest that does not incorporate this Agreement, or (v) the filing of any motion by a party in interest in the Case to liquidate the Assets or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein;

(g)     By the Buyer upon the entry of an order by the Bankruptcy Court for the appointment of a trustee or examiner, other than at the request of the Buyer;

(h)     By the Buyer if Seller breaches or violates any Order entered in the Case authorizing the use of cash collateral or the obtaining of financing, or if Seller becomes prohibited from using cash collateral or financing under any such order; or

(i)     By Buyer or Seller if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

10.2    Effect of Termination. Upon the termination of this Agreement in accordance with Section 10.1, the Parties shall be relieved of any further obligations or liability under this Agreement other than (i) the confidentiality obligations referenced in Section 6.6 and (ii) the return of the Deposit by the Escrow Agent as required by Section 2.4. Notwithstanding the foregoing, the forfeiture of all of the Deposit shall be the sole and exclusive remedy to the Seller for any breach by Buyer of this Agreement.

## ARTICLE 11

## CHAPTER 11 BANKRUPTCY PROCEEDING

11.1    Sale Order; Notices to Third Parties.

(a)     The Seller shall seek prompt entry of the Sale Order pursuant to the Sale Motion after sufficient notice has been given, which Sale Order shall include, among other things,

findings of fact and conclusions of law that the Buyer is not a successor in interest to the Seller or any Affiliate of the Seller, that the Buyer is a good faith purchaser pursuant to Bankruptcy Code Section 363(m) and the Purchase Price was not controlled by any agreement in violation of Section 363(n) of the Bankruptcy Code or any other section of the Bankruptcy Code, and the other customary and appropriate findings of fact and conclusions of law.

(b)     The Seller covenants that, to the extent that they have not done so prior to the date of this Agreement, they shall promptly serve the third parties who are parties to Seller's Contracts (such third parties being "Cure Obligees") with written notice of proposed cures on the such Contracts (such notice being the "Proposed Cure Notice"), which Proposed Cure Notice shall be provided to the Buyer within the time periods provided by the Bidding Procedures Order. The Proposed Cure Notice shall, as set forth in the Bidding Procedures Order, establish a deadline reasonably in advance of the Closing Date by which Cure Obligees must object to respective proposed cures, or any other matters related to the Cure Obligee, or be deemed to have waived any such objection.

(c)     The Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings, or pleadings that the Seller proposes to file with the Bankruptcy Court or any other court or tribunal that relate in any manner, directly or indirectly, to (i) this Agreement or the transactions contemplated hereby; (ii) the Sale Motion, including the form and content of the Bidding Procedures Order; or (iii) entry of the Sale Order, and will provide Buyer with at least 48 hours, or as much notice as is possible under the circumstances, to review such documents in advance of their service and filing. The Seller shall consult and cooperate with Buyer, and consider in good faith the views of Buyer, with respect to all such filings. The Seller shall not make any disclosures (including any statements or schedules) in connection with the Case that are inconsistent in any material respect with the representations, warranties or related Disclosure Schedules set forth in or delivered in connection with this Agreement. Seller will give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Buyer will have the right to attend and seek to be heard at any such hearings.

11.2   Requests for Information. From the date of the approval of the Bidding Procedures Order (a) if the Seller supplies any information regarding the Business to a potential bidder not heretofore given to the Buyer, the Seller shall further provide the Buyer with a copy of such information within a reasonable period of time after providing that information to any other potential bidder; and (b) with respect to any bid, term sheet, or written expression of interest by any other party for any asset or assets of the Seller, or any other reorganization proposal, submitted prior to the bid deadline established in the Bidding Procedures Order, the Seller shall provide the Buyer with prompt notice of such proposal and a copy of such proposal within a reasonable period of time after the Seller's receipt thereof.

**ARTICLE 12**

**GENERAL PROVISIONS**

12.1   Notice. All notices hereunder shall be in writing, dated and signed by the Party giving the same. Each notice shall be either: (a) delivered in person to the address of the Party for whom it is intended at the address of such Party as shown below; (b) delivered to the United States

Postal Service in a secure and sealed envelope or other suitable wrapper addressed to the Party for whom it is intended at the address of such Party as provided below, with sufficient postage affixed, certified or registered mail, return receipt requested; (c) transmitted via telecopy (or other facsimile device) or electronic mail to the number or e-mail address set out below if the sender promptly thereafter sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid); or (d) delivered to a nationally recognized overnight courier service that traces any such notice. The effective date of such notice shall be the date of delivery in the event of delivery in accordance with (a) or (c), five (5) days after deposit in the U.S. Mail in the event of delivery in accordance with (b), the next Business Day and in the event of delivery in accordance with (d). The address at which any Party hereto is to receive notice may be changed from time to time by such Party by giving notice of the new address to all other parties hereto. The addresses of the Parties, until changed in accordance with the foregoing, are:

The Seller:        Goodrich Quality Theaters, Inc.
                   4417 Broadmoor Ave. SE
                   Grand Rapids, Michigan 449512
                   Attn: Bob Goodrich, CEO
                   Facsimile:
                   Email:  bgoodrich@gqt.com

                   *And copies (which shall not constitute notice) to*:

                   Keller & Almassian, PLC
                   230 East Fulton St.
                   Grand Rapids, MI 49503
                   Attn: A. Todd Almassian, Esq.
                   Facsimile: (616) 364-2200
                   Email: talmassian@kalawgr.com

The Buyer:         Christopher Johnson, CEO
                   Tivoli Enterprises, Inc.
                   603 Rogers Street
                   Downers Grove, Illinois 60515
                   Telephone: 630-786-4666
                   Facsimile: 630-968-1626
                   Mobile: 630-476-2106
                   Email: cjohnson@classiccinemas.com

                   *And copies (which shall not constitute notice) to*:

                   Phillip W. Nelson
                   Holland & Knight LLP
                   150 N. Riverside Plaza, Suite 2700
                   Chicago, Illinois 60606
                   Telephone: 312-578-6584

Facsimile: 312-407-8424
Mobile: 773-213-7521
Email: phillip.nelson@hklaw.com

*– and –*

Robert C. Aument
Daspin & Aument, LLP
300 S. Wacker Drive, Suite 2200
Chicago, Illinois 60606
Telephone: 312-258-3777
Facsimile: 312-258-1955
Mobile: 630-772-2123
Email: raument@daspinaument.com

12.2    <u>Amendment</u>. This Agreement may not be amended nor any rights hereunder waived except by an instrument in writing signed by the Parties.

12.3    <u>Payment of Costs</u>. Except as otherwise set forth herein, the Parties shall each pay their own costs incurred in negotiating this Agreement and in consummating the transactions contemplated hereby, including any fees or commission payable to any party representing them in connection with arranging or negotiating this Agreement and transactions contemplated hereby.

12.4    <u>Headings</u>. The headings of the sections of this Agreement are for convenience or reference only and shall not affect any of the provisions of this Agreement.

12.5    <u>References</u>. References made in this Agreement, including use of a pronoun, shall be deemed to include, where applicable, masculine, feminine, singular or plural, individuals, partnerships or corporations.

12.6    <u>Governing Law</u>. This Agreement and the transactions contemplated hereby shall be construed in accordance with and governed by the laws of the State of Michigan without giving effect to the conflict of law provisions thereof. Each of the Parties agrees that any proceeding brought to enforce the rights and obligations of any Party under this Agreement (including the schedules attached hereto) or any Ancillary Agreement shall be commenced and maintained exclusively in the Bankruptcy Court and that the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.

12.7    <u>Entire Agreement</u>. This Agreement, the Disclosure Schedules attached hereto, and the Ancillary Agreements (in each case incorporated herein by this reference) contain the entire agreement and understanding of the Parties hereto with respect to the transactions contemplated hereby, and supersede any and all prior agreement, arrangements, and understandings, whether oral or written, between the Parties.

12.8    <u>Binding Effect</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties and, except as otherwise prohibited, their respective successors and assigns. Nothing

contained in this Agreement, or implied here from, is intended to confer upon any Person other than the Parties any benefits, rights, or remedies.

12.9    Assignment. No Party may assign all or any portion of its respective rights or delegate any portion of its duties hereunder without (a) the approval of the Bankruptcy Court and (b) the written consent of the other Parties; provided that (i) the Buyer may collaterally assign this Agreement to its lenders without the consent of the Seller, and (ii) the Buyer may assign this Agreement in whole or in part to any Affiliate of the Buyer so long as the Buyer retains its obligations under this Agreement, subject to the terms and conditions hereof, to effect the consummation of the transactions contemplated hereby. All of the terms, provisions and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, assigns and legal representatives.

12.10    Severability. If a court of competent jurisdiction determines that any provision of this Agreement is void, illegal, or unenforceable, the other provisions of this Agreement shall remain in full force and effect and the provisions that are determined to be void, illegal, or unenforceable shall be limited so that they shall remain in effect to the extent permissible by Applicable Law.

12.11    Publicity. Prior to the Closing, no Party shall issue any press release or similar public announcement concerning the transactions contemplated hereby or the contents of this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, nothing in this Section 12.12 shall preclude any Party (or Person controlling such Party) from making disclosures required by Applicable Law or Governmental Authority (or of any applicable stock or securities exchange or otherwise), or appropriate filings with the Bankruptcy Court in connection with the Case or necessary and proper in conjunction with the filing of any Tax return or other document required to be filed with any Governmental Authority; provided that the Party required to make the release or statement shall allow the other Party reasonable time to comment on such release or statement in advance of such issuance.

12.12    Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute shall be deemed to refer to such statute as amended and to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "include" or "including" means include or including, without limitation. All references in this Agreement to Sections and Schedules shall be deemed references to Sections of, and Disclosure Schedules to, this Agreement unless the context shall otherwise require.

12.13    Specific Performance. Each Party acknowledges that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by such Party in accordance with their specific terms or were otherwise breached by such Party. Each Party accordingly agrees that, prior to the termination of this Agreement pursuant to ARTICLE 10, in addition to any other remedy to which the other Parties are entitled at law or in equity, the other

Parties are entitled to injunctive relief to prevent breaches of this Agreement by such Party and otherwise to enforce specifically the provisions of this Agreement against such Party. Each Party expressly waives any requirement that any other Party obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement. If the Seller asserts a claim for actual damages against the Buyer based on an alleged breach, the Seller must bring an action against the Buyer in Bankruptcy Court seeking recovery of actual damages, and the Deposit will be held by the Escrow Agent pending a final resolution of such claims. To the extent required to compensate the Seller for any actual damages awarded by Final Order of the Bankruptcy Court, the Deposit will be used for such purpose. To the extent not required for the payment of such award, the Deposit or any balance thereof will be returned to the Buyer. Notwithstanding the foregoing, the forfeiture of all of the Deposit shall be the sole and exclusive remedy to the Seller for any breach by Buyer of this Agreement.

## ARTICLE 13

## DEFINITIONS

"Accounts Receivable" shall mean all accounts and notes receivable of the Seller.

"Acquisition Transaction" shall mean any sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller.

"Affiliate" shall mean, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.

"Ancillary Agreements" shall mean the agreements and documents delivered by the Parties in connection with Section 3.2 or Section 3.4.

"Applicable Law" shall mean, with respect to any Person, any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, or other requirement enacted, promulgated, issued or entered by a Governmental Authority, that is applicable to such Person or its business, properties or assets.

"Auction" shall mean the auction sale of the Assets to be conducted pursuant to the Bidding Procedures Order or other order of the Bankruptcy Court.

"Avoidance Actions" shall mean any and all actions which a trustee, debtor-in-possession or other appropriate party in interest (including any Person given standing to act for such party in interest) may assert on behalf of the Seller or its estate under applicable state statute or Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553.

"Bidding Procedures Order" shall mean an Order of the Bankruptcy Court entered in the Case approving procedures for the solicitation and consideration of competitive bids for the Assets under the terms and conditions of this Agreement, which Order shall provide: (a) the Buyer shall be designated as the stalking-horse purchaser for the Assets; (b) at any Auction for the Assets, (i) each higher bid for the Assets (each an "Overbid") shall provide additional cash consideration above the immediately preceding prevailing bid (including, on the first Overbid, the Purchase Price set forth in this Agreement, plus the Break-Up Fee, the Expense Reimbursement) of at least Thirty Five Thousand and No/100 Dollars ($35,000.00), (ii) the first Overbid shall be Five Million Two Hundred Ten Thousand and No/100 Dollars ($5,210,000.00), and (iii) the Buyer shall have the right to bid at the Auction against any Overbid made by another party and to apply, at Closing, the Break-Up Fee and the Expense Reimbursement as a credit against any Overbid made by the Buyer at such Auction; and (c) if the Buyer is not designated by the successful bidder for the Assets, the Buyer shall be entitled to receive the Break-Up Fee and the Expense Reimbursement as allowed administrative expenses of the Seller's bankruptcy estate, to be paid at Closing.

"Break-Up Fee" shall mean One Hundred Fifty Thousand and No/100 Dollars ($150,000.00).

"Business Day" shall mean any day other than Saturday, Sunday or any day on which banking institutions in the United States are closed either under Applicable Law or action of any Governmental Authority.

"Contract" shall mean any agreement, arrangement, contract, lease, purchase order, sale order or commitment, or any series of related agreements, arrangements, contracts, leases, purchase orders, sale orders, or commitments.

"Cure Costs" shall mean, in the aggregate, any and all costs and expenses for any available monetary cures (pursuant to Section 365 of the Bankruptcy Code and described in any Order of the Bankruptcy Court relating to such cure liability) of any Assumed Contacts.

"Disclosure Schedules" shall mean the schedules of the Seller delivered to the Buyer concurrently with the execution and delivery of this Agreement (as may be updated pursuant to Section 6.7), a copy of which is attached to this Agreement and incorporated by reference.

"Employee Plans" shall mean each plan, program, agreement or other arrangement, whether or not set forth in a collective bargaining agreement, providing for pension, profit-sharing, retirement savings, health, life insurance, scholarship, tuition reimbursement, welfare benefits, deferred compensation, severance, termination pay, performance awards, bonus, commission, incentive compensation, equity or equity-related awards, change in control, retention, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Theater" shall mean any Theater other than the Oswego Theater.

"Expense Reimbursement" shall mean Twenty-Five Thousand and No/100 Dollars ($25,000.00).

"Final Order" shall mean an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial, request for stay, motion or petition for reconsideration, application or request for review, or other similar motion, application, notice or request (collectively, a "Challenge") has been timely filed, or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further Challenge thereon; (b) as to which the time for instituting or filing a Challenge shall have expired; and (c) as to which no stay is in effect. Nothing herein shall prohibit the parties, by mutual written consent, from Closing the transactions contemplated hereby, in the absence of a Final Order, so long as the Sale Order is not then subject to a stay from a Governmental Authority.

"Governmental Authority" shall mean any national, federal, state, provincial, local or foreign government, or any subdivision, agency, instrumentality, authority, department, commission, board or bureau thereof, or any federal, state, provincial, local or foreign court, tribunal, or arbitrator, including the Bankruptcy Court.

"Home Office" shall mean the facility located at 4417 Broadmoor Ave SE, Grand Rapids, Michigan 49512.

"Intellectual Property" shall mean all patents, trademarks, trade names, service marks, trade dress, copyrights, applications for registration of any of the foregoing, and brand names, inventions, processes, know how, trade secrets, all databases, data collections, source code, all domain names and websites and related URLs, any moral and economic rights of authors and inventors, however denominated, throughout the world, and any similar or equivalent rights to any of the foregoing anywhere in the world.

"Inventory" shall mean all supplies, goods, materials, work in process, inventory and stock in trade.

"Knowledge of the Seller" (or "the Seller's Knowledge") shall mean the actual knowledge of the officers of the Seller listed on Schedule 13.1, after reasonable inquiry.

"Licenses" shall mean all business licenses, occupancy permits and other permits, authorizations or approvals held by the Seller.

"Liens" shall mean any and all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances, and other interests of any kind or nature whatsoever, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, retiree healthcare or life insurance claims of the Seller, and any transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of the Case, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise.

"Material Adverse Effect" shall mean with respect to the Seller, the Assets or the Business, as the context requires, any event, fact, condition, change or occurrence which is materially adverse to the business, operations, condition (financial or otherwise) or assets of the Business; *provided* that any (a) change in general economic or industry-wide conditions that does not affect the Business disproportionately, (b) change in law or accounting standards or interpretations thereof that is of general application, or (c) adverse effect that is solely the result of the execution or announcement of this Agreement or the transactions contemplated hereby or the consummation thereof, shall not be taken into account for purposes of determining a Material Adverse Effect hereunder.

"Order" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Party" and "Parties" shall have the meanings set forth in the Preamble.

"Permitted Liens" shall mean: (a) statutory Liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (b) zoning, entitlement and other land use and environmental regulations by any Governmental Authority provided that such regulations have not been violated; (c) title of a lessor under a capital or operating lease if such lease is an Assumed Contract; and (d) easements, covenants, rights of way, and other similar restrictions or conditions of record that do not materially interfere with the Buyer's use of the property to which the restrictions relate.

"Person" shall mean any individual, corporation, partnership, joint venture, trust, limited liability company, business association, Governmental Authority or other entity.

"Sale Order" shall mean an Order of the Bankruptcy Court entered pursuant to Bankruptcy Code Sections 363 and 365 that (a) is in substantially the form set forth as Exhibit A to this Agreement or otherwise in a form reasonably satisfactory to the Seller and the Buyer, (b) approves the sale of the Assets to the Buyer pursuant to the terms of this Agreement and the provisions of the Bankruptcy Code (including Bankruptcy Code Section 363), (c) approves the Seller's assignment of the Assumed Contracts to the Buyer pursuant to Section 365 of the Bankruptcy Code, (d) finds that the Buyer is a good faith purchaser pursuant to Bankruptcy Code Section 363(m) and the Purchase Price was not controlled by any agreement in violation of Section 363(n) of the Bankruptcy Code or any other section of the Bankruptcy Code, and (e) provides that it shall be effective and enforceable immediately upon entry by the Bankruptcy Court, notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

"Seller Intellectual Property" shall mean all Intellectual Property owned by Seller;

"Tax" or "Taxes" shall mean (a) all taxes, charges, fees, levies, penalties or other assessments of any kind whatsoever imposed by an federal, state, local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalties or additions

attributable thereto or (b) liability for the payment of any amounts of the type described in clause (a) above as a result of being a party to any agreement or any express or implied obligation to indemnify or otherwise succeed to the liability of any other Person.

"Tax Code" shall mean the Internal Revenue Code of 1986, as it has been and may be amended.

"Theaters" shall mean the retail theaters that are owned or operated by the Seller other than the Oswego Theater.

"Title Company" shall mean Chicago Title Insurance Company or any other title company jointly selected in the reasonable discretion of the Seller and the Buyer.

"Title Insurance Policy" shall mean an Owner's Policy based on the American Land Title Association 2006 form, or such form as may be acceptable to the Buyer in its reasonable discretion, covering the Oswego Real Property to the extent of the portion of the Purchase Price allocated to the Oswego Real Property, showing fee simple title vested in the Buyer, subject only to the Permitted Liens and Exceptions.

"Treasury Regulations" shall mean the federal income Tax regulations promulgated under the Tax Code, as amended, including any temporary and proposed regulations.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, and any similar Applicable Law.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

*SIGNATURES PAGES FOLLOW*

This Asset Purchase Agreement is executed by the Parties on the date set forth above.

**SELLER:**                        **GOODRICH QUALITY THEATERS, INC.**

By: _Robert Goodrich_

Name: ___Robert Goodrich___

Title: ___President___

**BUYER:**                         **TIVOLI ENTERPRISES, INC.**

By: _____

Name: Christopher Johnson

Title:   CEO

*– and –*

**603-635 ROGERS, LLC - OSWEGO**

By: _____

Name: Christopher Johnson

Title:   Manager

This Asset Purchase Agreement is executed by the Parties on the date set forth above.

**SELLER:**                      **GOODRICH QUALITY THEATERS, INC.**

By: _____

Name: _____

Title: _____

**BUYER:**                       **TIVOLI ENTERPRISES, INC.**

By: _____

Name: Christopher Johnson

Title:   CEO

*– and –*

**603-635 ROGERS, LLC – OSWEGO**

By: _____

Name: Christopher Johnson

Title:   Manager

28

**ASSET PURCHASE AGREEMENT**

**Dated as of June 9, 2020**

**By and Among**

**GOODRICH QUALITY THEATERS, INC.,**

**as Seller**

**AND**

**GOODRICH THEATER NEWCO, LLC,**

**as Buyer**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 PURCHASE AND SALE OF ASSETS .......................................................... 2
    1.1    Defined Terms .................................................................................................. 2
    1.2    Purchase and Sale ............................................................................................ 2
    1.3    Excluded Assets .............................................................................................. 3
    1.4    Assumed Liabilities ........................................................................................ 4
    1.5    Excluded Liabilities ........................................................................................ 5
    1.6    Assumed and Rejected Leases and Contracts .................................................. 6

ARTICLE 2 PURCHASE PRICE AND PAYMENT ....................................................... 7
    2.1    Purchase Price ................................................................................................. 7
    2.2    Non-Assignable Assets ................................................................................... 7
    2.3    Transfer Taxes ................................................................................................ 7
    2.4    Deposit ........................................................................................................... 7
    2.5    Prorations ....................................................................................................... 8

ARTICLE 3 CLOSING .................................................................................................... 8
    3.1    Closing ............................................................................................................ 8
    3.2    Deliveries by the Seller at Closing ................................................................. 8
    3.3    Deliveries by the Buyer at Closing ................................................................ 9
    3.4    Deemed Consents and Cures .......................................................................... 9
    3.5    Allocation of Purchase Price .......................................................................... 9
    3.6    Subsequent Documentation; Further Assurances .......................................... 10

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLER ............... 10
    4.1    Organization and Power ................................................................................ 10
    4.2    Authority; No Conflicts ................................................................................ 10
    4.3    Execution and Delivery ................................................................................ 10
    4.4    Title to Assets .............................................................................................. 11
    4.5    Permits; Compliance with Laws ................................................................... 11
    4.6    Third Party Approvals .................................................................................. 11
    4.7    Real Estate ................................................................................................... 11
    4.8    Employment and Benefit Matters ................................................................. 12
    4.9    Intellectual Property ..................................................................................... 12
    4.10    No Brokers ................................................................................................... 12
    4.11    Sufficiency of Assets ................................................................................... 12
    4.12    Litigation; Orders ........................................................................................ 12
    4.13    Contracts ...................................................................................................... 13
    4.14    Taxes ........................................................................................................... 13
    4.15    Absence of Certain Changes ......................................................................... 13
    4.16    Related Party Transactions ............................................................................ 13
    4.17    Termination of Representations and Warranties Upon Closing ..................... 13
    4.18    Disclaimer of Other Representations and Warranties .................................... 13

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE BUYER ............... 14

5.1   Organization and Power ...................................................................................14
5.2   Authority; No Conflicts ...................................................................................14
5.3   Execution and Delivery ...................................................................................14
5.4   Litigation .........................................................................................................14
5.5   No Brokers .......................................................................................................14
5.6   Financing .........................................................................................................14
5.7   Termination of Representations and Warranties Upon Closing .....................15

ARTICLE 6 COVENANTS OF THE SELLER                                                              15
6.1   Access ..............................................................................................................15
6.2   Reasonable Best Efforts ..................................................................................15
6.3   Notice to the Buyer .........................................................................................15
6.4   Maintenance of Interests .................................................................................15
6.5   Consents and Approvals ..................................................................................17
6.6   Confidentiality .................................................................................................17
6.7   Update to Disclosure Schedules ......................................................................17
6.8   Change of Name ..............................................................................................17

ARTICLE 7 COVENANTS OF THE BUYER                                                               17
7.1   Reasonable Best Efforts ..................................................................................17
7.2   Notice to the Seller ..........................................................................................17
7.3   Bankruptcy Court Approval and Related Matters ...........................................17
7.4   Transferred Employees ...................................................................................18

ARTICLE 8 CONDITIONS TO CLOSING                                                                18
8.1   Seller's Conditions to Closing ........................................................................18
8.2   Buyer's Conditions to Closing ........................................................................19

ARTICLE 9 ADDITIONAL OBLIGATIONS AFTER CLOSING                                                 19
9.1   Execution; Delivery of Instruments and Assistance; Wrong Pockets ............19
9.2   Access to Records ...........................................................................................20

ARTICLE 10 TERMINATION                                                                         20
10.1  Termination ......................................................................................................20
10.2  Effect of Termination ......................................................................................21

ARTICLE 11 CHAPTER 11 BANKRUPTCY PROCEEDING                                                    22
11.1  Sale Order; Notices to Third Parties ...............................................................22
11.2  Requests for Information ..................................................................................22
11.3  Additional Bankruptcy Court Matters .............................................................23

ARTICLE 12 GENERAL PROVISIONS                                                                  23
12.1  Notice ...............................................................................................................23
12.2  Amendment ......................................................................................................24
12.3  Payment of Costs .............................................................................................24
12.4  Headings ..........................................................................................................25
12.5  References ........................................................................................................25

12.6    Governing Law ................................................................................................25
12.7    Entire Agreement ...........................................................................................25
12.8    Binding Effect ................................................................................................25
12.9    Assignment ....................................................................................................25
12.10   Severability ...................................................................................................25
12.11   Publicity ........................................................................................................25
12.12   Construction ..................................................................................................26
12.13   Specific Performance .....................................................................................26

ARTICLE 13 DEFINITIONS                                                                   26

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), is entered into as of June 9, 2020, by and among: (a) **GOODRICH QUALITY THEATERS, INC.**, a Michigan Corporation formed under the laws of the State of Michigan ("Seller"); and (b) **GOODRICH THEATER NEWCO, LLC**, a Delaware limited liability company (the "Buyer"). The Seller and the Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, the Seller operates certain retail movie theaters located at the Leased Real Property and the Owned Real Property (the "Business");

WHEREAS, the Seller filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on February 25, 2020 (the "Petition Date") in the United States Bankruptcy Court for the Western District of Michigan (the "Bankruptcy Court"), Case No. 20-00759 (the "Case");

WHEREAS, the Seller filed with the Bankruptcy Court that certain *Motion for: (I) an Order (A) Approving Bidding Procedures for the Proposed Sale of Substantially All of the Debtor's Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (B) Approving the Establishment of Cure Amounts, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Authorizing Procedures for the Sale of Substantially All of the Debtor's Assets Free and Clear of Liens, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases, and (C) Granting Related Relief* (as may be amended and revised from time to time, the "Sale Motion");

WHEREAS, the Seller wishes to sell, transfer, convey, assign and deliver to the Buyer, and the Buyer wishes to purchase, assume and acquire, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, the Assets (as defined below), and the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, subject to the Bankruptcy Court's entry of the Sale Order as defined herein, the Seller shall sell, transfer, convey, assign and deliver to the Buyer, and the Buyer shall purchase, assume and acquire, the Assets and the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF ASSETS

1.1　<u>Defined Terms</u>.  All capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings set forth for such terms in <u>ARTICLE 13</u>.

1.2　<u>Purchase and Sale</u>.  Subject to the terms and conditions set forth in this Agreement and the Sale Order, at the Closing the Seller shall sell, transfer, convey and assign to the Buyer, free and clear of all Liens (except for Permitted Liens), and the Buyer shall purchase, assume and acquire from the Seller, all right, title and interest of the Seller in, to and under all of the business, properties, assets and goodwill of whatever kind and nature, real or personal, tangible or intangible, actual or contingent, which are owned, used, or held by the Seller, other than the Excluded Assets (collectively, the "Assets"), including the following:

(a)　All tangible personal property, leasehold improvements, installations, fixtures, trade fixtures, equipment, fittings, furniture, furnishings, office equipment and supplies other than Inventory (together with the Inventory, the "<u>Tangible Personal Property</u>") located at a Transferred Theater or the Home Office;

(b)　The Real Property owned by the Seller, including as set forth on <u>Schedule 1.2(b)</u> (the "<u>Owned Real Property</u>"), not including the Excluded Owned Real Property;

(c)　All Assumed Contracts;

(d)　All Inventory located at, or in shipment to, a Transferred Theater or the Home Office as of the Closing Time (the "<u>Transferred Inventory</u>");

(e)　All Licenses (to the extent such Licenses are transferable) relating to any of the Transferred Theaters or the Home Office, other than any Excluded Licenses (as defined below);

(f)　All Intellectual Property, including the name and phrase "Goodrich Quality Theaters, Inc." and derivatives thereof;

(g)　All security and other deposits and advances and all pre-paid expenses relating to the Transferred Theaters or the Home Office, other than Excluded Deposits (as defined below);

(h)　All Accounts Receivable as of the Closing Time related to a Transferred Theater;

(i)　All goodwill of the Seller associated with the Business as a going concern;

(j)　All of the Seller's books, records, files, documents and other written or electronic materials except those related solely to the Excluded Assets or the Excluded Liabilities or expressly included in the Excluded Assets pursuant to <u>Section 1.3</u>; <u>provided</u> that the Seller shall be permitted to make copies or extracts of such materials prior to

2

transfer in order to comply with any Applicable Law or to satisfy any contractual obligations;

(k)    All of Seller's rights under warranties, indemnities and similar rights against third parties to the extent related to the Assets;

(l)    All insurance benefits, including rights and proceeds related to the Assets or Assumed Liabilities ("Acquired Insurance Benefits");

(m)    All Avoidance Actions or other claims of the Seller under Chapter 5 of the Bankruptcy Code relating to any Assumed Contract or trade vendor and service providers used in the Business, except such trade vendor and service provider used exclusively by any Excluded Theater, except that neither the Debtor, the estate, nor the Lenders waive any right to object to or seek the disallowance of any claims, including claims described in section 507(a)(2), pursuant to section 502(d) of the Bankruptcy Code, including against any claimant from which property is recoverable as a Non-Insider Preference   ("Acquired Avoidance Actions");

(n)    All customer data and information derived from customer purchase files and branded loyalty promotion programs, including Seller's rewards subscription database, and other similar information related to customer purchases;

(o)    Telephone and fax numbers relating to the Home Office or any Transferred Theater;

(p)    email addresses; and

(q)    all refunds and other Tax assets related to the Assumed Property Taxes, and all Tax records of the Seller related to the Assumed Property Taxes.

1.3    Excluded Assets.  Notwithstanding anything to the contrary contained herein, the Buyer shall not purchase, assume or acquire from the Seller, and the Seller shall not sell, transfer, convey or assign to Buyer, any of the Seller's right, title and interest in and to the following business, properties, assets (and such business properties and assets shall not be considered Assets hereunder) (collectively, the "Excluded Assets"):

(a)    All Avoidance Actions or other claims of the Seller under Chapter 5 of the Bankruptcy Code, except for the Acquired Avoidance Actions;

(b)    Except in connection with the Assumed Property Taxes, all refunds, pre-payments, net operating losses and claims relating to federal, state or municipal income Taxes of the Seller for any period, or portion of any period, ending on or prior to the Closing Date, which shall also encompass all Tax records of the Seller;

(c)    All records relating solely to the Seller's corporate organization and existence, including the certificate of incorporation, bylaws and other governing documents of Seller and the equity interests described thereunder;

(d)    All equity securities owned or held by the Seller;

(e)    All claims (including any litigation or arbitration claims and any refunds and deposits), rights, rights of offset or causes of action that the Seller or its Affiliates may have against or from any Person relating to any of the Excluded Assets or the Excluded Liabilities;

(f)    All assets of the Seller Plans;

(g)    This Agreement and the other Ancillary Agreements and all causes of action and claims that may be asserted under this Agreement or any Ancillary Agreement or any other agreements or instruments otherwise delivered in connection with this Agreement or any Ancillary Agreement against the Buyer;

(h)    All Contracts other than the Assumed Contracts (the "Excluded Contracts"), including all Real Property Leases other than the Assumed Real Property Leases (the "Excluded Real Property Leases");

(i)    All Tangible Personal Property and Inventory located at or in, or in shipment to, any Excluded Theater as of the Closing Time;

(j)    All Licenses to the extent such Licenses are not transferable or are exclusively related to an Excluded Asset (including an Excluded Theater) (the "Excluded Licenses");

(k)    All security and other deposits and advances and all pre-paid expenses to the extent exclusively relating to an Excluded Asset (including an Excluded Theater) (the "Excluded Deposits");

(l)    The Excluded Owned Real Property;

(m)    All personnel and medical records of employees who do not become Transferred Employees;

(n)    All assets and other rights sold or otherwise transferred or disposed of during the period from the date of this Agreement through and including the Closing Date, in any event in accordance with the provisions of this Agreement;

(o)    All claims, deposits, prepayments, prepaid assets, refunds, causes of action, credits, choses in action, rights of recovery, rights of set off and rights of recoupment relating exclusively to any of the other Excluded Assets;

(p)    All insurance policies, claims and causes of action except for the Acquired Insurance Benefits; and

(q)    All cash and cash equivalents and all bank accounts.

1.4    <u>Assumed Liabilities</u>.    Subject to the terms and conditions set forth in this Agreement and the Sale Order, at the Closing, the Buyer shall assume and pay or perform and

discharge when due the following liabilities and obligations of the Seller existing as of such time (collectively, the "Assumed Liabilities"):

(a)     All liabilities and obligations under the Assumed Contracts that first arise and become due after the Closing Date, and all Cure Costs of the Assumed Contracts;

(b)     To the extent incurred in the ordinary course of business consistent with past practices, all liabilities and obligations with respect to any gift cards outstanding on the Closing Date, and all liabilities with respect to other loyalty programs and customer presells outstanding on the Closing Date to the they may be used at a Transferred Theater as of immediately prior to the Closing Time; and

(c)     any Liability of Seller for property Taxes associated with the Real Property Leases due and payable prior to the Closing Time ("Assumed Property Taxes").

1.5     Excluded Liabilities.  Except for the Assumed Liabilities, the Buyer shall not be subject to and shall not assume or be liable for any Liabilities of any kind or nature, whether absolute, contingent, accrued, known or unknown, of the Seller, whether existing on the Closing Date or arising thereafter, including Liabilities relating to or arising out of any of the following (the "Excluded Liabilities"):

(a)     any Liability relating to or arising out of the Excluded Assets;

(b)     any Liability of Seller for Taxes (except for the Assumed Property Taxes and as provided for in Section 2.3 and Section 2.5);

(c)     all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by Seller) and administrative expenses and priority claims accrued through the Closing Date and specified post-closing administrative wind-down expenses of the bankrupt estates pursuant to the Bankruptcy Code and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the transactions contemplated under this Agreement and each of the other documents delivered in connection herewith, and (ii) the negotiation, execution and consummation of financing, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Seller payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith;

(d)     all Liabilities (i) related to WARN Act, to the extent applicable, with respect to the termination of Seller's employees, (ii) for any action resulting from Seller's employees' separation of employment, (iii) for vacation, sick leave, parental leave, and other paid time accrued by Seller's employees, (iv) related to workers compensation claims of Seller's employees, (v) related to COBRA, to the extent applicable, with respect to the termination of Seller's employees, or (vi) to any employees arising prior to the Closing, including with respect to the termination of employment of the Company "insiders" (as such term is defined under the Bankruptcy Code);

(e)     all Liabilities relating to litigation, claims, actions, suits, arbitrations, proceedings or investigations (in each case whether involving private parties, Governmental

5

Authorities, or otherwise) involving, against, or affecting any Asset, the Business, the Seller or any assets or properties of Seller, commenced, filed, initiated or threatened before the Closing and relating to facts, events or circumstances arising or occurring before the Closing;

(f)     all Liabilities in connection with the failure by Seller to comply with any law or order of a Governmental Authority; and

(g)     accounts payable arising prior to the Closing.

provided that in the event of any conflict between Section 1.4 and this Section 1.5, Section 1.5 shall control.

     1.6     Assumed and Rejected Leases and Contracts.

(a)     Schedule 1.6(a) (the "Contract Schedule") sets forth a list of all executory Contracts and other Contracts (including all Real Property Leases and any non-executory Contracts) to which, to the Seller's Knowledge, the Seller is a party. Such schedule indicates which Theaters use the services or goods provided by such Contracts.

(b)     From the date of this Agreement until three (3) days prior to the Sale Hearing (the "Designation Deadline"), the Buyer shall have the right to designate, under a notice given to the Seller in accordance with Section 12.1 (any such notices given by the Buyer under this Section 1.6, a "Designation Notice") any Contract listed on the Contract Schedule as a Contract that will be assigned to, and assumed by, the Buyer (a "Assumed Contract").  To the extent the Buyer has not designated a Contract listed on the Contract Schedule an Assumed Contract by the Designation Deadline, such Contract shall not be an Assumed Contract.  Until the Designation Deadline, the Buyer may designate and/or de-designate any Contract as a Contract that will be an Assumed Contract as many times as it desires; provided that at any time prior to two (2) Business Days prior to Closing, by written notice to Seller, Buyer may de-designate any Contract (including any Real Property Lease) as an Assumed Contract and remove from Schedule 1.6(b).  The Assumed Contracts as of the date hereof are set forth on Schedule 1.6(b), which may be supplemented as Contracts are added or removed as provided in this Section 1.6(b). The Seller shall take all actions reasonably required to assign to the Buyer each Assumed Contract in accordance with Section 365 of the Bankruptcy Code, including providing that the Sale Order authorizes such assignment.

(c)     To the extent that any Assumed Contract is subject to a cure (pursuant to Section 365 of the Bankruptcy Code and described in any Order of the Bankruptcy Court relating to such cure liability), the Buyer shall be obligated to timely pay such Cure Costs as a condition to such assumption and assignment to the Buyer.

(d)     No designation of any Contract for assumption and assignment or rejection in accordance with this Section 1.6 shall give rise to any adjustment to the Purchase Price.

(e)     Notwithstanding anything contained herein to the contrary, after the filing date of the Bidding Procedures Motion, Buyer, without the consent of Seller, may directly communicate and engage with the landlord and related counterparties to the Real Property Leases for purposes of negotiating new leases, amendments or modifications to the Real Property Leases,

and/or terms of assumption and assignment of the Real Property Leases to Buyer.  The Seller shall cooperate with the Buyer in such manner as may be reasonably requested in connection therewith.

## ARTICLE 2

## PURCHASE PRICE AND PAYMENT

2.1     Purchase Price.  In addition to the assumption of the Assumed Liabilities, the consideration to be paid by the Buyer for the sale of the Assets (the "Purchase Price") shall be (i) Twelve Million Dollars ($12,000,000) ("Base Purchase Price"), plus (ii) Seller's Proration Amount, minus (iii) the Buyer Proration Amount.

2.2     Non-Assignable Assets.  If any Asset is by its terms or by Applicable Law non-assignable or non-transferable, to the extent such terms are not superseded by the terms of the Sale Order, the Seller shall use its reasonable best efforts to obtain, or cause to be obtained, on or prior to the Closing, any approvals or consents necessary to convey to the Buyer the benefit thereof. The Buyer shall cooperate with the Seller in such manner as may be reasonably requested in connection therewith.  In the event any consent or approval to an assignment contemplated hereby is not obtained on or prior to the Closing Date, the Seller shall continue to use reasonable best efforts to obtain any such approval or consent after the Closing Date and the Seller agrees to enter into any appropriate and commercially reasonable arrangement to provide that the Buyer shall receive the Seller's interest in the benefits under any such Asset; *provided* that the Buyer shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent the Buyer would have been responsible therefor if such consent or approval had been obtained.

2.3     Transfer Taxes.  To the extent the transactions contemplated hereby are not exempt under Section 1146 of the Bankruptcy Code, the Buyer and Seller shall each pay one-half of any sales and transfer Taxes, filing fees, documentary fees or other similar Taxes payable in connection with the purchase, sale or transfer of the Assets to, and the assumption of the Assumed Liabilities by, the Buyer pursuant to this Agreement.  The Buyer and the Seller shall use reasonable best efforts to minimize the amount of all the foregoing Taxes and shall cooperate in providing each other with any appropriate resale exemption certifications, Tax clearance certificates and other similar documentation, including Unemployment Insurance Agency Form 1027.  The Party that is required by Applicable Law to make the filings, reports, or returns and to handle any audits or controversies with respect to any of the foregoing Taxes shall do so, and the other Party shall cooperate (and make reimbursement) with respect thereto as necessary.

2.4     Deposit.  The Buyer shall, within two (2) Business Days after the date hereof, deposit with a mutually acceptable independent escrow agent (the "Escrow Agent") an amount equal to ten percent (10%) of the Base Purchase Price (the "Deposit"), pursuant to an escrow agreement in customary commercial form (the "Escrow Agreement").  If the Closing takes place as provided herein, then the Deposit (and all accrued investment income thereon)  shall be credited against the Purchase Price.  If this Agreement is terminated in accordance with ARTICLE 10 for any reason other  than by the Seller: (a) pursuant to Section 10.1(c), if the failure of the Closing to occur on or prior to the Outside Date results primarily from Buyer's breach or default of its obligations, covenants or representations under this Agreement, or (b) pursuant to Section 10.1(e),

7

then the Escrow Agent shall promptly return the Deposit (and all accrued investment income thereon) to the Buyer.  If this Agreement is terminated by the Seller: (a) pursuant to Section 10.1(c), if the failure of the Closing to occur on or prior to the Outside Date results primarily from Buyer's breach or default of its obligations, covenants, or representations under this Agreement, ro (b) pursuant to Section 10.1(e), the Escrow Agent shall promptly deliver the Deposit (and all accrued investment income thereon) to the Seller.  The Deposit shall not be considered property of the Seller's bankruptcy estates unless and until the Deposit is delivered to the Seller in accordance with this Section 2.4.

2.5    Prorations.  The following items shall be prorated between Seller and Buyer as of the Closing Date: (i) applicable property and personal Taxes (other than transfer Taxes and the Assumed Property Taxes), (ii) post-petition utilities, and (iii) post-petition lease payments under any leases that are Assumed Contracts (other than the Assumed Property Taxes).  Unless otherwise stated herein, all prorations shall be on an accrual basis in accordance with GAAP, and based on the actual number of days in each month.  Seller shall be responsible for amounts relating to the period prior to the Closing Time, and Buyer shall be responsible for amounts relating after the Closing Time.  Property Taxes on Assets will be prorated using applicable property tax rates if known, and if not known, applicable property Tax rates from the last known period shall be utilized but subject to later adjustments for actual property Tax rates.  The net amount of all prorations owed to Buyer and Sellers under this shall be referred to as the "Buyer Proration Amount" if owed to Buyer or the "Seller Proration Amount" if owed to Sellers.

## ARTICLE 3

## CLOSING

3.1    Closing.  Consummation of the transactions contemplated hereby (the "Closing") shall occur within two (2) Business Days after satisfaction or waiver of the conditions to closing in ARTICLE 8 (other than those conditions that by their nature are to be satisfied at the Closing) or at such other time as the Parties may agree but in any event no later than July 15, 2020 (the "Outside Date"); *provided*, *however*, that the Outside Date may be extended upon mutual agreement of the Parties.  The Closing shall take place remotely via electronic exchange of documents or at such other place that is mutually agreed by the Parties.  The date on which the Closing actually takes place is referred to in this Agreement as the "Closing Date." The Closing shall be effective as of 11:59 p.m.  on the Closing Date (the "Closing Time").

3.2    Deliveries by the Seller at Closing.  At the Closing, the Seller shall execute, acknowledge and/or deliver to the Buyer the following:

(a)    A bill of sale, pursuant to which the Seller will transfer the Tangible Personal Property included in the Assets to the Buyer, duly executed by the Seller;

(b)    One or more assignment and assumption agreements, pursuant to which the Seller shall assign to the Buyer the Assumed Contracts and Assumed Liabilities (the "Assignment and Assumption Agreements"), duly executed by the Seller;

8

(c)    If requested by the Buyer, trademark, patent and domain name assignments, pursuant to which the Seller shall assign the Intellectual Property included in the Assets to the Buyer, duly executed by the Seller (the "IP Assignment Agreements");

(d)    A copy of the resolutions adopted by the Seller's governing board authorizing the transactions contemplated hereby and the consummation thereof, certified by a secretary or assistant secretary of the Seller to be a true and correct copy;

(e)    With respect to each parcel of Owned Real Property that constitute Assets, a warranty deed in a form mutually acceptable to the parties conveying title which is free and clear of all Liens and other than Permitted Liens and any documents ancillary thereto required by the jurisdiction in which such parcel of Owned Real Property is located, duly executed by the Seller (collectively, the "Deed Documents");

(f)    An affidavit of Seller in a form reasonably satisfactory to Buyer certifying that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended; and

(g)    such other assignments and other instruments of transfer or conveyance as Buyer may reasonably request or as may otherwise be necessary to evidence and effect sale, assignment, transfer, conveyance and delivery of the Assets to Buyer.

3.3    Deliveries by the Buyer at Closing.  At the Closing, the Buyer shall execute, acknowledge and/or deliver to the Seller the following:

(a)    The Assignment and Assumption Agreement(s), duly executed by the Buyer;

(b)    The Purchase Price minus the Deposit, in cash by wire transfer of immediately available funds to a bank account designated in writing by the Seller at least one (1) day prior to the Closing Date;

(c)    The IP Assignment Agreements, if any, duly executed by the Buyer; and

(d)    The Deed Documents, duly executed by the Buyer.

3.4    Deemed Consents and Cures.  The Seller shall be deemed to have obtained all required consents in respect of the assignment of any of the Assumed Contracts and all defaults thereunder shall be deemed to have been cured if, and to the extent that, pursuant to the Sale Order or another Order of the Bankruptcy Court, the Seller is authorized to assume and assign any such Assumed Real Property Leases and Assumed Contracts to the Buyer pursuant to Section 365 of the Bankruptcy Code, except to the extent otherwise provided in the Sale Order or another Order of the Bankruptcy Court.

3.5    Allocation of Purchase Price.  Within sixty (60) days after the Closing Date, the Buyer will deliver to the Seller an allocation statement (the "Allocation Statement"), setting forth its calculation of the allocation of the sum of the Purchase Price and the Assumed Liabilities to the Assets.  The Seller will review the Allocation Statement and, to the extent the Seller disagrees in good faith with the content of the Allocation Statement, the Seller will inform the Buyer of such

9

disagreement within thirty (30) days after receipt of the Allocation Statement. The Seller and the Buyer will attempt to resolve any such disagreement. If the Seller and the Buyer are unable to reach a good faith agreement on the content of the Allocation Statement within ninety (90) days of the Closing Date, the Seller and the Buyer will each use its own allocation statement. If the Buyer and the Seller agree on the Allocation Statement, the Buyer and the Seller will act in accordance with the Allocation Statement in the preparation and filing of all Tax returns and for all other Tax, financial accounting or other purposes, in any litigation, or otherwise.

3.6    Subsequent Documentation; Further Assurances. The Buyer and the Seller shall, at any time and from time to time after the Closing Date, upon the reasonable request of the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such further (a) assignments, transfers, deeds and conveyances as may be required for assigning, transferring, granting, conveying and confirming the transactions contemplated hereby, including aiding and assisting the Buyer in collecting and reducing to possession any or all of the Assets and (b) documents and instruments as may be reasonably necessary for the further completion of any of the transactions contemplated hereby.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents that the following is true and correct as of the date hereof and shall be true and correct at the date of the Closing after giving effect to the Sale Order (taking into account any updates to Seller's Disclosure Schedules contemplated by Section 6.7 hereunder):

4.1    Organization and Power. The Seller is a Michigan Corporation duly organized, validly existing and in good standing under the laws of the State of its organization, is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not have a Material Adverse Effect, has all requisite corporate power and authority to carry on its business as currently conducted, and has the requisite corporate power and authority to own, lease, operate or hold the applicable Assets.

4.2    Authority; No Conflicts. Subject to the Bankruptcy Court's approval and entry of the Sale Order, Seller has the authority to enter into and consummate this Agreement and the Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby. Subject to the Bankruptcy Court's approval and entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and of the Ancillary Agreements to which it is a party (a) do not and shall not violate or conflict with any provision of the certificate of incorporation or bylaws of Seller, (b) do not and shall not violate any provision of any Applicable Law or any order, judgment or decree of any Governmental Authority, and (c) do not and shall not violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any Assumed Contract, except to the extent such violation, breach or default would not have a material and adverse effect on the Business.

4.3    Execution and Delivery. Subject to the Bankruptcy Court's approval and entry of the Sale Order, the execution and delivery of this Agreement and the consummation of the

WEST\290674651.7

transactions contemplated hereby by the Seller has been duly authorized by all necessary company action, and the execution and performance of the Ancillary Agreements by the Seller has been or shall be authorized by all necessary company action prior to the Closing Date.  Subject to the Bankruptcy Court's approval and entry of the Sale Order, this Agreement constitutes, and upon execution of each of the Ancillary Agreements such agreements shall constitute, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms.

4.4    Title to Assets.  At the Closing, the Buyer, under the Sale Order, will acquire good and marketable title in, to and under all of the Assets owned by the Seller as of the Closing Time and a good and valid leasehold interest in, to and under all of the Assets leased by the Seller as of the Closing Time, in each case free and clear of all Liens (other than Permitted Liens) to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  Except as set forth on Schedule 4.4, Seller has good and marketable title to the Assets.

4.5    Permits; Compliance with Laws

(a)    The Seller is in compliance with the material terms of all material Licenses used by the Seller in the Business, and all such Licenses are valid and in full force and effect, and no proceeding is pending or threatened in writing, the object of which is to revoke any such License.

(b)    The operation of the Business by the Seller complies in all material respects with all Applicable Laws and the requirements and conditions of all Licenses, including all applicable operating certificates and authorities, and all other rules, regulations, directives and policies of all Governmental Authorities having jurisdiction over the Business. Seller has not received any written notice of or been charged with the violation of any Applicable Laws that would reasonably be expected to have a material and adverse effect on the Business.

4.6    Third Party Approvals.  Except for (a) entry of the Sale Order, and (b) approvals or consents set forth on Schedule 4.6, the execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated hereby do not require any material consent, waiver, authorization or approval of, or filings with, any Person (including any Governmental Authority) that has not been obtained or is not deemed to be superseded by applicable provisions of the Bankruptcy Code (the matters described in this Section 4.6, collectively referred to as the "Consents").

4.7    Real Estate.

(a)    The Seller owns all of the Owned Real Property, free and clear of Liens other than Permitted Liens.  Schedule 4.7 sets forth a list of the Leased Real Property, Owned Real Property and Excluded Owned Real Property, which list constitutes all real property owned, or leased,  by Seller.

(b)    The Seller has made available to Buyer true and complete copies of all Real Property Leases with respect to such Leased Real Property, and true and complete copies of all title insurance policies, opinion, abstracts, surveys, and environmental reports in the possession of Seller with respect to each parcel of Owned Real Property that constitute Assets and Leased Real Property.

(c)      The Seller has not leased or otherwise granted to any Person the right to use or occupy any of the Owned Real Property that constitute Assets or Leased Real Property, or any portion thereof; and

(d)      There are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase any of the Owned Real Property that constitute Assets or any portion thereof or interest therein.

4.8      <u>Employment and Benefit Matters</u>.  All Employee Plans sponsored or contributed to by the Seller, covering employees of the Seller, or for which the Seller may have any liability are set forth on <u>Schedule 4.8</u> (the "<u>Seller Plans</u>").  No employee of Seller is covered by, and the Seller is not bound by, a collective bargaining or other labor-related agreement with any union or employee organization.  There has not been any, and there is no pending or, to the Knowledge of Seller, threatened union organizing campaign or other attempt to organize or establish a labor union, employee organization or labor organization involving or representing employees of Seller. To the Knowledge of Seller, there has not been any, and there is no pending or threatened, labor strike, labor dispute, walkout, work stoppage, slowdown or lockout involving Seller. The Michigan Department of Civil Rights has an open file of investigation related to the termination of certain employees that occurred pre-petition.

4.9      <u>Intellectual Property</u>.  Seller is the sole and exclusive legal and beneficial, and with respect to the any registrations related thereto, record, owner of all right, title and interest in and to the Seller Intellectual Property free and clear of Liens.  Seller has a valid right to use all other Intellectual Property used or held for use by the Seller as of the Closing Time, free and clear of Liens.  Schedule 4.9 sets forth a true, correct and complete list of all Intellectual Property that is issued, registered, or subject to an application for registration.  Such schedule also sets forth any common law trade names and trademarks and any domain names included in the Assets, identifying each as such.

4.10      <u>No Brokers</u>.  Except as set forth on <u>Schedule 4.10,</u> the Seller has not utilized the services of or contracted or dealt with a broker or finder in connection with any of the transactions contemplated by this Agreement, including the Buyer's purchase of the Assets or any portion thereof, and no commission or other compensation is or shall be due or owed from the Seller to any Person with respect to the purchase and sale of the Assets.

4.11      <u>Sufficiency of Assets</u>.  The Assets are in substantially the same condition since the Petition Date and  constitute all of the rights, property and assets necessary to conduct the Business as currently conducted immediately prior to the date hereof.

4.12      <u>Litigation; Orders</u>.  Except for the Case and any adversary proceedings or contested motions commenced in connection therewith, or as set forth on <u>Schedule 4.12</u>, (a) there is no claim, proceeding or Order pending, outstanding or, to any Sellers' Knowledge, threatened against any Seller (i) that would reasonably be expected to be material to the Business or the Assets or (ii) that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby.

WEST\290674651.7

4.13    Contracts.  Full copies of all Contracts (including Real Property Leases) set forth on the Contract Schedule have been provided to Buyer, or Seller shall use commercially reasonable efforts to provide such copies promptly after the date hereof.

4.14    Taxes.   Seller has provided Buyer with  copies of all Tax Returns for the three (3) most recent Tax years for which returns have been filed (2017, 2018 and 2019).

4.15    Absence of Certain Changes.   Since the Petition Date, and except for the preparation and commencement of the Case and related negotiations and financings, (a) there has not been any event, occurrence, development or state of circumstances or facts which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect, (b) there has not been any material damage, destruction, loss or casualty to property or assets of Seller, whether or not covered by insurance, and (c) the Business of Seller has been conducted only in the ordinary course of business consistent with past practices, other than in connection with the COVID-19 pandemic.

4.16    Related Party Transactions.  Except as set for the on Schedule 4.16, other than the Seller Plans no officer, director or executive committee member of any Seller or any member of their immediate family or any Affiliate of the Seller (a) is a party to any Contract set forth on Contract Schedule or has any material business arrangement with, or has any material financial obligations to or is owed any financial obligations from, the Seller or any actual competitor, vendor or licensor of the Seller, (b) to the Knowledge of Sellers, none of the foregoing Persons have any cause of action or other claim whatsoever against or related to the Business or the Assets, and (c) to the Knowledge of Sellers, the Seller does not have any direct or indirect business arrangement with or financial obligation to the foregoing Persons.

4.17    Termination of Representations and Warranties Upon Closing.  The representations and warranties of the Seller in this ARTICLE 4 shall not survive the Closing and shall be null and void *ab initio* and of no further force or effect immediately after the Closing.

4.18    Disclaimer of Other Representations and Warranties.   The representations and warranties set forth in this ARTICLE 4 are the only representations and warranties made by the Seller with respect to the Business, the Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement.  Except as specifically set forth in this ARTICLE 4: (a) the Seller is selling the Assets to Buyer "as is" and "where is" and with all faults, and makes no warranty, express or implied, as to any matter whatsoever relating to the Business, the Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Business by Buyer after the Closing in any manner or (iii) the probable success or profitability of the Business after the Closing, and (b) none of the Seller, any of the Seller's Affiliates, or any of their respective officers, directors, employees, agents, representatives, members or managers will have, or will be subject to, any liability or indemnification obligation to Buyer or any other Person resulting from the distribution to the Buyer or its Affiliates or representatives of, or the Buyer's use of, any information relating to the Business including any descriptive memoranda, summary business descriptions or any information, documents or material made available to Buyer or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to

13

questions submitted on behalf of the Buyer or in any other form in expectation of the transactions contemplated by this Agreement.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller that the following is true and correct as of the date hereof and shall be true and correct at the date of the Closing:

5.1     Organization and Power.  The Buyer is a duly organized, validly existing entity under Applicable Laws and in good standing in the State of its organization, has all requisite power and authority to carry on the business in which it is now engaged, and has taken all action required by Applicable Law, and by the Buyer's organizational documents, to authorize the execution and delivery of this Agreement and the purchase of the Assets and assumption of the Assumed Liabilities in accordance with this Agreement.

5.2     Authority; No Conflicts .  The Buyer has the requisite power and authority to execute this Agreement and each Ancillary Agreement to which the Buyer is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by the Buyer of this Agreement and each Ancillary Agreement to which the Buyer is a party (a) do not and shall not violate or conflict with any provision of the organizational documents of the Buyer, and (b) do not and shall not violate any provision of any Applicable Law or any order, judgment or decree of any Governmental Authority.

5.3     Execution and Delivery.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of the Buyer, and the execution and performance of each Ancillary Agreement to which the Buyer is a party has been or shall be authorized by all necessary action on the part of the Buyer prior to the Closing Date.  This Agreement constitutes, and upon execution by the Buyer of each of the Ancillary Agreements to which it is a party, such agreements shall constitute, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms.

5.4     Litigation.  There is no claim, litigation, action or legal proceeding before a Governmental Authority pending or threatened in writing against the Buyer, adversely affecting the Buyer's ability to perform its obligations hereunder.

5.5     No Brokers.  The Buyer has not utilized the services of or contracted or dealt with a broker or finder in connection with any of the transactions contemplated by this Agreement, including the Buyer's purchase of the Assets or any portion thereof, and no commission or other compensation is or shall be due or owed from the Buyer to any Person with respect to the purchase and sale of the Assets.

5.6     Financing.  The Buyer has sufficient funds available to consummate the transactions contemplated by this Agreement.

WEST\290674651.7

5.7    <u>Termination of Representations and Warranties Upon Closing</u>  The representations and warranties of the Buyer in this <u>ARTICLE 5</u> shall not survive the Closing and shall be null and void *ab initio* and of no further force or effect immediately after the Closing.

## ARTICLE 6

## COVENANTS OF THE SELLER

Seller covenants and agrees with the Buyer that:

6.1    <u>Access</u>.  Prior to the Closing or the termination of this Agreement, and on the basis that the Buyer shall have executed a Non-Disclosure Agreement in customary form as referenced in <u>Section 6.6</u> hereof, the Seller shall, upon reasonable advance notice, afford to the Buyer's officers, independent public accountants, counsel, lenders, consultants and other representatives ("<u>Representatives</u>"), reasonable access during normal business hours to the Owned Real Property that constitute Assets, the Leased Real Property and the books and records of the Business.  The Buyer shall not be entitled to access to any materials containing privileged communications or information about employees, disclosure of which might violate an employee's reasonable expectation of privacy or to the extent they relate exclusively to Excluded Assets.  The Buyer shall have no right under this Agreement to conduct any environmental or other assessment of any Owned Real Property or Leased Real Property other than visual inspection and document review. The Buyer expressly acknowledges that (a) Seller does not own the property described in the Real Property Leases, (b) access to the property described in the Real Property Leases is subject to the consent of the owners of such real property, and (c) nothing in this <u>Section 6.1</u> is intended to give rise to any contingency to the Buyer's obligations to proceed with the transactions contemplated by this Agreement.

6.2    <u>Reasonable Best Efforts</u>.  The Seller shall use its reasonable best efforts to cause the conditions set forth in <u>ARTICLE 8</u> to be satisfied and to facilitate and cause the consummation of the transactions contemplated hereby.

6.3    <u>Notice to the Buyer</u>.  The Seller agrees to promptly notify the Buyer in writing of any information it obtains or becomes aware of that would indicate that a representation and warranty of the Seller made herein or in any Schedule hereto is not correct in all material respects or that any of the conditions to Closing are in capable of being satisfied.

6.4    <u>Maintenance of Interests</u>.  The Seller shall use its commercially reasonable efforts from the date of execution of this Agreement until the Closing to maintain and operate the Business and Assets (or cause the Business and Assets to be maintained and operated) in the ordinary course of business consistent with past practice (except to the extent modified in connection with the COVID-19 pandemic), in a reasonable and prudent manner, in compliance with Applicable Law in all material respects.  Without limiting the generality of the foregoing and without the prior written consent of the Buyer, Seller shall not, except for the items set forth on <u>Schedule 6.4</u> which are being sought pursuant to motions pending with or approved by the Bankruptcy Court as of the date hereof or in connection with changes related to the COVID-19 pandemic:

WEST\290674651.7

(a)    introduce any materially new or different method of maintenance, operation or accounting with respect to the Business and the Assets;

(b)    sell, lease or otherwise dispose of or agree to sell, lease or otherwise dispose of, any of its assets, properties, rights or claims, except for sales of Inventory in the ordinary course of business consistent with past practice or in connection with an Acquisition Transaction;

(c)    enter into, modify, amend, terminate, waive any material rights or obligations under, or otherwise seek to reject, any Real Property Lease or any other Contract that would be material to the Business;

(d)    sell, transfer, convey, assign, or otherwise dispose of any of the Assets or permit Seller to purchase any assets outside of the ordinary course of business consistent with past practices;

(e)    mortgage, pledge or subject to Liens (other than Permitted Liens) on the Assets and/or any of the assets of the Seller or any part thereof;

(f)    institute, settle, compromise or agree to settle any (i) material proceeding (other than the Case) before any Governmental Authority relating to the Seller or (ii) any pending or threatened claim that could give rise to liabilities or could impose any binding obligation, whether contingent or realized, on the Seller, or modify in any manner that is adverse to the Seller, rescind, reject or terminate a License (or application therefor) relating to the Business or the Seller;

(g)    (i) make, change or revoke any material Tax election, (ii) change any annual Tax accounting period, (iii) enter into any agreement with respect to material Taxes or apply for any Tax ruling, (iv) file any amended Tax return, (v) settle or compromise any Tax Liability or Claim for a Tax refund, (vi) surrender any right to Claim a refund for Taxes, or (vii) incur any material Tax Liability outside of the ordinary course of business consistent with past practices.

(h)    accelerate receipt of any Accounts Receivable;

(i)    issue gift cards or incur any Liabilities with respect to loyalty programs or customer presells;

(j)    cancel, modify, or otherwise fail to maintain its insurance policies related to the Assets;

(k)    move any Tangible Personal Property from a Transferred Theater to an Excluded Theater;

(l)    enter into any Contract providing for capital expenditures with respect to the Business in an amount to be paid after the Closing of more than $25,000, individually, or $100,000, in the aggregate; or

(m)    authorize, commit, agree to or enter into any Contract to do any of the foregoing.

16

6.5     Consents and Approvals.  The Seller shall use its reasonable best efforts to obtain all Consents required by the Bankruptcy Code or other Applicable Law to be obtained by the Seller to effect the transactions contemplated hereby.  Without limiting the foregoing, as soon as practicable after the date of this Agreement, the Seller shall make or cause to be made all such further filings and submissions and take or cause to be taken such further action, as may reasonably be required in connection therewith on a timely basis.

6.6     Confidentiality.  The provisions of the Non-Disclosure Agreement between or among the Parties shall remain in full force and effect and shall be incorporated herein by this reference.

6.7     Update to Disclosure Schedules.  From the date hereof until the Closing Date, the Seller shall disclose to the Buyer in writing (in the form of a supplement to the Disclosure Schedules): (a) Disclosure Schedules which are expressly contemplated to be delivered after the date hereof, or (b) any newly arising or occurring fact, condition, event or occurrence that will or is reasonably likely to cause any of the representations and warranties contained in ARTICLE 4 hereof to be untrue or inaccurate in any material respect at any time from the date hereof until the Closing Date.  Such disclosures pursuant to this Section 6.7 shall amend, cure and supplement the appropriate Disclosure Schedules delivered on the date hereof and attached hereto; provided, however, that such disclosures shall not be deemed to amend and supplement the appropriate Disclosure Schedules for purposes of the Buyer's ability to terminate this agreement pursuant to Section 10.1.

6.8     Change of Name.  No later than September 30, 2020, Seller shall discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Goodrich Quality Theaters", and/or "Goodrich Theaters" without the prior written consent of Buyer; provided, further, that prior to discontinuing such use, Seller may only continue to use their current names and any other names or DBA's currently utilized by such Seller solely for purposes of winding down the affairs of Seller.

## ARTICLE 7

### COVENANTS OF THE BUYER

The Buyer covenants and agrees with the Seller that:

7.1     Reasonable Best Efforts.  The Buyer shall use its reasonable best efforts to cause the conditions set forth in ARTICLE 8 to be satisfied and to facilitate and cause the consummation of the transactions contemplated hereby.

7.2     Notice to the Seller.  The Buyer agrees to promptly notify the Seller in writing of any information the Buyer obtains or becomes aware of that would indicate that a representation and warranty of the Buyer made herein or in any Schedule hereto is not correct in all material respects.

7.3     Bankruptcy Court Approval and Related Matters.  The Buyer acknowledges and agrees to the procedures set forth in ARTICLE 11 and shall use reasonable best efforts to assist

the Seller in obtaining any Orders necessary to consummate the transactions contemplated hereby and any Orders ancillary hereto and agree to provide the Seller with information reasonably necessary to obtain such Orders.

        7.4    <u>Transferred Employees</u>.

        (a)    Within five (5) days after the date hereof, the Seller shall deliver to the Buyer a true and correct list of all employees of the Seller, including the Theater (or Home Office) at which they are employed and, including with respect to any inactive employee, the reason for such inactive status and, if applicable, the anticipated date of return to active employment.

        (b)    At least five (5) Business Days prior to the Closing Date (or such lesser time as may be appropriate for employees who are hired within five (5) Business Days of the Closing Date or as the parties may otherwise agree), the Buyer shall provide Seller a list of employees of Seller that Buyer would like to make an offer of employment. Prior to the Closing Date, Buyer may deliver, individually or generally, an offer of employment commencing on the day after the Closing Date and contingent upon the Closing, on an at-will basis (except to the extent otherwise expressly agreed in a writing signed by the Buyer and such employee), to: (i) all of the employees employed by the Seller at each Transferred Theater; (ii) all of the officers and employees of the Seller at the Home Office; and (iii) those employees of the Seller who had been employed at an Excluded Theater, if any, who are identified on <u>Schedule 7.4(a)</u>; *provided* that, in each case, Buyer shall have the right to not offer employment to any employee of the Seller.   The individuals who accept offers of employment extended by the Buyer pursuant to this <u>Section 7.4</u> are hereinafter referred to as the "<u>Transferred Employees</u>."

        (c)    To the extent that service is relevant for purposes of eligibility, vesting or benefit accrual under any employee benefit plan, program or arrangement established or maintained by the Buyer for the benefit of Transferred Employees, the Buyer will use commercially reasonable efforts to cause such plan, program or arrangement will credit such employees or former employees for service on or prior to the Closing with the Seller and its Affiliates.

        (d)    The Buyer shall be responsible for all compensation and benefits payable or provided to the Transferred Employees by Buyer for services performed after the Closing Date as employees of Buyer and any other employees of the Buyer or its Affiliates from and after the Closing Date.

# ARTICLE 8

## CONDITIONS TO CLOSING

        8.1    Seller's Conditions to Closing.  The obligations of the Seller at the Closing are subject, at the option of the Seller, to the satisfaction or waiver at or prior to the Closing of the following conditions:All representations and warranties of the Buyer contained in this Agreement shall be true in all material respects at and as of the Closing and the Buyer shall have performed and satisfied all material covenants and obligations to be performed by the Buyer at or prior to the Closing pursuant to this this Agreement in all material respects;

(b)     No stay or injunction shall have been obtained by a court of competent jurisdiction restraining, prohibiting or declaring illegal the purchase and sale contemplated by this Agreement;

(c)     The entry by the Bankruptcy Court of the Sale Order; and

(d)     The Buyer shall have executed and delivered the documents required to be executed and delivered pursuant to <u>Section 3.3</u>.

8.2     Buyer's Conditions to Closing.  The obligations of the Buyer to consummate the transactions contemplated hereby at the Closing are subject, at the option of the Buyer, to the satisfaction or waiver at or prior to the Closing of the following conditions:

(a)     All representations and warranties of the Seller contained in this Agreement shall be true in all material respects at and as of the Closing and the Seller shall have performed and satisfied all material covenants and obligations to be performed by the Seller at or prior to the Closing pursuant to this this Agreement in all material respects and the Seller shall have certificated the foregoing to the Buyer in writing;

(b)     No stay or injunction shall have been obtained by a court of competent jurisdiction restraining, prohibiting or declaring illegal the purchase and sale contemplated by this Agreement;

(c)     The entry by the Bankruptcy Court of the Sale Order;

(d)     Since the Petition Date, no Material Adverse Effect shall have occurred and be continuing, other than in connection with the COVID-19 pandemic; and

(e)     The Seller shall have executed and delivered the documents required to be executed and delivered pursuant to <u>Section 3.2</u>.

For the avoidance of doubt, the obligations of the Buyer hereunder are not subject to (a) the ability of the Buyer to obtain any financing, or (b) the results of any due diligence investigation of the Buyer.

# ARTICLE 9

## ADDITIONAL OBLIGATIONS AFTER CLOSING

The Parties shall have the following additional obligations after the Closing:

9.1     <u>Execution; Delivery of Instruments and Assistance; Wrong Pockets</u>.

(a)     The Seller and the Buyer shall each execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments and take such other actions as may be necessary or advisable to carry out their obligations under this Agreement and under any document, certificate or other instrument delivered pursuant hereto or thereto or required by Applicable Law.

19

(b)     If after the Closing (i) Buyer or any of its Affiliates or Representatives holds any Excluded Assets or Excluded Liabilities, (ii) any Seller or any of their Affiliates or Representatives holds any Assets or Assumed Liabilities, or (iii) Seller receives payment from a customer of Buyer on account of services provided by Buyer after the Closing, Buyer or Seller, as applicable, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other party.  Until transferred, such funds shall be held in a separate account, to the extent feasible, and not comingled with other assets or funds.

(c)     Seller will use commercially reasonable efforts to assist Buyer's efforts to transfer any Licenses required to own the Assets and operate the Business, including entering into a management agreement ("Management Agreement") with Buyer requiring Seller to maintain, on Buyer's behalf and to the extent legally permitted, any liquor licenses included in the Assets that are not transferred to Buyer at Closing or obtained by Buyer in its own name as of the Closing. Any such Management Agreement shall be negotiated in good faith and shall provide that Buyer shall be responsible for fees and charges to maintain any such liquor licenses, and shall contain other such customary terms and conditions.

9.2     Access to Records.  From and after the Closing Date, the Seller on the one hand and the Buyer on the other hand shall afford each other and their respective Representatives such access to records in respect of the Seller's businesses which, after the Closing, are in the custody or control of the other Party and which such Party reasonably requires, including in order to comply with its obligations under Applicable Law, including, but not limited to, audits by Tax authorities, or which the Buyer reasonably requires to comply with its obligations under the Assumed Liabilities.  Each Party may require the other Party or its Representatives to enter into a confidentiality agreement in customary form in connection with providing access to the records of such Party.

# ARTICLE 10

# TERMINATION

10.1     Termination.  This Agreement may be terminated as follows:

(a)     At any time by the mutual written agreement of the Seller and the Buyer;

(b)     By the Seller or Buyer, upon the Seller's entry into any agreement seeking to consummate any Acquisition Transaction between the Seller and a party other than the Buyer and the Bankruptcy Court's entry of an Order approving the Acquisition Transaction;

(c)     By either Party, at such Party's election, in the event that the Closing shall not have occurred on or before the Outside Date; *provided* that no Party shall be entitled to terminate this Agreement pursuant to this Section 10.1(c) if the failure of the Closing to occur on or prior to such date results primarily from such Party's breach or default of its obligations, covenants or representations under this Agreement;

WEST\290674651.7

(d)    By the Buyer, at its sole election, in the event of a material breach of this Agreement by the Seller or if any representation or warranty of the Seller shall have become untrue in any material respect, in either case if such breach or untruth is not, or is incapable of being, cured by the later of (i) the Outside Date and (ii) fifteen (15) days after written notice of such breach or untruth; *provided* that the Buyer shall not be entitled to terminate this Agreement pursuant to this Section 10.1(d) if such termination right results primarily from the Buyer's breach of any representation, warranty or covenant contained in this Agreement;

(e)    By the Seller, at its sole election, in the event of a material breach of this Agreement by the Buyer or if any representation or warranty of the Buyer shall have become untrue in any material respect, in either case if such breach or untruth is not, or is incapable of being, cured by the later of (i) the Outside Date and (ii) fifteen (15) days after written notice of such breach or untruth; provided that the Seller shall not be entitled to terminate this Agreement pursuant to this Section 10.1(e) if such termination right was caused by the Seller or results primarily from the Seller's breach of any representation, warranty or covenant contained in this Agreement;

(f)    By the Buyer, at its sole election, upon the granting of any motion for relief from the automatic stay which would have a Material Adverse Effect, the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Case, the filing of any plan of reorganization by any party in interest that does not incorporate this Agreement or the filing of any motion by a party in interest in the Case to liquidate the Assets or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein;

(g)    By the Buyer upon the entry of an order by the Bankruptcy Court for the appointment of a trustee or examiner, other than at the request of the Buyer;

(h)    By the Buyer if Seller breaches or violates any Order entered in the Case authorizing the use of cash collateral or the obtaining of financing, or if Seller becomes prohibited from using cash collateral or financing under any such order; or

(i)    By Buyer or Seller if there is in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

10.2    Effect of Termination.  Upon the termination of this Agreement in accordance with Section 10.1, the Parties shall be relieved of any further obligations or liability under this Agreement other than (i) the confidentiality obligations referenced in Section 6.6,  (ii) the return of the Deposit by the Escrow Agent as required by Section 2.4, (iii) payment of the Break Up Fee and Expense Reimbursement, to the extent payable pursuant to Section 11.3(b), (iv) Section 4.16, (v) ARTICLE 13, (vi) ARTICLE 13, and (vi) this Section 10.2.  Notwithstanding the foregoing, the forfeiture of all of the Deposit shall be the sole and exclusive remedy to the Seller for any breach by Buyer of this Agreement and in no event shall Buyer's liability under this Agreement and the transactions contemplated hereby exceed an amount equal to the Deposit.

# ARTICLE 11

# CHAPTER 11 BANKRUPTCY PROCEEDING

11.1    <u>Sale Order; Notices to Third Parties</u>.

(a)    The Seller shall seek prompt entry of the Sale Order pursuant to the Sale Motion after sufficient notice has been given, which Sale Order shall be approved by Buyer and include, among other things, findings of fact and conclusions of law that the Buyer is not a successor in interest to the Seller or any Affiliate of the Seller, that the Buyer is a good faith purchaser pursuant to Bankruptcy Code Section 363 and the other customary and appropriate findings of fact and conclusions of law.

(b)    The Seller covenants that, to the extent that they have not done so prior to the date of this Agreement, they shall promptly serve the third parties who are parties to Seller's Contracts (such third parties being "<u>Cure Obligees</u>") with written notice of proposed cures on the such Contracts (such notice being the "<u>Proposed Cure Notice</u>"), which Proposed Cure Notice shall be provided to the Buyer within the time periods provided by the Bid Procedures Order. The Proposed Cure Notice shall, as set forth in the Bid Procedures Order, establish a deadline reasonably in advance of the Closing Date by which Cure Obligees must object to respective proposed cures, or any other matters related to the Cure Obligee, or be deemed to have waived any such objection.

(c)    The Seller shall promptly provide Buyer with drafts of all documents, motions, orders, filings, or pleadings that the Seller proposes to file with the Bankruptcy Court or any other court or tribunal that relate in any manner, directly or indirectly, to (i) this Agreement or the transactions contemplated hereby; (ii) the Sale Motion, including the form and content of the Bid Procedures Order; or (iii) entry of the Sale Order, and will provide Buyer with at least 48 hours, or as much notice as is possible under the circumstances, to review such documents in advance of their service and filing. The Seller shall consult and cooperate with Buyer, and consider in good faith the views of Buyer, with respect to all such filings. The Seller shall not make any disclosures (including any statements or schedules) in connection with the Case that are inconsistent in any material respect with the representations, warranties or related Disclosure Schedules set forth in or delivered in connection with this Agreement. Seller will give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Buyer will have the right to attend and seek to be heard at any such hearings.

11.2    <u>Requests for Information</u>. From the date of the approval of the Bid Procedures Order (a) if the Seller supplies any information regarding the Business to a potential bidder not heretofore given to the Buyer, the Seller shall further provide the Buyer with a copy of such information within a reasonable period of time after providing that information to any other potential bidder; and (b) with respect to any bid, term sheet, or written expression of interest by any other party for any asset or assets of the Seller, or any other reorganization proposal, submitted prior to the bid deadline established in the Bid Procedures Order, the Seller shall provide the Buyer with prompt notice of such proposal and a copy of such proposal within a reasonable period of time after the Seller's receipt thereof.

11.3    <u>Additional Bankruptcy Court Matters</u>.

(a)    No later than June 10,2020, Seller shall file with the Bankruptcy Court an application or motion seeking approval of (i) the Bidding Procedures Order (ii) the form of this Agreement and Sellers' authority to enter into this Agreement and (iii) the Bid Protections (as defined below) (the "<u>Bidding Procedures Motion</u>").

(b)    If this Agreement is terminated pursuant to <u>Section 10.1</u> (other than pursuant to <u>Section 10.1(a)</u>, <u>Section 10.1(c)</u> (if the failure of the Closing to occur on or prior to the Outside Date results primarily from Buyer's breach or default of its obligations, covenants or representations under this Agreement), or <u>Section 10.1(e)</u>), then (i) Buyer shall be entitled to the reimbursement of, and Sellers shall promptly reimburse Buyer in immediately available funds for, its actual, reasonable and documented actual and necessary out-of-pocket fees and expenses in connection with the transaction contemplated hereby in the maximum amount of $75,000 (the "<u>Expense Reimbursement</u>"), and (ii) if Seller enters into or consummates an Acquisition Transaction, then Buyer shall be entitled to the payment of a break-up fee equal to three percent (3%) of: the Base Purchase Price <u>plus</u> Cure Costs (the "<u>Break-Up Fee</u>", together with the Expense Reimbursement, the "<u>Bid Protections</u>").  The obligations of Sellers to pay the Bid Protections (i) shall be entitled to administrative expense of the Case, (ii) shall not be subordinate to any other administrative expense claim against Seller, and (iii) shall survive the termination of this Agreement in accordance with <u>Section 10.2</u>.  The Bidding Procedures Order shall approve the Bid Protections as set forth in this paragraph.

(c)    Payment of the Expense Reimbursement shall be made in cash, without further order of the Bankruptcy Court, promptly following such termination. Payment of the Break-Up Fee shall be made solely from the proceeds of any only upon consummation of, an Acquisition Transaction.

(d)    Unless otherwise agreed by the Parties in writing, the Sale Hearing shall be held on or before June 30, 2020 the Bidding Procedures Order shall also (i) be entered by the Bankruptcy Court on or before June 19, 2020, and (ii) provide that qualified bids must be submitted by June 24, 2020, and an auction, if any, shall take place on or before June 26, 2020.

## ARTICLE 12

## GENERAL PROVISIONS

12.1    <u>Notice</u>.  All notices hereunder shall be in writing, dated and signed by the Party giving the same.  Each notice shall be either (a) delivered in person to the address of the Party for whom it is intended at the address of such Party as shown below, (b) delivered to the United States Postal Service in a secure and sealed envelope or other suitable wrapper addressed to the Party for whom it is intended at the address of such Party as provided below, with sufficient postage affixed, certified or registered mail, return receipt requested, (c) transmitted via telecopy (or other facsimile device) or electronic mail to the number or e-mail address set out below if the sender promptly thereafter sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid) or (d) delivered to a nationally recognized overnight courier service that traces any such notice.  The effective date of such notice shall be the date of delivery in the event of

delivery in accordance with (a) or (c), five (5) days after deposit in the U.S. Mail in the event of delivery in accordance with (b), the next Business Day and in the event of delivery in accordance with (d). The address at which any Party hereto is to receive notice may be changed from time to time by such Party by giving notice of the new address to all other parties hereto. The addresses of the Parties, until changed in accordance with the foregoing, are:

The Seller:          Goodrich Quality Theaters, Inc.
                     4417 Broadmoor Ave. SE
                     Grand Rapids, Michigan 449512
                     Attn: Bob Goodrich, CEO
                     Facsimile:
                     Email:  bgoodrich@gqt.com

And copies (which
shall not constitute
notice) to:          Keller & Almassian, PLC
                     230 East Fulton St.
                     Grand Rapids, MI 49503
                     Attn: A. Todd Almassian, Esq.
                     Facsimile: (616) 364-2200
                     Email:  talmassian@kalawgr.com

The Buyer:           Mr. Elliot Nassim
                     Mason Asset Management
                     747 Middle Neck Road
                     Suite 101
                     Great Neck, NY  11024

                     And copies (which
                     shall not constitute
                      notice) to:

                     DLA Piper LLP (US)
                     1251 Avenue of the Americas
                     New York, New York 10020
                     Attention: Richard Chesley
                     E-mail:  Richard.Chesley@dlapiper.com

     12.2    <u>Amendment</u>.  This Agreement may not be amended nor any rights hereunder waived except by an instrument in writing signed by the Parties.

     12.3    <u>Payment of Costs</u>.  Except as otherwise set forth herein, the Parties shall each pay their own costs incurred in negotiating this Agreement and in consummating the transactions contemplated hereby, including any fees or commission payable to any party representing them in connection with arranging or negotiating this Agreement and transactions contemplated hereby.

24

12.4    <u>Headings</u>.  The headings of the sections of this Agreement are for convenience or reference only and shall not affect any of the provisions of this Agreement.

12.5    <u>References</u>.  References made in this Agreement, including use of a pronoun, shall be deemed to include, where applicable, masculine, feminine, singular or plural, individuals, partnerships or corporations.

12.6    <u>Governing Law</u>.  This Agreement and the transactions contemplated hereby shall be construed in accordance with and governed by the laws of the State of Michigan without giving effect to the conflict of law provisions thereof.  Each of the Parties agrees that any proceeding brought to enforce the rights and obligations of any Party under this Agreement (including the schedules attached hereto) or any Ancillary Agreement shall be commenced and maintained exclusively in the Bankruptcy Court and that the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.

12.7    <u>Entire Agreement</u>.  This Agreement, the Disclosure Schedules attached hereto, and the Ancillary Agreements (in each case incorporated herein by this reference) contain the entire agreement and understanding of the Parties hereto with respect to the transactions contemplated hereby, and supersede any and all prior agreement, arrangements, and understandings, whether oral or written, between the Parties.

12.8    <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the Parties and, except as otherwise prohibited, their respective successors and assigns.  Nothing contained in this Agreement, or implied here from, is intended to confer upon any Person other than the Parties any benefits, rights, or remedies.

12.9    <u>Assignment</u>.

(a)    No Party may assign all or any portion of its respective rights or delegate any portion of its duties hereunder without (a) the approval of the Bankruptcy Court and (b) the written consent of the other Parties; *provided* that (i) the Buyer may collaterally assign this Agreement to its lenders without the consent of the Seller, and (ii) the Buyer may assign this Agreement in whole or in part to any Affiliate of the Buyer without the consent of the Seller so long as the Buyer retains its obligations under this Agreement, subject to the terms and conditions hereof, to effect the consummation of the transactions contemplated hereby.  All of the terms, provisions and conditions of this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors, assigns and legal representatives.

12.10    <u>Severability</u>  If a court of competent jurisdiction determines that any provision of this Agreement is void, illegal or unenforceable, the other provisions of this Agreement shall remain in full force and effect and the provisions that are determined to be void, illegal or unenforceable shall be limited so that they shall remain in effect to the extent permissible by Applicable Law.

12.11    <u>Publicity</u>.  Prior to the Closing, no Party shall issue any press release or similar public announcement concerning the transactions contemplated hereby or the contents of this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, nothing in this <u>Section 12.11</u>

shall preclude any Party (or Person controlling such Party) from making disclosures required by Applicable Law or Governmental Authority (or of any applicable stock or securities exchange or otherwise), or appropriate filings with the Bankruptcy Court in connection with the Case or necessary and proper in conjunction with the filing of any Tax return or other document required to be filed with any Governmental Authority; *provided* that the Party required to make the release or statement shall allow the other Party reasonable time to comment on such release or statement in advance of such issuance.

12.12   <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local or foreign statute shall be deemed to refer to such statute as amended and to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "include" or "including" means include or including, without limitation.  All references in this Agreement to Sections and Schedules shall be deemed references to Sections of, and Disclosure Schedules to, this Agreement unless the context shall otherwise require.

12.13   <u>Specific Performance</u>.  Each Party acknowledges that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by such Party in accordance with their specific terms or were otherwise breached by such Party.  Each Party accordingly agrees that, prior to the termination of this Agreement pursuant to <u>ARTICLE 10</u>, in addition to any other remedy to which the other Parties are entitled at law or in equity, the other Parties are entitled to injunctive relief to prevent breaches of this Agreement by such Party and otherwise to enforce specifically the provisions of this Agreement against such Party.  Each Party expressly waives any requirement that any other Party obtain any bond or provide any indemnity in connection with any action seeking injunctive relief or specific enforcement of the provisions of this Agreement.  If the Seller asserts a claim for actual damages against the Buyer based on an alleged breach, the Seller must bring an action against the Buyer in Bankruptcy Court seeking recovery of actual damages, and the Deposit will be held by the Escrow Agent pending a final resolution of such claims.  To the extent required to compensate the Seller for any actual damages awarded by Final Order of the Bankruptcy Court, the Deposit will be used for such purpose.  To the extent not required for the payment of such award, the Deposit or any balance thereof will be returned to the Buyer.  Notwithstanding the foregoing, the forfeiture of all of the Deposit shall be the sole and exclusive remedy to the Seller for any breach by Buyer of this Agreement.

# ARTICLE 13

# DEFINITIONS

"<u>Accounts Receivable</u>" shall mean all accounts and notes receivable of the Seller.

"<u>Acquired Avoidance Actions</u>" shall have the meaning set forth in <u>Section 1.2(m)</u>.

"<u>Acquired Insurance Benefits</u>" shall have the meaning set forth in <u>Section 1.2(l)</u>.

"Acquisition Transaction" shall mean any sale, transfer or other disposition (not involving the Buyer or its Affiliates), in one transaction or a series of transactions, of all or any substantial portion of the Assets or the Business, whether proposed to be effected pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, reorganization, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed or advanced by the Seller and whether or not such transactions are entered into in connection with any bankruptcy, insolvency or similar proceedings.

"Affiliate" shall mean, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person.

"Ancillary Agreements" shall mean the agreements and documents delivered by the Parties in connection with Section 3.2 or Section 3.3.

"Applicable Law" shall mean, with respect to any Person, any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, or other requirement enacted, promulgated, issued or entered by a Governmental Authority, that is applicable to such Person or its business, properties or assets.

"Assumed Real Property Leases" means all Real Property Leases that are Assumed Contracts.

"Avoidance Actions" shall mean any and all actions which a trustee, debtor-in-possession or other appropriate party in interest (including any Person given standing to act for such party in interest) may assert on behalf of the Seller or its estate under applicable state statute or Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553.

"Bid Procedures Order" shall mean an Order of the Bankruptcy Court approving procedures for the solicitation and consideration of competitive bids for the Assets under the terms and conditions of this Agreement.

"Business Day" shall mean any day other than Saturday, Sunday or any day on which banking institutions in the United States are closed either under Applicable Law or action of any Governmental Authority.

"Contract" shall mean any agreement, arrangement, contract, lease, purchase order, sale order or commitment, or any series of related agreements, arrangements, contracts, leases, purchase orders, sale orders, or commitments.

"Cure Costs" shall mean, in the aggregate, any and all costs and expenses for any available cures (pursuant to Section 365 of the Bankruptcy Code and described in any Order of the Bankruptcy Court relating to such cure liability) of any Assumed Contacts.

"Disclosure Schedules" shall mean the schedules of the Seller delivered to the Buyer concurrently with the execution and delivery of this Agreement (as may be updated pursuant to Section 6.7), a copy of which is attached to this Agreement and incorporated by reference.

"Employee Plans" shall mean each plan, program, agreement or other arrangement, whether or not set forth in a collective bargaining agreement, providing for pension, profit-sharing, retirement savings, health, life insurance, scholarship, tuition reimbursement, welfare benefits, deferred compensation, severance, termination pay, performance awards, bonus, commission, incentive compensation, equity or equity-related awards, change in control, retention, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Theater" shall mean any Theater that is subject to an Excluded Real Property Lease.

"Excluded Owned Real Property" shall mean the Kendall 11 GDX Theater located at 95th Fifth Street, Oswego, Illinois 60543.

"Final Order" shall mean an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial, request for stay, motion or petition for reconsideration, application or request for review, or other similar motion, application, notice or request (collectively, a "Challenge") has been timely filed, or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further Challenge thereon, (b) as to which the time for instituting or filing a Challenge shall have expired, and (c) as to which no stay is in effect. Nothing herein shall prohibit the parties, by mutual written consent, from Closing the transactions contemplated hereby, in the absence of a Final Order, so long as the Sale Order is not then subject to a stay from a Governmental Authority.

"Governmental Authority" shall mean any national, federal, state, provincial, local or foreign government, or any subdivision, agency, instrumentality, authority, department, commission, board or bureau thereof, or any federal, state, provincial, local or foreign court, tribunal, or arbitrator, including the Bankruptcy Court.

"Home Office" shall mean the facility located at 4417 Broadmoor Ave SE, Grand Rapids, Michigan 49512.

"Intellectual Property" shall mean any and all intellectual property rights and other similar rights, in any jurisdiction in the world (whether arising under statutory or common law, contract, or otherwise), which includes rights pertaining to or arising from: (a) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (b) patents, patent applications, industrial design registrations and applications therefor, divisions, divisionals, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) trademarks (whether registered, unregistered or pending), trade dress, service marks, service

names, trade names, brand names, product names, logos, domain names, internet rights (including IP addresses and AS numbers), corporate names, fictitious names, other names, symbols (including business symbols), slogans, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and any applications or registrations in connection with the foregoing and all advertising and marketing collateral including any of the foregoing; (d) work specifications, databases and artwork; (e) technical, scientific and other know-how and information (including promotional material and tech packs and blocks), trade secrets, confidential information, methods, know how, processes, practices, formulas, designs, patterns, assembly procedures, specifications; (f) rights associated with works of authorship including copyrights, moral and economic rights, design rights, rights in databases, copyright applications, copyright registrations, rights existing under any copyright laws and rights to prepare derivative works; (g) work for hire; (h) the name "Goodrich Quality Theaters, Inc." or any derivations thereof, (i) customer lists and databases, websites, social media sites/handles and accounts (including the content contained therein, user names and passwords), diagrams, drawings, and all advertising and marketing materials and collateral (including all physical, digital, or electronic imagery and design files), samples, product catalogs, product designs and specifications (including tech specifications) vendor and merchandise supplier data and information, (j) computer software and firmware, including data files, source code, object code and software-related specifications and documentation, (k) all books and records, files, data, reports, computer codes and sourcing data, advertiser and supplier lists, cost and pricing information, business plans, and manuals, blueprints, research and development files, and other records; (l) financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files in whatever media retained or stored, including computer programs and disks, (m) the right to sue for infringement and other remedies against infringement of any of the foregoing, and (n) rights to protection of interests in the foregoing under the laws of all jurisdictions..

"Inventory" shall mean all supplies, goods, materials, work in process, inventory and stock in trade.

"Knowledge of the Seller" (or "the Seller's Knowledge") shall mean the actual knowledge of the officers of the Seller listed on Schedule 13.1, after reasonable inquiry.

"Leased Real Property" shall mean each parcel of real estate leased by the Seller or in which the Seller have a leasehold, subleaseholder or other interest, including (a) those on which a Theater is located and (b) those used in connection with the Business.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"Licenses" shall mean all business licenses, occupancy permits and other permits, authorizations or approvals held by the Seller, including liquor licenses.

"Liens" shall mean any and all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, retiree healthcare or life insurance claims of the Seller, and any transferee or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of the Case, whether known or unknown, and whether imposed by agreement, understanding, law, equity or otherwise.

"Material Adverse Effect" shall mean with respect to the Seller, the Assets or the Business, as the context requires, any event, fact, condition, change or occurrence which is materially adverse to the business, operations, condition (financial or otherwise) or assets of the Business; *provided* that any (a) change in general economic or industry-wide conditions that does not affect the Business disproportionately, (b) change in law or accounting standards or interpretations thereof that is of general application, or (c) adverse effect that is solely the result of the execution or announcement of this Agreement or the transactions contemplated hereby or the consummation thereof, shall not be taken into account for purposes of determining a Material Adverse Effect hereunder.

"Order" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each case whether preliminary or final).

"Party" and "Parties" shall have the meanings set forth in the Preamble.

"Permitted Liens" means (a) statutory Liens for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (b) zoning, entitlement and other land use and environmental regulations by any Governmental Authority provided that such regulations have not been violated; (c) title of a lessor under a capital or operating lease if such lease is an Assumed Contract; and (d) easements, covenants, rights of way, and other similar restrictions or conditions of record that do not materially interfere with the Company Party's use of the property to which the restrictions relate.

"Person" shall mean any individual, corporation, partnership, joint venture, trust, limited liability company, business association, Governmental Authority or other entity.

"Real Property Leases" shall mean all agreements or documents under which the Seller claims or holds a leasehold, subleasehold or other interest or right to the use of the Leased Real Property.

"Sale Hearing" shall have the meaning set forth in the Sale Motion.

"Sale Motion" shall have the meaning set forth in the recitals.

WEST\290674651.7

"Sale Order" shall mean an Order of the Bankruptcy Court entered pursuant to Bankruptcy Code Sections 363 and 365 that (a) is in substantially the form set forth as Exhibit A to this Agreement or otherwise in a form reasonably satisfactory to the Seller and the Buyer, (b) approves the sale of the Assets to the Buyer pursuant to the terms of this Agreement and the provisions of the Bankruptcy Code (including Bankruptcy Code Section 363), and (c) approves the Seller's assignment of the Assumed Contracts to the Buyer pursuant to Section 365 of the Bankruptcy Code.

"Seller Intellectual Property" shall mean all Intellectual Property owned by Seller;

"Tax" or "Taxes" shall mean (a) all taxes, charges, fees, levies, penalties or other assessments of any kind whatsoever imposed by an federal, state, local or foreign taxing authority, including, but not limited to, income, excise, property, sales, transfer, franchise, payroll, withholding, social security or other taxes, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalties or additions attributable thereto or (b) liability for the payment of any amounts of the type described in clause (a) above as a result of being a party to any agreement or any express or implied obligation to indemnify or otherwise succeed to the liability of any other Person.

"Tax Code" shall mean the Internal Revenue Code of 1986, as it has been and may be amended.

"Theaters" shall mean the retail theaters that are operated at the leased premises subject to the Real Property Leases or the Owned Real Property.

"Transferred Theaters" shall mean Theaters that are operated at premises subject to Assumed Real Property Leases or located on the Owned Real Property, not including the Excluded Owned Real Property.

"Treasury Regulations" shall mean the federal income Tax regulations promulgated under the Tax Code, as amended, including any temporary and proposed regulations.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, and any similar Applicable Law.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*
*SIGNATURES PAGES FOLLOW*

31

This Asset Purchase Agreement is executed by the Parties on the date set forth above.

**SELLER:**                                    **GOODRICH QUALITY THEATERS, INC.**

By: _____

Name: _ Robert Goodrich _____

Title: _President_____

*Signature Page to Asset Purchase Agreement*

**BUYER:**                              **GOODRICH THEATER NEWCO, LLC**

By: _____

Name: _____

Title:  Authorized Signatory