## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

_____

**IN RE**

**GOODRICH QUALITY THEATERS INC.,**

**Debtor.**

Case No. 20-00759-swd
Chapter 11 Filed: 02/25/2020
Honorable Scott W. Dales
U.S. Bankruptcy Judge

_____ /

## FORUM SHOPPING CENTER'S OBJECTION TO NOTICE TO CERTAIN CONTRACT PARTIES OF: (I) PROPOSED SALE OF DEBTOR'S ASSETS; (II) PROPOSED ASSUMPTION AND ASSIGNMENT OF DEBTOR'S CONTRACTS AND LEASES; (III) DEADLINE FOR OBJECTING TO PROPOSED CURE COSTS; AND (IV) HEARING ON THE REQUESTED APPROVAL THEREOF

Forum Shopping Center, LLC ("Forum"), by and through its undersigned counsel, brings this objection ("Objection") to the above-captioned Debtor's *Notice to Certain Contract Parties of: (I) Proposed Sale of Debtor's Assets; (II) Proposed Assumption and Assignment of Debtor's Contracts and Leases; (III) Deadline for Objecting to Proposed Cure Costs; and (IV) Hearing on the Requested Approval Thereof* [D.N. 351] (the "Notice") and states as follows:

1.      On February 5, 2020 (the "Petition Date"), Goodrich Quality Theaters Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code").

2.      On June 12, 2020, the Bankruptcy Court entered an *Order (A) Approving Bidding Procedures for the Proposed Sale of Substantially all of the Debtor's Assets and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (B) Approving Bid Protections, (C) Approving the Establishment of Cure Amounts, and (D) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof* [D.N. 346] (the "Bidding Procedures Order").

3.      The Bidding Procedures Order requires the Debtor to give notice to counterparties of executory contracts and leases that the Debtor may want to assume and assign to the purchaser of its assets.

4.      On June 12, 2020, the Debtors filed the Notice.  Schedule 3 to the Notice lists the contracts and leases which the Debtor may assume and assign to the purchaser of its assets and the cure amounts.

5.      According to the Notice, if a party to a contract or lease listed on Schedule 3 disagrees with the cure amount set forth on Schedule 3, or otherwise does not want the Bankruptcy Court to grant the relief requested in the Notice and/or the proposed assumption and assignment of a contract or lease listed in Schedule 3, an objection to the Notice must be filed.

6.      According to Schedule 3, the Debtor is party to a lease with Forum regarding a movie theater property located at 1209 Forum Katy Parkway, Columbia, MO 65203 (the "Leased Property"), and the cure amount is $40,520.00.

7.       It is Forum's understanding that the cure amount of $40,520.00 constitutes the Debtor's estimate of unpaid real property taxes, which per the lease the Debtor is required to pay.

8.      On or about June 16, 2020, Forum provided a default notice, which is attached hereto as **Exhibit 1**, to the Debtor.  The default notice sets forth the existing defaults under the lease.

9.      Subsequent to providing the default notice, Forum received an inspection report regarding the Leased Property, which is attached hereto as **Exhibit 2**.

10.      As set forth in the default notice and inspection report, there are significant defaults under the lease with respect to ongoing maintenance obligations of the Debtor.

Specifically, the lease provides, among other things, that the Debtor must maintain the sidewalks and parking areas, mechanical systems, equipment and appliances, and the foundation, walls and roof.  According to the inspection report, a significant amount of the Debtor's maintenance obligations have not been performed, which constitute defaults under the lease.  A copy of the lease is attached as **Exhibit 3**.

11.    Although Forum does not object specifically to the monetary cure amount of $40,520.00 for unpaid rent and real property taxes, as that number is very close to the number set forth in the default notice regarding those items ($40,069.06), Forum files this objection in order to provide notice of and preserve its rights with respect to the significant maintenance defaults under the lease.

12.    Section 365(b) of the Bankruptcy Code provides that the debtor may not assume an executory contract or lease on which there has been a default unless the debtor (1) cures the default or provides adequate assurance that the default will be promptly cured, (2) compensates or provides adequate assurance that the debtor will promptly compensate the other party for any pecuniary loss to the party resulting from the default, and (3) provides adequate assurance of future performance under the contract or lease.  See also *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1309–10 (5th Cir. 1985); *In re FPSDA I, LLC,* 450 B.R. 392, 397-98 (Bankr. E.D.N.Y. 2011).

13.    Under § 365(b)(1)(B), a non-debtor party to a lease is entitled to any element of actual pecuniary loss resulting from the debtor's default that it is able to prove, that is authorized by the parties' agreement, and that is reasonable.  *In re DMSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009).

14.     In order to assume the lease, the Debtor must cure all defaults under the lease.  As a result of the Debtor's defaults under the lease, Forum has suffered damages, which must be cured, in the total amount of at least $1,358,069.06[1] pursuant to the lease.[2]

15.     Forum reserves its right to amend or supplement this Objection as additional information becomes available.

WHEREFORE, Forum respectfully requests the Bankruptcy Court (i) deny Debtor's request to assume and assign the lease unless the above-described defaults are cured; (ii) determine the cure amount is at least $1,358,069.06, plus whatever additional costs might be incurred as necessary repairs of the Leased Property are completed, if this Court orders assumption and assignment of the lease; and (iii) grant such other and further relief to Forum as is appropriate.

MILLER JOHNSON
Attorneys for Forum Shopping Center, LLC


Dated: June 22, 2020                    By: /s/ Rachel L. Hillegonds
                                        Rachel L. Hillegonds (P67684)
                                        hillegondsr@millerjohnson.com
                                        Business Address:
                                        P.O. Box 306
                                        Grand Rapids, MI 49501-0306
                                        (616)  831-1700

---

[1] The inspection report states a minimum of $1,318,000.00 of repair/maintenance costs are immediately necessary, plus $40,069.06 of unpaid rent and real property taxes.

[2] This amount covers some, but potentially not all, rejection damages incurred by Forum in the event the lease is not assumed and assigned to a buyer of the Debtor's assets.  Forum filed a proof of claim (No. 40) setting forth the amount of unpaid rent on the Petition Date.  Forum intends to amend its proof of claim should its lease be rejected by the Debtor.



P.O. Box 1037 • 1400 Forum Boulevard • Columbia, MO 65205 • O: 573.446.5500 F: 573.446.5050

June 16, 2020

Mr. Bob Goodrich
Goodrich Quality Theaters, Inc.
4417 Broadmoor Avenue SE
Kentwood, MI 49512

> RE:    Forum 8 Theater – Forum Shopping Center, Columbia, MO
> **DEFAULT NOTICE**

Dear Bob:

After a recent inspection of the above referenced location, it was determined that Goodrich Quality Theaters, Inc. is in Default of their lease with Forum Shopping Center, LLC for failing to timely pay rent and failure to properly maintain the demised premises. Specifically, please note the following lease deficiencies:

1. Goodrich has a past due balance owed to Landlord of $2,885.93 as of today, per the enclosed account statement.

2. Section 1(h) of the Lease states "Under the terms of this Lease, Tenant shall be responsible for the maintenance and upkeep of the parking areas, common area, sidewalks and right-of-way and other facilities…"  There are parking lot and sidewalk repairs needed to a variety of areas around the property maintained by Goodrich.  The landscaping is also in disrepair and in need of weeding and mulch. Although we are still awaiting a formal estimate of these damages, the repairs will most likely cost more than $70,000.

3. Section 12(c) of the Lease states "Tenant agrees at Tenant's expense to clean, repair, replace when necessary, maintain in good condition, and provide preventative maintenance for any, heating, ventilation, cooling units, filters, and any other mechanical systems, equipment, and appliances for all the demised premises and on the roof thereof, if any."  We have not been provided with required maintenance documentation despite request.  Additionally, our inspection notes repairs needed to a number of the HVAC units on the roof.  Although we are still awaiting a formal estimate of these damages, the repairs will most likely cost more than $50,000.

> **Exhibit 1**

4. Section 12(d) of the Lease states "Tenant shall keep in good order, condition and repair the foundations, exteriors walls and the exterior roof of the Premises." We've found the following areas of the building that are in need of repair:

   a. Internal structural problems – There are significant structural repairs needed to the walls leading to the projection room. These walls have large cracks throughout and in some areas appear to have shifted.
   b. Roof repairs – The roof system is in need of repairs and/or replacement. There are numerous ceiling leaks visible from inside the building that need to be addressed, with ceiling tiles replaced.
   c. Front overhang - The ceiling on the overhang has separated in some areas.
   d. Structural wall cracks – There are cracks in the exterior structural block walls, needing further review by a structural engineer.

   Although we are still awaiting a formal estimate of these damages, the repairs will most likely cost more than $500,000.

5. In accordance with Section 20 of the lease, "Tenant shall pay all real property taxes and assessments levied on the demised premises (before same become delinquent), provided however, that within thirty (30) days after notice by Landlord, Tenant shall pay Landlord for its share of such payment of real property taxes and assessments for that tax year…" While 2020 real property taxes are not technically due until December 31, 2020, the amount allocated to Tenant as of June 30, 2020 will be $37,183.13.

We understand that Goodrich is in the process of selling assets to a 3rd party bidder, who may seek an assignment of this Lease. Please note that these (and any other identified) repairs will need to be assumed and cured by such 3rd party bidder/buyer, or otherwise addressed to the Landlord's satisfaction prior to any lease assignment.

Sincerely,

Jay R. Lindner
President
Enc.

## Forum Shopping Center, LLC

1400 Forum Boulevard
P.O. Box 1037
Columbia, MO 65205

**Statement date**: 06/16/2020
**Move in date**: 05/22/1991
**Recurring rent**: 4,902.46
**Deposit balance**: 3,200.00



### Forum 8 Theatres

1209 Forum Katy Parkway
Suite 150
Columbia, MO 65203



### Forum Shopping Center

1400 Forum Blvd.
Columbia, MO 65203

**Unit**: Suite 150

**Office**: (573) 446-3223
**Mobile**: (573) 694-2772

| Date | Description | Charges | Payments | Balance |
|------|-------------|---------|----------|---------|
| 03/31/2020 | Late Rent Fees - March Late Fees for March Rent Charge | 807.29 | 0.00 | 807.29 |
| 04/06/2020 | Late Rent Fees - April Late Fees for March Rent Charge | 171.19 | 0.00 | 978.48 |
| 04/27/2020 | Late Rent Fees - April Late Fees for April Rent Charge | 695.98 | 0.00 | 1,674.46 |
| 04/30/2020 | Late Rent Fees - April Late Fees for % Rent Charge | 1,238.96 | 479.43 | 2,433.99 |
| 05/04/2020 | Late Rent Fees - Late Rent Fees - May Late Fees for % Rent Charge (5/1/20 - 5/4/20) | 179.65 | 0.00 | 2,613.64 |
| 05/11/2020 | Late Rent Fees - Late Rent Fees - May Late Fees for May Rent Charge (5/1/20 - 5/11/20) | 272.29 | 0.00 | 2,885.93 |
| **Total** | | | | **2,885.93** |

| Total Amount Due | 0 - 30 Days | 30+ Days |
|------------------|-------------|----------|
| 2,885.93 | 0.00 | 2,885.93 |

# Commercial Building Inspection Report



## 1209 Forum Katy Pkwy, Columbia MO 65203

**Inspection Date: May 20, 2020**
**Prepared For: Jay R. Lindner, Lindner Properties**

**Prepared By:**
Barry Dennison, Director Facilities Management
Coil Facilities Management
209 E Broadway
Columbia, MO 65203
(573) 554-1888

## Inspector:
Tyler Morts
Coil Facilities Management

<div style="border: 1px solid black;">

**Exhibit
2**

</div>

Table of Contents

| | |
|---|---|
| SUMMARY | 3 |
| INTRODUCTION | 5 |
| EXTERIOR | 6 |
| INTERIOR | 7 |
| LIFE SAFETY FIRE PROTECTION | 8 |
| ROOFING | 9 |
| ELECTRICAL | 11 |
| HEATING AIR CONDITIONING SYSTEMs | 12 |
| PLUMBING | 13 |
| EXHAUST / VENTILATION | 15 |
| CLOSING COMMENTS | 16 |
| APPENDIX A SUMMARY OF PHOTOGRAPHS | 17 |

## Summary

1) This is a typical movie theater in which maintenance has been satisfactory, for the most part.  Although, major structural deficiencies were noted.
2) The exterior walls were in satisfactory condition.
   a) There is an area in need of repair to the north was observed. It appears to have settled and joints separating. This area has shown water running from the room down the wall. Repairs are recommended.
   b) The handicap ramp located on the north end appears to have been struck with snow removal equipment and broken brick and joints are noted. Repairs are recommended.
3) Interior walls
   a) The north stairwell has noticeable cracks and separation. I would consider this to require major repairs. A structural engineers' advice should be obtained.
   b) The main block wall running North-South on the upper level is severely cracked and separating.  This wall ties into the stairwell walls and floor. A structural engineers' advice should be obtained.
   c) Windows and doors were found to be in satisfactory condition.
4) The fire suppression system certification has expired and requires the yearly Fire Protection inspection. We did not set off the alarms or test the systems.
5) The roofing system is separated into three separate roofs.
   a) The front entrance & ticket sales and waiting area has several areas of possible leakage were noted. This area had 113 individual roof patches. Stained ceiling tiles were noted.  Repairs/replacement are recommended.
   b) The concession and restroom roof appears to be in satisfactory condition but is aging. Stained ceiling were noted. Repairs are recommended.
   c) The storage/mechanical room and the north hallway roof has a major slop issue where rainwater does not drain from the room and is pooling in various areas. It shows numerous areas of low, non-sloping areas. Repairs are recommended.
   d) The main Theater roof is older and worn. There were significant leak indicators on the inside ceilings noted in this area. Replacement is recommended.
6) The electrical system was generally found to be in satisfactory condition.  Electrical panels appear in good serviceable condition. Majority of the service panels have spares available.
7) Majority of the roof heating and air conditioning units are showing signs of age. No refrigerant levels were tested although the building was cool, and the units were running.
8) The plumbing system was generally in satisfactory condition. All drains were flowing, and no laboratories were backed up.
9) The ventilation systems are satisfactory for the most part. Exhaust fans were running as design. No CFM's were measured.

## Summary of Repairs

### Summary of Necessary Repairs

The following table summarizes the recommendations made in this report that rare of an immediate necessary nature.

| Recommendations | Budget Cost |
| --- | --- |
| Exterior Wall (Area to the North, corner of dock area) Repair | $6,000 - $10,000 |
| Exterior Wall (North Handicap ramp) Repair | $2,000 – $4,500 |
| Asphalt Parking lot Repair | $30,000 - $40,000 |
| North Stair well – Requires structural engineer | Unknown - $300,000 |
| Interior Block Wall/2nd Floor, north-south- Requires a structural engineer | Unknown - $300,000 |

3

| Roof A, B, C, D Replace | $450,000 |
| Rooftop HVAC should be evaluated for life expectancy | $230,000 - $290,000 |

## Introduction

As per request, a visual inspection was performed of the property. Our inspection was limited to identify the existing conditions of the following readily visible building components.

1) Exterior Components – Cursory
2) Interior Components – Cursory
3) Fire Protection and inspections – Cursory
4) Roofing System (4 separate roofs) – Cursory
5) Electrical – Cursory
6) Heating Ventilation Air Conditioning System (HVAC) – Cursory
7) Plumbing System - Cursory
8) Exhaust / Ventilation - Cursory

This report provides recommendations, preliminary cost estimates and priorities for:

1) Remedying major deficiencies,
2) Updating ageing major components, and
3) Undertaking further detailed investigations

The recommendations are for remedial actions that are beyond the normal maintenance of the building. Costs are provided for recommendations expected to exceed $300,000.00  The costs are only intended to provide an order of magnitude.  Contractors should be contacted for exact quotations.

This report is initial in nature.  Before any major repairs are undertaken, we recommend that a specialist perform a detailed condition survey and develop a plan of action.

Only the items specifically addressed in this report were examined.  No comment is offered on fire protection equipment or on fire regulation, building code and building bylaw compliance, or environmental concerns.

### Building Description

This is a single-story, with a projection room on an upper 2nd level.  No other use for the 2nd level besides projection room. It was determined that the building has an approximately area of 32,000 plus square feet. The building is presently occupied by a movie theater, currently closed for business due to the Convid-19 issues, but not vacant.  This building has the utilities on.

The age of the building is unknown for this report.

### ADA and Accessibility Review

Complete review for compliance with ADA and accessibility requirements was not conducted. Visual review indicates the restrooms are not in compliance.

## Document Review and Interviews

No plans were available.  No additional documents regarding past repairs or maintenance were available.  It is recommended that these documents be obtained for review.  The owner was available for discussions.  Public records review was not included.  A brief interview was conducted with the theaters' manager from out of state.  His knowledge of the building was quite limited.

# Exterior

### Description

1) The exterior walls are decorative concrete block.
2) The windows are aluminum frame double glazed units.  All windows are fixed glazing.
3) There is a poured concrete sidewalk on all sides.
   a) There is two handicap accessible ramps to the building.
4) There is an asphalt parking lot at the north and west side of the property and asphalt service roads at the side.

### Observations and Discussion

1) The exterior of the building is in generally good condition and maintained.
2) A damaged section was noted at the north of the building adjacent to the dock area. There is the source of leak from the roof that may be adding to the block breakage and cracks.
3) The metal exterior doors are in well maintained satisfactory condition. Minimal deterioration was noted.
4) No overhead doors were noted.
5) The windows are in good condition.
6) The grading is satisfactory.
7) The poured concrete sidewalk at the front of the building is in satisfactory condition except for caulking (NP1) along the building and sidewalk edge.

### Recommendations, Costs and Priorities:

| Recommendations | Cost | Time Frame |
|---|---|---|
| Exterior Wall (Area to the North, corner of dock area) Repair | $6,000 - $10,000 | When Feasible |
| Exterior Wall (North Handicap ramp) Repair | $2,000 – $4,500 | When Feasible |
| Asphalt Parking lot  Repair | $30,000 - $40,000 | When Feasible |

6

## Interior

**Description:**

1) The ceilings primarily consist of drop ceiling panels.
2) The wall finishes consist of drywall and carpet style material.
3) Bathroom finishes are drywall and tile.
4) The floor coverings consist of tile and carpet.

**Observation and Discussion:**

1) The interior finishes are in generally satisfactory condition.  It should be noted that extensive remodeling will be required should this property be used for anything other than a theater.
2) Stains were noted at many drop ceilings panels.  The source is considered roof leakage.
3) Since interior components are subjective to some degree, our comments here will be general, except where functional concerns are noted.

**Recommendations, Costs and Priorities:**

| Recommendations | Costs | Time frame |
|---|---|---|
| North Stair well – Requires structural engineer | Unknown - $300,000 | ASAP |
| Interior Block Wall/2nd Floor, north-south- Requires a structural engineer | Unknown - $300,000 | ASAP |

7

## Life Safety Fire Protection

**Description**

1) The theater is equipped with a wet sprinkler system.

**Observation and Discussion**

1) Current inspection tags from Cintas were observed.
   a) Expired April 2020
2) Alarm and security systems were observed, but no inspections were noted.
   a) No alarms were tested during the inspection.

**Recommendations, Costs and Priorities**

| Recommendations | | Costs | Time Frame |
| --- | --- | --- | --- |
| Fire / Life Safety Code Inspections | Keep current with inspections | Minimal | Every Year - 1 year |

8

# Roofing

**Description:**

**Multi-Level Flat**

1)  The flat roofs is covered by a single-ply TPO & EDPM rubber membrane.

**Roof Drainage**

1)  I have, for the use of this report separated the 4 roofs into its own identification.
    a)  The west & entrance roof is above the ticketing and waiting area.
        i)   The front entrance, ticket sales and waiting area has several areas of possible leakage were noted.
        ii)  No documentations was available to know the age of this roof.
        iii) This area alone, had 113 individual roof patches.
        iv)  Stained ceiling tiles were noted.
    b)  The eastward roof is above the concession, public restrooms, and the office with alarm panel.
        i)   No documentations was available to know the age of this roof.
        ii)  The concession and restroom roof appears to be in satisfactory condition but is aging.
        iii) Stained ceiling were noted.
    c)  The 3rd roof is further east and north and is the main theater hallways and the mechanical room.
        i)   The storage/mechanical room and the north hallway roof has a major slop issue where rainwater does not drain from the roof and is pooling in various areas.
        ii)  No documentations was available to know the age of this roof.
        iii) It shows numerous areas of low, non-sloping areas.
        iv)  Stained ceiling were noted.
    d)  The main roof is the roof over the theaters
        i)   The main Theater roof is older and worn.
        ii)  No documentations was available to know the age of this roof.
        iii) Many stained ceiling were noted



2)  One major concern is the downspout trash-guards were covered with debris and the roof was retaining water. While  performing inspection, Coil inspector removed the trash from the guard to allow for drainage on roof C.
    a)  Routine maintenance needs completed on the roofing systems.
    b)  The roofs are designed to support the roof membrane and a reasonable amount of water. When the trash-guards are blocked, the roof will retain water and a gallon of water weighs

**Observations and Discussion:**

1)  The ballast covered EDPM membrane roof cover appears to be in used condition.  There is evidence of leakage in several areas and evidence of past repairs.

a) From Google aerial and personal photos taken, it is evident that the roof has reached its life expectancy

2) There is no documentation of the date of installation EPDM roof.
3) Proper walking surfaces should be installed in the roof to facilitate servicing of equipment.

**Recommendations, Costs, and Priorities:**

| Recommendations | | Costs | Time Frame |
|---|---|---|---|
| Roofs A, B, C & D | Re-roof the entire building (approximately 35,000 sq. Ft) | $450,000 | Immediate |
| Roofs A, B, C & D | Install walkway pavers to equipment | $3,000-$7,000 | During new roof installation |

## Electrical

### Description

1) The electrical service to the building is in satisfactory condition. No noted errors from visual inspections or from the current tenant.
2) The building is equipped with 208v/120v 3 phase 4 wire electrical service.
3) The breaker panels were unlocked.  The individual breakers were marked noting the usable areas. All wiring observed was copper.  No aluminum was reported.
4) Interior lighting was a combination of fluorescent, metal halide and recessed incandescent.

### Observations and Discussion:

1) While detailed load calculations were not performed, no problems are suspected with the service capacity.
2) The service should be adequate for the present usage.
3) The grounding electrode conductors at the exterior are intact and serviceable.
4) There is one single 120v duplex with packing take over the outlet. This is in the dish washing area.

### Recommendations, Costs and Priorities:

| Recommendations | | Costs | Time Frame |
|---|---|---|---|
| Research duplex | May be a faulty duplex outlet | Minimal | Immediate |

## Heating Air Conditioning System

**Description:**

1) The building is heated with a total of twenty (20) roof-mounted, gas fired, heating (electric cooling) units.
2) The type of refrigerant used in the air conditioning systems could not be verified.
3) The heated/cooled air is distributed is handled by the same air handling equipment previously mentioned in the heating section.

**Observations and Discussion:**

1) The oldest of the rooftop units are estimated at 31 years old.
2) While it is impossible to predict with certainty when a heat exchanger / compressor will fail, the average life for heating equipment of this type is 15 to 20 years.
3) It was not feasible to observe the units in heating mode operation. (Outside air temperatures were in the 80's)
4) The temperatures was comfortable in the building and the A/C was running currently.
5) The air discharge distribution appears adequate in most areas.  Some pressurization issues were observed. This may be caused by the enormous ceilings and areas. (Theaters)

**Recommendations, Costs, and Priorities**

| Recommendations | | Costs | Time Frame |
|---|---|---|---|
| HVAC Units (20 Total) | Replace Rooftop Unit | $6,000 – $20,000 Per/unit | At time of remodel or as a Capital Improvement |

## Plumbing

Description:

1) **Supply**
   a) The building is supplied with a 2-inch diameter water supply line into the building.
   b) The main shut off valve is in the main storage mechanical room.
   c) One water meter was located.
   d) All supply plumbing examined is copper.

2) **Waste**
   a) Most of the waste piping is under-slab and not visible for observation.
   b) Visible piping was PVC.

3) **Women's Public Restroom.**
   a) There are 8 toilets with manual flush valves.
      i) There is one handicap with manual flush valve stall that does not meet the ADAAG code for circulation.
   b) There are 5 sinks with battery operated on/off valves.

4) **Men's Public Restroom**
   a) There are 5 toilets with manual flush valves.
      i) There is one handicap with manual flush valve stall that does not meet the ADAAG code for circulation.
   b) There are 4 urinals
      i) There is one handicap urinal
   c) All had working battery operated flush valves.
   d) There are 5 sinks
   e) All had working battery operated on/off valves.

5) **Single stall restroom**
   a) Located on the 2nd floor north with manual flush valve.
   b) No deficiency is noted.

6) **Water Heating**
   a) There are two 50-gallon electric water heaters.
   b) One 50 gallon is in a mechanical room off the public restrooms.
   c) One 50 gallon is in a mechanical room off kitchen/dishwashing area.
      i) These units were unplugged, had energy smart controller attached, but was not tested.

 

7) **Backflow Prevention valves**
   a) Appears to be leaking

b) Required City and State inspection has expired.

**Observations and Discussion:**

1) No major deficiencies were noted in the plumbing system during the assessment.  The location of the main water line to the property was not determined.
2) Some corrosion was observed at the water heater unit.

**Recommendations, Costs and Priorities**

| Recommendations | | Costs | Time Frame |
|---|---|---|---|
| Water Heaters | Repair Water Leak | Minimal | 1 year |
| Backflow Prevention Valves | Inspections & Repair as required | Minimal | 1 year |

## Exhaust & Ventilation

**Description:**

1) There are several exhaust / ventilation units in the building.
2) The public restrooms are ventilated by exhaust fans
3) The building receives fresh air from the heating and cooling rooftop units.  These units are equipped with fresh-air makeup units, which allow fresh air from the exterior to enter the return air plenum.  This introduction of fresh air helps to improve indoor air quality as well as compensate for air that is expelled through exhaust fans.

**Observations and Discussion:**

1) Ventilation of the building is provided by localized exhaust fans located in bathrooms and kitchen areas. No rooftop exhaust fans were noted.

**Recommendations, Costs and Priorities**

| Recommendations | | Costs | Time Frame |
|---|---|---|---|
| Exhaust Fans | Service exhaust and ventilation equipment | Minor | As needed |

## Closing Comments

This report provides you with an overview of the condition of the major components in the building. This building is in adequate shape and repairs have been maintained. The major components, HVAC units and structural routine maintenance appears to be less. Should you have any questions, please do not hesitate to contact us.

Please find photographs documenting several conditions noted in Appendix A.


Sincerely,


**BARRY DENNISON**  Director of Facilities
Office: 573.554.1888 |  cell: 573.220.3795
209 E Broadway, Columbia, MO 65203
Barry@coilfm.com
Coil Facilities Management | *Building a Better Community*

## Appendix A Summary of Photographs

Exterior





Interior







Life Safety & Fire Protection Inspections



   



## Roofing

   

   

0





## Electrical









## HVAC






22

   

## Plumbing

   

   

 

5/22/91
DICKNLSE.LSR

FORUM SHOPPING CENTER
LAND LEASE

This lease entered into as of the _22nd_ day of _MAY_, 19_91_, by and between the LANDLORD and TENANT hereinafter named.

## SECTION ONE: DEFINITIONS AND DESCRIPTIONS OF PREMISES

(a) "LANDLORD"  : Forum Shopping Center, a Missouri Limited Partnership

(b) "LANDLORD's" address  : c/o Boone Financial Group – 33 Broadway – P.O. Box 1037 – Columbia, Mo. 65205

(c) "TENANT"  : Dickinson, Inc.

(d) TENANT's address  : 5913 Woodson Road – Mission Ks.  66202

(e) TENANT's telephone  : (913) 432-2334

(f) TENANT's contact person  : Kent Dickinson or Leon Hoofnagle

(g) TENANT's trade name  : Forum 8

(h) LANDLORD in consideration of the rents, covenants, and agreements herein contained, leases and demises to TENANT premises located at and described as Pad Site H, 1400 Forum Boulevard, Columbia, Mo.  65203, containing approximately 186,000 square feet of land area.  The legal description of such Pad Site H shall be determined by actual Survey, as soon as a Site Plan is completed and approved by both LANDLORD and TENANT, and it shall include a description of the area reserved for TENANT's pylon sign (in accordance with SECTION TEN herein).  Said legal description shall govern, and shall be attached as Exhibit "A" to this Lease as soon as it is available.  Any easements for any other tenant of LANDLORD'S Shopping Center or for LANDLORD shall be defined on the site plan or plat and approved by TENANT and shall not interfere with TENANT'S building lines or entrance to TENANT'S building or in any way permanently interfere with the parking for TENANT'S invitee's, customers or guests.  Attached hereto as Exhibit "B" is an outline of TENANT'S building and parking area.  Under the terms of this Lease, TENANT shall be responsible for the maintenance and upkeep of the parking area, common area, sidewalks and right–of–way and other facilities within the area outlined in Exhibit "B".  Neither LANDLORD nor TENANT shall fence or otherwise impede the parking, ingress, egress or the right–of–way between TENANT's parking area and the rest of the parking area in the Shopping Center.  This Lease includes the non-exclusive right of TENANT and LANDLORD and their agents, successors, assigns, licensees, concessionaires, customers, suppliers, and patrons to use and enjoy throughout the term of this Lease the common areas of the Shopping Center, including the driveways, entrances exits, roadways, parking areas, sidewalks, and right–of–way and other fixtures and facilities provided for the general use and purposes of TENANT and other tenants.  LANDLORD agrees to provide turnaround space for tractor trailer trucks servicing LANDLORD's other tenants, on LANDLORD's common area space in the shopping center adjacent to, but not on, TENANT's common area.  TENANT may record in the land records of Boone County notice of TENANT'S right to use the common areas of the Shopping Center.

(i) LANDLORD shall build rights-of-way and public streets adjacent to the demised premises to be completed in accordance with the plan approved by LANDLORD and TENANT and the City of Columbia, Missouri, by the date of building occupancy.  LANDLORD shall provide all funds for the above referenced rights-of-way and public street construction.  No assessments shall be levied against TENANT's leasehold estate for the construction of any such improvements.

## SECTION TWO: TERM

(a) The term of this Lease shall commence on June 1, 1991, and end on May 31, 2046, unless terminated as provided in paragraph (b), below.

Exhibit
3

5/22/91
DICKNLSE.LSR

(b) TENANT may cancel this Lease Two Hundred Seventy (270) days on or before the following dates:

May 31, 2006
May 31, 2016
May 31, 2026
May 31, 2036
May 31, 2046

## SECTION THREE:  RENT

(a) MINIMUM RENT:  TENANT shall pay monthly installments, in advance, on the 1st day of each and every month in the amount of Three Thousand Two Hundred and No/100 Dollars ($3,200.00), as may be adjusted by SECTION FIVE herein.

(b) RENT DUE:  It shall not be necessary for LANDLORD to demand the rent or any other payment or payments of money required to be made under the terms of this lease.  TENANT shall pay each installment of rent and other payments as the same shall become due LANDLORD.  Notwithstanding the above, the TENANT shall not be in default under this Lease unless LANDLORD has provided the notice required under SECTION TWENTY THREE of this Ground Lease.

(c) PERCENTAGE RENT:  In addition to the minimum rent, TENANT will pay LANDLORD as annual percentage rent during the term of this lease and any extensions thereof ___three___ percent (_3_%) of all annual net sales in excess of _$2,000,000_.  The percentage rent shall be payable thirty (30) days after the end of each applicable calendar year.  Annual net sales shall be accounted for on a calendar year basis.  The _$2,000,000_ sales level indicated above shall be prorated on a monthly basis (1/12 per month) for any calendar year which includes fewer than 12 months of TENANT's current lease.  TENANT shall, each calendar year, be entitled to credit against such percentage rent the amount of "minimum rent" paid by TENANT during such calendar year which is computed to be in excess of $38,400 as a result of Section Five herein.

(d) ACCOUNTING:  For the purpose of ascertaining the percentage rent due, TENANT shall keep accurate accounts of all sales made by it in, on or from the demised premises; the same shall be entered in a book of a permanent nature, and TENANT shall deliver to LANDLORD monthly statements of the total of such sales.  Upon the written request of LANDLORD, TENANT agrees to pay the cost of an audit of TENANT'S sales records to be performed by an auditing firm chosen by LANDLORD.  Such audit shall be arranged by LANDLORD, at LANDLORD's option, but with no less than 30 days prior notice to TENANT.  Such audit shall be limited to verification and adequacy of TENANT'S sales records and sales reports.  However, if such an audit is requested by LANDLORD at less than a three year interval since the prior audit (or since the commencement of this Lease for the first such audit), LANDLORD shall pay the cost of such more frequent audit, unless such audit discloses a variance greater than 1% in the reported Sales, in which case TENANT shall pay the cost.  As an alternative to this audit requirement, if TENANT's sales and records are audited annually by an independent Certified Public Accounting firm, TENANT shall have the option to provide LANDLORD a copy of such audit verifying TENANT's reported sales to LANDLORD.   LANDLORD shall have the right at all times during the business hours, at the demised premises or at any other location where such books, accounts, etc., are kept, acting through its agent, attorney or accountant, to inspect and copy TENANT'S books, accounts, records and reports of receipts in any way pertaining to the business transacted in, on or from the demised premises.  TENANT acknowledges that time is of the essence regarding this provision and that the failure of TENANT to abide by the terms of this provision shall constitute a material breach of the lease including the failure to pay the rent which LANDLORD is entitled to receive.

(e) NET SALES.  The term "net sales" shall mean the total amount of gross receipts from the conduct of business in, upon, or from the demised premises and all transactions had therein and therefrom by TENANT, its confectionaries, or licensees, less all film rentals and excise taxes on ticket sales and auditorium rentals.  Net sales shall include: all merchandise sold or services performed in or supplied from the demised premises whether for cash or charge, all sales originally made or services originally contracted for in the demised premises shall be considered as made and completed therein even though payment of the account may be transferred to some other location for collection; all deliveries or merchandise or service made from a place other than the demised premises; all services performed outside the demised premises; all merchandise and services delivered from the demised premises to customers, though contracted for elsewhere.  The following shall be excluded from net sales: all taxes payable on the sale of merchandise or services in or from the demised premises (provided however, no capital stock tax, privilege tax or franchise tax and no income or similar tax based on income or profits shall be deducted from net sales).

5/22/91

DICKNLSE.LSR

## SECTION FOUR:  LATE CHARGE

If any payment due is not received by LANDLORD by the fifth (5) day of the month in which it is first due, a late charge of an additional one-half of one percent (.5%) per day of that amount for each day the payment is late, shall be paid to LANDLORD.

## SECTION FIVE:  ADJUSTMENT OF RENT

TENANT agrees that the monthly rent due in "SECTION THREE: RENT", paragraph "(A) MINIMUM RENT", of this Lease, notwithstanding the provisions contained therein, shall be the amount specified in said paragraph during the seventh (7th) one year period of the Ground Lease as tolled from the commencement date of this Lease.  The seventh (7th) year after the commencement of this Lease (which shall be the twelve (12) month period from June 1, 1997 through May 31, 1998, shall be the "base year".  At the end of the seventh (7th) year, as defined herein, and each one (1) year period thereafter, said monthly rent shall be adjusted to equal the amount of monthly rent required to be paid hereunder during the prior twelve (12) months increased by that percentage, if any, by which the index number hereinafter described for the month which is three (3) months prior to the end of said year when the rent is to be increased is larger than said index number for the same month one (1) year prior thereto.  Such percentage increase is, by mutual agreement of LANDLORD and TENANT, hereby limited to an annual 2.5% maximum.

The "index number" referred to above is the "Consumer Price Index – U. S.  City Average, All Urban Consumers, All Items" (CPI–U) now published monthly by the Bureau of Labor Statistics of the United States Department of Labor.  The base period now used for such index is 1982–84 = 100.  If a new base period shall be substituted for said base period currently used, all computations provided for herein shall take into account such change in the base period so that all determinations of the percentage by which such index number has increased will be made by comparing such index numbers based on such new base period.  If publication of such index number shall be discontinued, the parties shall use other comparable statistics to reflect such increase in the aforesaid United States consumer prices.

## SECTION SIX:  SECURITY DEPOSIT

This Section is not applicable.

## SECTION SEVEN:  POSSESSION

TENANT shall be granted possession at the beginning of the term of this Lease as indicated in Section Two above.  TENANT's rent and all other costs and charges required by this lease shall commence at the same time.

## SECTION EIGHT:  CONDITION OF PREMISES

LANDLORD and TENANT agree that this is a Land Lease and that TENANT accepts the premises as is, except that it shall be LANDLORD's obligation, at LANDLORD's expense, to bring all utilities to TENANT's demised property line as determined by the survey mentioned in Section One herein.  LANDLORD and TENANT agree that the entrance and driveway area proposed to be located West of TENANT's proposed building should be designed to handle truck traffic that may use such driveway to access the rest of the shopping center for deliveries, and that the actual (per square foot) cost of constructing any section of such driveway which is in excess of the (per square foot cost) cost of constructing TENANT's other driveways shall be shared by LANDLORD and TENANT on a 50/50 basis.  LANDLORD and TENANT further agree that construction of all improvements will be performed in accordance with plans and specifications to be prepared by Cowan Stevens Architects – 7223 West 95th –Suite 230, Overland Park, Ks.  66212 (913–341–0662), which plans and specifications are subject to mutual approval in writing by both LANDLORD and TENANT, following which approval they shall be made a part of this Lease as if attached hereto. TENANT shall provide LANDLORD, in writing, no less than 20 days prior to the date bid requests are to be mailed to prospective contractors, a copy of the mailing list of such contractors.  LANDLORD shall, no less than 5 days prior to such bid request mailing date, provide TENANT a revised mailing list, showing names and addresses of the qualified contractors which are to be deleted from, or added to, said mailing list.  All costs of improvements, and all fixtures and signage, shall be paid by TENANT.  LANDLORD or LANDLORD's designated agent shall have the

5/22/91
DICKNLSE.LSR

right to inspect the progress of the construction for satisfaction that the construction is being completed in accordance with the approved plans and specifications. TENANT shall start construction of the improvements no later than April, 1992, and shall use its best efforts to see that construction is completed no later than December, 1992 (weather permitting). TENANT shall be responsible for compliance with all City, County, State and Federal requirements and ordinances affecting the site work and improvements to be constructed, including any applicable "tree" ordinance(s) that may be approved by the City of Columbia. TENANT agrees to be attentive to environmental issues, such as minimizing necessary tree removal, in completing the construction of the proposed improvements.

## SECTION NINE:  USE OF PREMISES

(a) TENANT shall use the premises for the maintenance and operation of motion picture theaters and related operations, and for no other purpose without the prior written consent of LANDLORD. TENANT may change the use of the Premises if TENANT expands into a non-competing use that does not conflict with existing lessees of LANDLORD.

(b) TENANT shall keep the leased premises open during business hours for similarly situated theaters in cities the size of Columbia, Missouri. Nothing herein shall prohibit TENANT from expanding its hours of operation. All exterior parking lot and building lighting controlled by TENANT shall be kept lighted from thirty (30) minutes after sunset until thirty (30) minutes after the last motion picture show. From that time, until dawn, TENANT shall keep lighted a portion of the exterior parking lot and building lighting controlled by TENANT, sufficient, in TENANT's opinion, to provide for adequate security and pedestrian or vehicular traffic throughout the premises.

(c) TENANT agrees that it will keep its place of business in the Shopping Center open continuously during the term of this lease, and will not cease operations in said premises without the express written consent of the LANDLORD, unless prevented from doing business therein by reason of applicable ordinances or other acts of governmental authorities, or by force majeure as set forth in SECTION FOURTEEN.

## SECTION TEN:  SIGNAGE

(a) TENANT shall not erect any sign or signs on the exterior of the demised premises without the written consent of LANDLORD, which consent shall not be unreasonably withheld. All signs shall comply with applicable ordinances and the determination of such requirements and the compliance therewith shall be the responsibility of TENANT. The cost of all signage shall be paid by TENANT.

(b) TENANT shall not maintain any exterior wall or window display signage other than agreed upon between LANDLORD and TENANT. LANDLORD agrees that it will not unreasonably withhold agreement to proposed signage suggested by TENANT.

(c) TENANT agrees to cooperate with the Forum Merchants' Association and participate in its activities and promotions, unless TENANT deems such participation to be financially or operationally detrimental to TENANT.

(d) LANDLORD hereby grants TENANT permission to erect a free-standing "marquee" (or pylon) sign near the intersection of Stadium and Forum Boulevards, to advertise TENANT's business and attractions, subject to LANDLORD and TENANT's mutual written approval of such sign's exact location and design, which approval shall not be unreasonably withheld by either party. Such sign shall comply with all City of Columbia specifications and restrictions.

In accordance with SECTION ONE herein, the sign location is to be described by TENANT'S surveyor as part of TENANT's demised premises. LANDLORD will obtain any necessary consent agreements from LANDLORD'S lenders allowing TENANT to place the pylon sign on the designated area. The failure of the TENANT to obtain a sign permit for such location, or LANDLORD'S failure to obtain LANDLORD'S lenders' consent for the placement of the pylon sign shall entitle TENANT to cancel this Ground Lease and demand a refund of all pre-paid rents.

## SECTION ELEVEN:

N/A

Page 4

SECTION TWELVE:  REPAIRS AND MAINTENANCE IN GENERAL

(a) TENANT shall keep demised premises free from common pests.

(b) TENANT agrees at TENANT'S expense to clean, repair, replace when necessary, maintain in good condition, and provide preventive maintenance, for all of the demised premises including, but not limited to, non-structural interior portions thereof, electrical fixtures and systems, plate and window glass, windows, show windows, doors, moldings, floors, and plumbing fixtures.

(c) TENANT agrees at TENANT'S expense to clean, repair, replace when necessary, maintain in good condition, and provide preventive maintenance for any, heating, ventilation, cooling units, filters, and any other mechanical systems, equipment, and appliances for all the demised premises, and on the roof thereof, if any.  TENANT shall provide written evidence that all preventive maintenance measures have been made or taken by TENANT for the prior year, if LANDLORD so requests in writing.

(d) TENANT shall keep in good order, condition and repair the foundations, exterior walls and the exterior roof of the premises.

SECTION THIRTEEN:  UTILITIES

TENANT shall pay for all utilities including, but not limited to, gas, water, electricity, and sewer charges for the demised premises.

SECTION FOURTEEN:  ATTORNEY'S FEES

If it is necessary for either LANDLORD or TENANT to employ an attorney to enforce any of the provisions of this lease, the prevailing party shall be reimbursed by the losing party for the reasonable attorney's fees incurred and court costs as well as other reasonable expenses of litigation.

SECTION FIFTEEN: ALTERATIONS

TENANT shall not make any alterations or additions to the demised premises without LANDLORD'S written consent based on plans and specifications to be provided by TENANT to LANDLORD.  All alterations, additions, and improvements made by TENANT to or on the demised premises become the property of LANDLORD upon the termination of this lease.  TENANT shall be free to choose its own contractor for such work, but such work may be started only after first obtaining LANDLORD's written approval of the particular contractor(s) to be used. LANDLORD shall not unreasonably withhold such consent or approval.

SECTION SIXTEEN:  REPAIRS AND DESTRUCTION OF IMPROVEMENTS

(a) In the event the building on the demised premises is damaged so as to be untenantable, TENANT agrees to promptly restore said demised premises to a tenantable condition.  The proceeds of any policy or policies of insurance covering the destruction or partial destruction of the demised premises are the property of the TENANT, subject to TENANT's use of such proceeds to repair or replace the premises in accordance with this Section.

(b) Damage, destruction, or partial destruction of any improvements of the demised premise shall not release TENANT from any obligation of the lease.

(c) Any mortgagee holding a mortgage or deed of trust may require that the insurance proceeds be paid to it.  The TENANT shall be paid any excess monies remaining from insurance proceeds after the building is reconstructed and repaired.

SECTION SEVENTEEN:  LIENS

(a) MECHANIC'S LIEN:  Any mechanic's liens asserted against the demised premises on account of any contract entered into between

5/22/91

DICKNLSE.LSR

TENANT and the lien claimant shall be paid or otherwise satisfied by TENANT within thirty (30) days after such lien statement is filed in the office of the Boone County Circuit Clerk. If TENANT chooses to contest said lien, TENANT will make appropriate provision, satisfactory to LANDLORD, to protect LANDLORD's interest. Breach of this provision shall be treated as the failure to pay rent due LANDLORD under this lease.


## SECTION EIGHTEEN: INDEMNIFICATION OF LANDLORD

TENANT agrees to protect and save LANDLORD harmless from any loss or damage resulting from any claims, actions, causes of action or suits filed or asserted in connection with loss of life, bodily injury or property damage arising from or out of any occurrence in, upon or at the leased premises, including the adjacent parking lot and driveways, occasioned by any act or omission of TENANT or its agents, contractors, employees, servants, invitees or licensees, and the foregoing shall include all costs and expenses incurred by LANDLORD in connection with defense of the same, including reasonable attorney fees.


## SECTION NINETEEN: INSURANCE

(a) TENANT shall purchase and continue in force, in the names of LANDLORD and TENANT, general liability insurance against any and all claims for injuries to persons occurring in, on, or about the demised premises, during the term of this lease. Such insurance will, at all times, be in a primary amount not less than $1,000,000 for injuries to or death of any one person, and not less than $1,000,000 for injury to or death to any number of persons in one occurrence, with additional "umbrella" liability coverage in an amount not less than five million dollars ($5,000,000). Certificates of coverage shall be furnished LANDLORD annually.

(b) LANDLORD is not an insurer of TENANT's person or possessions. TENANT agrees that all of TENANT's person and property in the TENANT's demised premise or elsewhere in the building shall be at the risk of TENANT only, and that TENANT will carry such insurance as TENANT deems necessary therefore.

(c) TENANT shall purchase and continue in force, in the names of LANDLORD and TENANT, replacement-cost property and casualty insurance on the demised premises, in an amount equal to the total actual site, design, construction and other development costs incurred by TENANT for the demised premises. Such insurance amount shall be adjusted annually to reflect increases in replacement costs as recommended by TENANT's insurer. Certificates of coverage shall be furnished to LANDLORD annually.

(d) TENANT agrees to hold LANDLORD harmless from all claims which may arise from, on, in, or about the demised premises, when such claims arise out of or are caused in whole or in part by a defective, dangerous or unsafe condition of the premises, equipment, fixtures, or appurtenances required by law, or the terms of this lease, to be maintained by TENANT.


## SECTION TWENTY: REAL PROPERTY TAXES

TENANT shall pay all real property taxes and assessments levied on the demised premises (before same become delinquent), provided however, that within thirty (30) days after notice by LANDLORD, TENANT shall pay LANDLORD for its share of such payment of real property taxes and assessments for that tax year, if such tax is paid by LANDLORD either directly or as part of the Forum Shopping Center tax billing. TENANT's share of such amount shall be paid by TENANT based on property valuation and tax rate data to be provided each year from information available from the Columbia and Boone County Assessor's Offices, or other proper regulatory authority. LANDLORD and TENANT agree to request that the Boone County Assessor's office separate out the demised parcel from the rest of the Shopping Center, for assessment purposes only, in TENANT'S and LANDLORD'S name so that TENANT'S parcel may be assessed and taxed as a separate parcel.


## SECTION TWENTY ONE: ASSIGNMENT AND SUBLEASE

(a) TENANT shall not assign this lease or sublet (which term shall, without limitation, include the granting of concessions, licenses and the like) the whole or any part of the leased premises without first receiving written consent of LANDLORD. LANDLORD shall not unreasonably withhold consent, particularly in the case of a proposed assignee with a net worth of at least $5,000,000. LANDLORD reserves the right to assign this lease to new owner. Further in the event LANDLORD does consent to any assignment or subletting, then any increased rent, percentage

5/22/91
DICKNLSE.LSR

rent, or increased adjustment of rent, shall be payable to LANDLORD.

(b) Both LANDLORD and TENANT shall, within thirty (30) days after written notice by either party that status of the Lease is required, give written notice showing that the Lease is in good standing and, if not, the particulars thereof. Failure to give a written reply within the thirty (30) day period shall constitute a representation which any person may rely upon as being true and correct, that the Lease is in good standing.

## SECTION TWENTY TWO:  SERVICE OF NOTICE

Service of any notice served by LANDLORD on TENANT shall be sufficient if sent by certified mail (return receipt requested) with sufficient postage addressed to TENANT at the address appearing in Section One hereof, or such latest address as may be furnished by TENANT to LANDLORD in writing. Service of any notice served by TENANT on LANDLORD shall be sufficient if sent by ordinary mail with sufficient postage addressed to LANDLORD at the address appearing in Section One hereof, or such latest address as may be furnished by LANDLORD to TENANT in writing.

## SECTION TWENTY THREE:  DEFAULT

(a) Effect of Default by Lessee. If at any time TENANT defaults in the payment of any rent on the day it is due and payable, or if TENANT fails to perform any other covenant under this Lease, the LANDLORD may declare the Lease term ended. In that event, the LANDLORD may re-enter upon any part of the premises and the building or buildings and improvements situated on it, either with or without process of law, the LANDLORD waiving any demand for possession of the premises and all buildings and improvements situated thereon. The LANDLORD shall also have all other remedies provided by law and this instrument. Immediately upon termination of the demised term, at the LANDLORD'S election or in any other way, the TENANT shall peaceably surrender and deliver upon the demised premises and all real and personal property to the LANDLORD or its agent or attorney. If the TENANT or its agent, attorney or TENANTS, hold the premises or any part thereof, one day after the date for their surrender, according to the terms of the Lease, the TENANT shall be deemed guilty of forcible detainer of the premises under the statutes and shall be subject to eviction or removal, forcibly or otherwise, with or without process of law.

(b) LANDLORD'S Remedies. Nothing herein shall be construed as authorizing the LANDLORD to declare this Lease in default, however, unless the default is for the nonpayment of rent, security, insurance premiums or taxes in violation of the terms of the Lease, and the nonpayment continues for thirty (30) days after written notice by certified mail, return receipt requested. If the alleged default consists of any other violation, nothing herein shall be construed as authorizing the LANDLORD to declare this Lease in default, unless the violation continues for forty five (45) days after written notice by LANDLORD to TENANT, sent by certified mail, return receipt requested. However, nothing contained herein shall be construed as precluding the LANDLORD from having any other remedy that may be necessary to preserve its right and its interest in the premises and this Lease, even before expiration of the grace or notice periods provided for in the allowance of the grace or the giving of the notice would prejudice or endanger the LANDLORD'S rights and estate in this Lease and the demised premises.

## SECTION TWENTY FOUR:  TERMINATION

At the end of the term of this lease, including any extensions, TENANT shall surrender to LANDLORD the demised premises, together with all improvements therein in as good a condition as existing at the beginning of the lease term, except for ordinary wear and tear. No improvements will be removed from the demised premises including, but not limited to, buildings, real estate improvements, carpeting, walls, lighting fixtures, and any other improvements, without LANDLORD's written approval. This SECTION shall not prohibit TENANT from removing its own items of personal property including, but not limited to, theater seats, projection equipment, video equipment, concession equipment, screens and supplies, but TENANT shall be responsible for repairing, to LANDLORD's satisfaction, any damages caused to the premises by such removal.

## SECTION TWENTY FIVE:  ENTRY BY LANDLORD

LANDLORD and their agents shall have free access to the demised premises during all reasonable hours for the purpose of inspection and repair or to show for sale or rent. Within 270 days of the end of the term of this lease, LANDLORD may begin to advertise that the demised premises are for lease.

5/22/91
DICKNLSE.LSR

**SECTION TWENTY SIX:  EFFECT OF BANKRUPTCY**

If TENANT becomes bankrupt or makes an assignment for benefit of creditors, or in the event a receiver is appointed for TENANT, then LANDLORD may terminate this lease and take possession of the demised premises without waiving any of its rights.

**SECTION TWENTY SEVEN:  CONDEMNATION**

(a) Eminent Domain; Cancellation.  If, at any time during the continuance of this Lease, all or any portion of the demised real estate or the improvements of any building located thereon is taken, appropriated or condemned by reason of eminent domain, the LANDLORD and TENANT shall divide the proceeds and awards in the condemnation proceedings, abate the rent, and make other adjustments in a just and equitable manner under the circumstances.  If the parties cannot agree on a just and equitable division, annual abatement of rent, or other adjustments within thirty (30) days after the award has been made, the disputed matters shall, by appropriate proceedings, be submitted to a court having jurisdiction of the subject matter for its decision and determination.  If legal title to the entire premises is wholly taken by condemnation, or if the parking lot is taken so as to make it impossible to operate TENANT'S business, the Lease shall be cancelled.

(b) Apportionment.  Although title to the building and improvements placed by the TENANT upon the demised premises will pass to the LANDLORD for purpose of condemnation, the fact that the TENANT placed the buildings on the demised premises shall be taken into account.  The deprivation of the TENANT'S use of the buildings and improvements shall together with the remaining term of the Lease, be an item of damage in determining the TENANT'S portion of the condemnation award.  It is the general intent of this Section that, upon condemnation, the parties shall share in their awards to the extent that their respective interests are depreciated, damaged or destroyed by the exercise of the right of eminent domain.  If the condemnation is total, the condemnation award shall be allocated so that the then value of the property, as if it were unimproved property, is allocated to the LANDLORD and the then value of the building or buildings and parking lot improvements thereon is allocated to the TENANT.

**SECTION TWENTY EIGHT:  HOLDING OVER**

If TENANT refuses to vacate the premises after the termination of this lease TENANT shall pay three times the rent computed on a daily basis of the highest rent paid by TENANT during the term of this lease.

**SECTION TWENTY NINE:  QUIET ENJOYMENT AND NON-DISTURBANCE**

(a) So long as the TENANT keeps and performs all of its covenants and conditions under this lease, it shall have quiet, undisturbed and continued possession of the premises, free and clear from all claims from anyone whomsoever.

(b) So long as the TENANT keeps and performs all of its covenants and conditions under this Lease, TENANT shall not be disturbed or interrupted in TENANT'S use of the demised premises whether by foreclosure of LANDLORD'S interest by a mortgagee of LANDLORD or otherwise.

**SECTION THIRTY:  TERMS NOT TO BE REVEALED — DUPLICATES — RECORDATION**

TENANT shall not reveal any of the terms of this lease to anyone except to appropriate regulatory authorities, and TENANT's bank, attorney or accountant.
Either party shall, at any time, at the other's request, promptly execute duplicate originals of an instrument, in recordable form, which shall constitute a short form of Lease.  The form of such instrument is attached hereto as Exhibit "C".

**SECTION THIRTY ONE:  MISCELLANEOUS**

(a) TENANT shall not store equipment or other unsightly items on the exterior of the premises without LANDLORD's prior written approval.

5/22/91
DICKNLSE.LSR

(b) TENANT and LANDLORD hereby confirm that the execution, delivery and performance by each of this Lease, and the consummation of the transactions contemplated hereunder have been duly authorized by all requisite action on the part of each. TENANT and LANDLORD further hereby confirm that the executing officers or partners of each have full power and authority to enter into this Lease and to perform their respective obligations hereunder.

(c) MORTGAGE FINANCING.   TENANT shall be allowed to mortgage its leasehold interest for construction and permanent financing in an initial amount not to exceed 100% of TENANT's construction costs, and an amortization period not to exceed fifteen (15) years, or the initial number of years of the term of this Lease during which TENANT has waived its rights to cancel this Lease in accordance with SECTION TWO herein, whichever period is longer.  Any subsequent refinancing shall be limited to an amount not to exceed 70% of TENANT's original construction costs, with an amortization period not to exceed ten (10) years, but in no event shall such amortization period extend beyond the then next date when TENANT could exercise its right to cancel this Lease in accordance with SECTION TWO herein, unless TENANT first waive such right in writing.  TENANT shall have the right to assign its rights under this Lease to the lending institution or institutions providing financing for the project contemplated by this Lease, as security for said lending institution's or institutions' loan or loans in conjunction with said project, however, such assignment shall not relieve TENANT from any of its liabilities or obligations under this Lease.

(d) FORCE MAJEURE.   Except for the payment of any monies required from TENANT by this Lease, if TENANT is delayed, hindered or prevented from performing any act required hereunder by reason of strikes, lock-out, labor troubles, inability to procure materials, failure of power, restricting government laws and regulations, riots, insurrection, the act or failure to act or default of another party, war or other reason beyond its control, then performance of the act shall be excused for the period of the delay.  In that event, the period for performance of the act shall be extended for a period equivalent to the period of delay.

(e) All covenants, including appurtenances, conditions and obligations contained herein and implied by law are covenants running with the land and shall attach and bind and inure to the benefit of the LANDLORD and TENANT and their respective successors and assigns, heirs, legal representatives, except as otherwise provided herein.

(f) WAIVER OF SUBROGATION.   LANDLORD and TENANT and all parties claiming under them hereby mutually release and discharge each other from all claims and liabilities arising from and caused by any hazard covered by insurance on the demised premises or covered by insurance in connection with property on or activities conducted on the demised premises regardless of the cause of the damage or loss.

(g) This Lease is subject to TENANT obtaining financing satisfactory to TENANT, by October 1, 1991, for at least eighty percent (80%) of the value of the improvements and land for the demised premises.  In such event the TENANT is unable to obtain satisfactory financing, TENANT shall notify LANDLORD in writing and this Lease shall be cancelled and terminated.  LANDLORD may retain the seventy-third (73rd) month's rent paid upon the execution of this Lease.

(h) TENANT has no responsibility under this Lease for the payment of any brokerage commissions or finders' fees and LANDLORD hereby indemnifies TENANT against any and all claims made by real estate companies or brokers against TENANT in connection with the execution of this Lease.

(i) ESTOPPEL CERTIFICATES.   Either party shall, without charge, at any time and from time to time hereafter, within ten (10) days after one's written request of the other, certify by instrument duly executed and acknowledged to any mortgagee or purchaser or proposed mortgagee or proposed purchaser, or any other person, firm, or corporation specified in the request as to:

(i)  Whether this Lease has been supplemented or amended, and, if so, the substance and manner of the supplement or amendment; and

(ii)  Whether the Lease is in full force and effect and all rents have been paid when due or, if there are any arrearage, the amount of such arrearage.

(j) NO OTHER THEATERS.   In order to induce the TENANT to enter into this Ground Lease, while this Lease is in effect, neither LANDLORD nor its successors, assigns or General Partners (Jose L. Lindner and Richard A.  Mendenhall) shall use, suffer, permit or consent to the use or occupancy of (a) any part of the Shopping Center or adjacent Premises as a motion picture theater or similar theatrical or video program or presentation or (b) any other premises owned or controlled by LANDLORD or any of the above-mentioned parties within a radius of five (5) miles of the demised premises as a motion picture theater, theatrical or video program or presentation.  However, nothing contained

5/22/91
DICKNLSE.LSR

herein shall prohibit Jose L. Lindner or Richard A. Mendenhall from acquiring, or attempting to acquire, properties which have existing leases to motion picture theaters (such as another Shopping Center located within five (5) miles of the Forum Shopping Center). Notwithstanding any other provision of this Lease, TENANT shall have the absolute right to cancel and terminate this Lease, after payment of the 73rd month's rent, if any general or limited partner of Landlord directly or indirectly leases, sells or otherwise promotes a competing theater within the five (5) mile radius referred to above. This absolute right of cancellation shall expire only upon the commencement of the footings for TENANT's building construction.

(k) TENANT's original lease with LANDLORD, dated April 15, 1966, for the 12,755 square foot space presently occupied by TENANT, shall be terminated upon occupancy by TENANT of TENANT's new building to be constructed on the demised premises, or on December 31, 1992, whichever date is earlier. However, should TENANT be unable to occupy its new building before December 31, 1992, due to construction delays or other circumstances beyond TENANT's control, LANDLORD agrees to extend the termination date of said original lease until June 30, 1993, at terms to be negotiated by LANDLORD and TENANT on or before September 30, 1992.

## SECTION THIRTY TWO:  WAIVER

No waiver of any cause for termination, by acceptance of rent or otherwise, shall constitute a waiver of any past, present or future cause for termination. Any failure of LANDLORD to exercise any powers conferred by this lease, or to insist upon strict compliance by TENANT of its obligations under this lease, and no custom or practice which may become established which varies the term of this lease shall constitute a waiver of LANDLORD's right to enforce the terms of this lease as they are written. This lease may be modified only by written amendment thereto.

## SECTION THIRTY THREE:  GOVERNING LAW

The laws of Missouri shall govern this lease.

LANDLORD:

Forum Shopping Center

By: _____    5/20/91    3:30
                                 MO/DAY/YR    TIME

TENANT:

Dickinson, Inc.

By: _____    5/22/91    5:30
                                 MO/DAY/YR    TIME

Attested: _____  Exc v/Pres    5/22/91    5:35
                                      MO/DAY/YR    TIME

Page 10

# FIRST AMENDMENT TO LEASE

This Amendment is entered into this 21st day of January, 1999, by and between Forum Shopping Center, a Mo. Ltd. Partnership, hereinafter referred to as "LANDLORD"; Dickinson, Inc., a Missouri Corporation, hereinafter referred to as "DICKINSON"; and Goodrich Quality Theaters, Inc., a Michigan Corporation, hereinafter referred to as "GOODRICH".

WHEREAS, DICKINSON currently holds a Lease (LEASE) with LANDLORD, which said LEASE is dated May 22, 1991; and

WHEREAS, DICKINSON will assign its interest in the LEASE to GOODRICH, subject to amendment of the LEASE as set forth below;

NOW, THEREFORE, in consideration of the facts recited above and other good and valuable consideration, the parties agree as follows:

1. APPROVAL OF ASSIGNMENT:
   LANDLORD hereby approves the assignment of the LEASE from DICKINSON to GOODRICH. The assignment shall be effective as of January 21, 1999.

2. TENANT and TENANT's ADDRESS:
   SECTIONS ONE (c), ONE (d), ONE (e) and ONE (f) are amended as follows:

   c) Goodrich Quality Theaters, Inc.

   d) 4417 Broadmoor - Kentwood, MI 49512   *Grand Rapids*

   e) (616) 698.7730      FAX: (616) 698.7720

   f) *William T. M^c Mennie*

3. CURRENT MONTHLY RENT:
   The parties herein acknowledge that $3,245.00 is the current monthly rent payable to LANDLORD in accordance with SECTIONS THREE and FIVE of the Lease.

   LANDLORD, DICKINSON and GOODRICH acknowledge that DICKINSON's percentage rent obligation for 1998, in accordance with SECTION THREE of this Lease, is not yet fulfilled. Subsequent to the execution of this Amendment, DICKINSON shall provide LANDLORD a timely accounting and timely payment of such percentage rent, in accordance with the requirements of said SECTION THREE. LANDLORD, DICKINSON and GOODRICH agree that DICKINSON's failure to timely provide such accounting and pay such applicable percentage rent to LANDLORD shall constitute a default under this Lease.

R012199

4. <u>PARKING LOT LIGHTING</u>:
   SECTION NINE (b) is hereby amended to require TENANT to maintain all parking lot lighting controlled by TENANT lighted from the hours of dusk to dawn.

5. <u>COMMON AREA MAINTENANCE</u>:
   LANDLORD, DICKINSON, and GOODRICH also acknowledge the following items of deferred maintenance for the common areas surrounding the Premises:
   a) Maintenance and replacement of landscaping and landscaped islands.
   b) Parking lot repairs at the Southwest corner of the Theater parking lot area.
   c) Irrigation system repairs.
   d) Repairs to the sidewalks surrounding the theater, particularly along the West side of the Theater.
   e) Repairs to the storm sewer manhole located at the South-end of the theater parking lot.

   DICKINSON and GOODRICH agree to, on or before May 31, 1999, make the necessary repairs and improvements regarding the above-listed deferred maintenance items, with the exception of (e), the storm sewer manhole repair, which shall be made by DICKINSON and GOODRICH as soon as possible. DICKINSON and GOODRICH agree that the improvements to the PREMISES' landscaping shall be coordinated with the landscaping design used in the rest of the Forum Shopping Center.

   LANDLORD, DICKINSON, and GOODRICH acknowledge that the following paragraphs shall be added to the Lease as "<u>SECTION ELEVEN: PARKING LOT AND GROUNDS MAINTENANCE</u>", effective January 21, 1999:

   TENANT shall keep the parking lot and grounds of the Premises clean, in good condition, and in a manner consistent with the rest of the Forum Shopping Center. TENANT further agrees that TENANT's such cleaning responsibilities, regarding the pick-up of litter and debris caused by TENANT's customers, shall extend to parking lot and grounds areas surrounding TENANT's Premises.

   LANDLORD and TENANT recognize that TENANT's daily hours of operation commence later than the rest of the Forum Shopping Center. Therefore, TENANT agrees that the timing and level of TENANT's maintenance efforts to be performed by TENANT's employees or contractors shall be coordinated with LANDLORD, to minimize any negative impact on LANDLORD as a result of TENANT's separate maintenance functions. For example (but not limited to): (a) litter and debris caused by TENANT's customers each day, must be picked-up by TENANT on the following morning, at a time no later than the time when the remaining areas of the Forum Shopping Center are picked-up by the LANDLORD's employees or contractors, and (b) Removal of snow and ice from TENANT's parking lot areas must be performed at a time no later than the removal of snow and ice from the rest of the Forum Shopping Center's parking lot areas.

R012199

6. NO OTHER MODIFICATIONS:
   All other terms and conditions set forth in the LEASE shall remain the same.

This Amendment is executed as of the date first above written.

LANDLORD:   Forum Shopping Center

By: _____

Its: _____


DICKINSON:   Dickinson, Inc.

By: _____

Its: _____C E O_____


GOODRICH:   Goodrich Quality Theaters, Inc.

By: _____

Its: _____P___/_____

① Filed for record ___Jan. 29___ 19 _99_ at _2:53:18_ _P_ M In Boone Co. Mo
Document No. _45D4_ recorded in Book _1477_ Page _64_ Bettie Johnson, Recorder of Deeds

## ASSIGNMENT OF LEASE

64

DICKINSON THEATRES, INC., a Kansas corporation, of 5913 Woodson Road, Mission, Kansas 66202 ("Assignor"), sells, transfers and assigns to GOODRICH QUALITY THEATERS, INC., a Michigan corporation, of 4417 Broadmoor S.E., Kentwood, Michigan 49512 ("Assignee"), all of its right, title and interest as Lessee in and to the Lease Agreement described on the attached Exhibit A (the "Lease Agreement") pursuant to the terms and conditions of the Purchase Agreement between Assignor and Assignee dated December 16, 1998, the terms and conditions of which are incorporated by reference. The Lease Agreement pertains to the real property and the theatre located thereon (the "Theatre") described on attached Exhibit B.

1.    Assignor represents and warrants to Assignee that Assignor is the owner and holder of the interest of tenant under the Lease Agreement and has full right and authority to execute this Assignment, subject to the requirement of the Forum Shopping Center, a Missouri limited partnership (the "Landlord") to consent to this Assignment.

2.    Assignor represents, acknowledges and confirms to Assignee that:

(a)    The Lease Agreement is in full force and effect without default on the part of Assignor or, to the knowledge of Assignor, Landlord and neither Assignor nor, to the knowledge of Assignor, Landlord has knowledge of any events or circumstances which, with the passage of time, would constitute a default thereunder;

(b)    The current term of the Lease Agreement will expire on May 31, 2046 (the "Expiration Date"); and

(c)    All rents and charges have been paid to date.

(d)    The Lease Agreement, as referred to above with all amendments thereto, constitute the entire agreement between Landlord and Assignor with respect to the Theatre and there are no amendments, modifications or supplements, written or oral, to the Lease Agreement except as otherwise disclosed to Assignee. The Lease Agreement has not been previously assigned by Assignor nor has any portion of the Theatre been sublet.

(e)    No security deposit is held by Landlord.

(f)    There are no dispute or forbearance agreements in effect as to the Lease, except as otherwise disclosed to Assignee.

3.    This instrument may be executed in any number of counterpart copies, each of which counterpart copies shall be deemed an original for all purposes.

4.    Assignee agrees to assume and perform the Lessee's obligations under the Lease Agreement from and after this date and to indemnify Lessee against and hold it harmless from any liability that may accrue as a result of Assignee's failure to do so.

310025143JV-1

001497

65

5.    Assignor and Assignee each unconditionally, absolutely and irrevocably agree to indemnify and hold the other harmless of, from and against any and all costs, claims, obligations, damages, penalties, causes of action, losses, injuries, liabilities and expenses, including, without limitation, reasonable attorneys' fees, arising by reason of or in connection with their respective failure to perform the tenant's obligations under, or in any way related to, the Lease Agreement or with respect to the Theatre and the condition thereof, arising or accruing (a) on and after the date hereof as to the Assignee and (b) prior to the date hereof with respect to the Assignor.

IN WITNESS WHEREOF, the undersigned has executed this Assignment of Lease Agreement as of this January 22, 1999.

DICKINSON THEATRES, INC.,
a Kansas corporation

By _____
                    Glenn W. Dickinson, III

Its _____CEO_____

                                                    Assignor

GOODRICH QUALITY THEATERS, INC.,
a Michigan corporation

_____
                    Robert Emmett Goodrich

Its _____Pres/Sec_____

                                                    Assignee

-2-

001137

STATE OF MISSOURI )
) ss.                                                                          66
COUNTY OF *Jackson* )

The foregoing instrument was acknowledged before me this 26th day of *January* , 1999, by
*Glenn W. Dickinson III* of Dickinson Theatres, Inc., a Kansas corporation, and
acknowledged that the foregoing was executed as the free act and deed of said corporation, as Assignor.

(Notarial Seal)                                     *Diane L Schumacher*

Notary Public, *Clay* County, Missouri
My commission expires: _____

DIANE L. SCHUMACHER
Notary Public - Notary Seal
STATE OF MISSOURI - Clay County
My Commission Expires: Nov. 8, 2000

2100354 RV.1                                        -3-

001497

STATE OF ~~MICHIGAN~~ *Missouri*     )
                          ) ss.
COUNTY OF ~~KENT~~ *Jackson*     )

67

The foregoing instrument was acknowledged before me this 21st day of *January*, 1999, by *Robert Emmett Goodrich* of Goodrich Quality Theaters, Inc., a Michigan corporation, and acknowledged that the foregoing was executed as the free act and deed of said corporation, as Assignee.

*Diane L. Schumacher*

Notary Public, ~~Kent~~ *Clay* County, ~~Michigan~~ *Missouri*
My commission expires: _____

DIANE L. SCHUMACHER
Notary Public - Notary Seal
STATE OF MISSOURI - Clay County
My Commission Expires: Nov. 8, 2000

THIS INSTRUMENT PREPARED BY:

James P. Bir
Law, Weathers & Richardson, P.C.
Bridgewater Place
333 Bridge Street, N.W., Suite 800
Grand Rapids, Michigan 49504-5360
(616) 459-1171

Return to draftsman when recorded.

-4-

001497

## EXHIBIT A

### Description of Lease Agreement

A lease agreement originally executed between Forum Shopping Center, a Missouri limited partnership as landlord and Dickinson Theatres, Inc., a Kansas corporation as tenant dated May 22, 1991 concerning property known as Pad Site H, 1400 Forum Boulevard, Columbia, MO 65203 and consisting of approximately 180,000 square feet.

NOTICE OF WHICH IS GIVEN BY INSTRUMENT ENTITLED "MEMORANDUM OF LEASE" RECORDED SEPTEMBER 25, 1992, IN BOOK 927, PAGE 999, RECORDS OF BOONE COUNTY, MISSOURI.

68

EXHIBIT B                                   69

Legal Description of Property

A tract of land in the northwest quarter of Section 23, Township 48 North, Range 13 West, in
the city of Columbia, Boone County, Missouri, further described as being part of Lot 1 Forum
subdivision recorded in Plat Book 25, Page 35, and part of Lot 1 University Heights recorded
in Plat Book 7, Page 64, and also being part of the survey recorded in Book 1102, Page 477,
which is corrected by survey recorded in Book 1366, Page 636, all in the records of Boone
County, Missouri, said tract of land being more particularly described as follows:

Beginning at the southeast corner of Lot 1 Forum subdivision recorded in Plat Book 25, Page
35, thence, along the south line of said lot, south 83 degrees 03' west 250.00 feet, thence north
79 degrees 36' west 101.55 feet, thence along a curve to the left having a radius of 255.0 feet,
118.65 feet to the southwest corner of Lot 1 Forum subdivision, also being on the east line of
Lot 1 Heights recorded in Plat Book 7, Page 64, and on the northerly right-of-way of Forum-
Katy Parkway; thence north 83 degrees 14' 30" west, along said right-of-way, 35.96 feet;
thence leaving said right-of-way, north 1 degree 41' 10" east 250.0 feet; thence north 88
degrees 16' 40" west 134.0 feet; thence north 1 degree 41' 10" east 121.0 feet; thence south
88 degrees 16' 40" east 66.2 feet; thence north 1 degree 41' 10" east 181.0 feet; thence south
88 degrees 18' 50" east 66.0 feet; thence south 1 degree 41' 10" west 110.44 feet; thence
south 88 degrees 18' 50" east 256.54 feet to the easterly line of Lot 1 Forum subdivision;
thence south 25 degrees 54' east, along said line, 518.67 feet to the beginning, and containing
207,509 square feet or 4.76 acres, more or less.

University

210035431V-2                              6

001497

70

CHICAGO TITLE INSURANCE COMPANY
ATTN: DEAN A. HUTCHESON
P.O. BOX 26370
KANSAS CITY, MISSOURI 64196

STATE OF MISSOURI)
COUNTY OF BOONE ) SS.                                    Document No.   2504

    I, the undersigned Recorder of Deeds for said county and state do
hereby certify that the foregoing instrument of writing was filed for record
in my office on the 29th day of January    1999 at  2 o'clock and 55:18
minutes PM and is truly recorded in Book  1497 Page   64.

Witness my hand and official seal on the day and year aforesaid.

BETTIE JOHNSON, RECORDER OF DEEDS

by _____ deputy
    Vicki Gilpin

001497